## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| COLONY HILLS CAPITAL, LLC; TPI COMMUNITIES I, LLC; DAVID KAUFMAN; and GLENN HANSON, | |
| Plaintiffs, | Case No. 1:17-cv-04993 |
| v. | **FIRST AMENDED COMPLAINT** |
| PF HOLDINGS LLC; JPC CHARITIES; PF HOLDINGS MANAGEMENT LLC; LEIB PURETZ; ARON PURETZ; CHAIKEL PURETZ; PURE CHARITY FUND; and JOHN DOES 1-10, | **[DEMAND FOR JURY TRIAL]** |
| Defendants. | |

Plaintiffs Colony Hills Capital, LLC, TPI Communities I, LLC, David Kaufman, and Glenn Hanson (collectively, "Colony Hills"), as and for their First Amended Complaint against defendants PF Holdings LLC, JPC Charities, PF Holdings Management LLC, Leib Puretz, Aron Puretz, Chaikel Puretz, Pure Charity Fund, and John Does 1-10 (collectively, "Defendants"), allege as follows:

### INTRODUCTION

1.      For more than two years, Colony Hills devoted a substantial amount of time and resources, including several millions of dollars, and focused almost exclusively on negotiating and structuring a complex real estate transaction involving the acquisition of numerous residential rental properties in Indianapolis, Indiana (the "Transaction," which is further defined below).

2.      After devoting substantial resources and two years of effort, Colony Hills entered into a purchase agreement with the sellers of the rental properties, which provided Colony Hills with the exclusive right to acquire the rental properties and enter into the Transaction.

3.      Then, when Colony Hills was about six months from closing and acquiring the rental properties, Defendants expressed an interest in providing financing to Colony Hills for the Transaction.

4.      Soon after their initial discussions, however, Defendants proposed a dramatically different idea by asking to acquire from Colony Hills the right and opportunity to engage in the Transaction, including Colony Hills' rights under its purchase contract with the sellers.

5.      In exchange, Defendants, despite never intending to follow through, repeatedly promised and agreed to provide substantial compensation to Colony Hills, including approximately $5 million in cash payments upon Defendants' closing on the Transaction, plus, *inter alia*, a share of future profits.

6.      In reliance on Defendants' deceptive representations, promises, and agreements, Colony Hills fully performed by, *inter alia*, forgoing its right to close on the Transaction, assisting with and facilitating the transition of the Transaction to Defendants, and allowing Defendants to close on the Transaction and acquire the properties.

7.      Unfortunately, from the outset, Defendants had been acting in bad faith and outright lying to Colony Hills about their intentions because, in truth, Defendants' plan and intentions included (i) inducing Colony Hills to perform (including as stated in the preceding paragraph) so that (ii) Defendants could acquire the properties through the Transaction and (iii) then, after the closing, providing Colony Hills with a small portion of the payments and consideration owed to Colony Hills.

2

8.     Through this First Amended Complaint, which asserts breach of contract, promissory estoppel, fraudulent inducement, and other causes of action (including some causes of action in the alternative) Colony Hills seeks to recover monetary damages caused by Defendants' misconduct, including but not limited to: (a) the more than $3.2 million that Defendants failed to provide to Colony Hills when Defendants closed on the Transaction and purchased the properties; (b) monthly and profit-sharing payments that Defendants have unlawfully withheld since Defendants' closing; (c) Colony Hills' expenses (including substantial out-of-pocket costs paid to third-parties) and internal costs from the Transaction; (d) the value of all lost profits and opportunities caused by Defendants' misconduct, which fraudulently induced Colony Hills to devote substantial amounts of its resources, personnel's time and energy, and funds to the Transaction for Defendants' benefit, rather than to Colony Hills' other opportunities and projects; and (e) other compensatory, actual, consequential, and special damages.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, as the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

10.    Venue in this judicial district is proper under 28 U.S.C. § 1391(b)(1) and (2) because certain defendants reside or have a principal place of business in the State of New York and a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## PARTIES

### A.  Plaintiffs

11.     Plaintiff Colony Hills Capital, LLC ("Colony Hills Capital"), is a Massachusetts limited liability company with its principal place of business at 2040 Boston Road, Wilbraham, Massachusetts.

12.     Plaintiff TPI Communities I, LLC ("TPI"), is a Florida limited liability company with its principal place of business at 2001 W. Blue Heron Blvd., Riviera Beach, Florida.

13.     Plaintiff David Kaufman ("Kaufman") is an individual who resides in Massachusetts.  Kaufman is the President and a member of Colony Hills Capital.  Further, Kaufman is a "payee" under one of the agreements that is the subject matter of this case.

14.     Plaintiff Glenn Hanson ("Hanson") is an individual who resides in Massachusetts. Hanson is the Chief Executive Officer and a member of Colony Hills Capital.  Further, Hanson is a "payee" under one of the agreements that is the subject matter of this case.

### B.  Entity Defendants

15.     Defendant PF Holdings LLC ("PF Holdings") is a New York limited liability company with an address at 1223 East 13th Street, Brooklyn, New York.

16.     Defendant JPC Charities is an Ohio not-for-profit corporation with an address at 1223 East 13th Street, Brooklyn, New York.

17.     Defendant PF Holdings Management LLC ("PF Holding Management") is a New York limited liability company with an address at 1223 East 13th Street, Brooklyn, New York.

18.     Defendant Pure Charity Fund (together with PF Holdings, JPC Charities, and PF Holdings Management, the "JPC" or the "Entity Defendants") is a Georgia non-for-profit corporation with an address at 428 Clifton Avenue #44, Lakewood, New Jersey.   Upon

4

information and belief, Pure Charity Fund is controlled by Chaikel Puretz.

**C.   Individual Defendants**

19.     Defendant Leib Puretz ("L-Puretz") is an individual with an address at 1223 East 13th Street, Brooklyn, New York.  During the period relevant to this Complaint, defendant L-Puretz was an officer and owner of PF Holdings and other Entity Defendants, and also was signatory, payor, and obligor with respect to the agreements that serve as the bases for Plaintiff's Complaint.

20.     Defendant Aron Puretz ("A-Puretz") is an individual who resides in Lakewood, New Jersey. During the period relevant to this Complaint, defendant A-Puretz was an officer and owner of PF Holdings and other Entity Defendants, and also was signatory, payor, and obligor with respect to the agreements that serve as the bases for Plaintiff's Complaint.

21.     Defendant Chaikel Puretz ("C-Puretz," together with L-Puretz and A-Puretz, the "Individual Defendants") resides in Lakewood, New Jersey.  During the period relevant to this Complaint, defendant C-Puretz was an officer and owner of PF Holdings and other Entity Defendants, including Pure Charity Fund, and also was signatory, payor, and obligor with respect to the agreements that serve as the bases for Plaintiff's Complaint.

22.     Defendants John Does 1-10 are individuals or entities whose names and addresses are unknown.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

23.     Between about 2012 and 2014, Colony Hills negotiated and secured the right and opportunity (the "Purchase Rights") to engage in a transaction with the Foundation for Affordable Housing and its affiliated entities (collectively, "FARH") under which FARH would sell, convey, transfer, and assign certain rental properties located in Indianapolis, Indiana, (the

"Transaction") to Colony Hills.  The properties that were part of the Transaction included the rental properties known as Capital Place, Covington Square, Estates at Crystal Bay, Fox Club, Lakeside Pointe, Woodhaven Park, and Woods at Oak Crossing (the "Properties").

24.     During the span of more than two years, Colony Hills spent hundreds of thousands of dollars on, among other things, inspections and on-site reviews, due diligence, property appraisals, surveys, financial analyses, environmental inspections and review, air testing, legal review of zoning regulations, and professionals' fees (the "Transactional Expenses").

25.     Additionally, Colony Hills devoted a substantial amount of its own resources (the "Internal Costs") in connection with the Transaction.

26.     Taken together, Colony Hills' Transactional Expenses and Internal Costs amounted to at least $2.6 million.

27.     The terms of the Transaction were memorialized in the Purchase and Sale Agreement between Colony Hills and FARH, dated April 14, 2014 (the "CHC-FARH Purchase Agreement").  (*See* Exhibit A).

28.     Under the terms of the CHC-FARH Purchase Agreement, FARH agreed to sell and convey the Properties in exchange for approximately $87,500,000.00, which was comprised of a cash payment of $10,500,000.00 and loan assumption of approximately $77,000,000.00 (*See Id.*, ¶¶ 2.1, 3.1, 3.2).

29.     The CHC-FARH Purchase Agreement, among other things, also required Colony Hills to place funds into an escrow account as an earnest money deposit, which Colony Hills would forfeit to FARH if it failed to consummate the Transaction by the agreed upon closing date.  (*Id.,* ¶¶ 3.4, 10.2).

30.     Pursuant to the Earnest Money Escrow Agreement between Colony Hills, FARH

and First American Title Insurance Company ("Escrow Agent"), dated April 28, 2014, CHC deposited approximately $140,000. (*See* Exhibit B, ¶ B).

31.     Under the CHC-FARH Purchase Agreement and various amendments, October 31, 2014, was established as the date (the "Closing/Expiration Date") for either the closing on the Transaction or, if the closing did not occur, the expiration of the CHC-FARH Purchase Agreement. (*Id.*, ¶ 1).

32.     Through amendments to the CHC-FARH Purchase Agreement, Colony Hills and FARH ultimately agreed to extend the Closing/Expiration Date to March 11, 2015. (*Id.*, ¶ 1.) Thus, if Colony Hills did not close on the Transaction on or before March 11, 2015, then Colony Hills' rights under the CHC-FARH Purchase Agreement would automatically expire and Colony Hills would forfeit its substantial deposit to FARH. (*Id.*)

33.     As alleged below, based on agreements among Colony Hills and Defendants and Defendants' repeated – and intentionally false – promises and representations, Colony Hills did not exercise its Purchase Rights so that Defendants could close on the Transaction and acquire the properties.

34.     Defendants, which now dispute the existence and enforceability of the agreements alleged in this Complaint, closed on the purchase of the Properties, but then failed to compensate or pay Colony Hills in the manner promised and as agreed by the parties. As a result, Colony Hills have suffered substantial harm, while Defendants have been unjustly enriched.

## FIRST COUNT
### (Breach of Contract as to the CHC-JPC Oral Agreement)

35.     Colony Hills repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

36.     In or around summer 2014, Hanson and Kaufman — Colony Hills Capital's CEO

and President, respectively — met with A-Puretz and L-Puretz in New York City to discuss the Transaction.  At that time, A-Puretz and L-Puretz, on behalf of JPC, offered to provide financing to or partner with Colony Hills in connection with the Transaction.

37.     Following that initial meeting, however, Defendants — particularly, L-Puretz — expressed a strong interest in acquiring from Colony Hills the right and opportunity to engage in the Transaction, and purchase the Properties for themselves.

38.     In or around August or September 2014, Hanson and Kaufman met (the "2014 Meeting") with the Individual Defendants, and other non-party brokers, at a restaurant in New York City to discuss Defendants' request to acquire from Colony Hills the right and opportunity to engage in the Transaction and Colony Hills' Purchase Rights.

39.     At the 2014 Meeting, each of the Individual Defendants assured Colony Hills that JPC was capable, financially and otherwise, of stepping into Colony Hills' shoes, and engaging in the Transaction, purchasing the Properties, and then managing the Properties after the closing.

40.     At the 2014 Meeting, each of the Individual Defendants represented to Colony Hills that they would provide substantial compensation and consideration to Colony Hills.

41.     After extensive discussions, at the 2014 Meeting, Colony Hills (through Hanson and Kaufman) and JPC (through the Individual Defendants) accepted and agreed to the following terms (the "CHC-JPC Oral Agreement"):

    a.  Colony Hills agreed to forego its rights to the Transaction so Defendants could acquire those rights, including the Purchase Rights, and close on the Transaction and purchase of the Properties; and

    b.  in exchange, Defendants agreed to pay Colony Hills the following:

        i.  $5,000,000.00 at the closing;

8

ii.   $5,000 monthly during the "hold period"; and

iii.  twenty percent (20%) of the gross gain in fair market value over the

$85,138,837 purchase price of the Properties.

42.    While the CHC-JPC Oral Agreement constituted a valid and enforceable

agreement, soon after the 2014 Meeting, Kaufman discussed with L-Puretz Colony Hills' desire

to memorialize the CHC-JPC Oral Agreement's terms in a document signed by the parties.

43.    L-Puretz told Kaufman that Defendants would send Colony Hills the term sheet

within a week.

44.    A few weeks later, on or about September 22, 2014, having not received the

promised term sheet memorializing the CHC-JPC Oral Agreement, Kaufman sent Defendants an

email expressing Colony Hills' concern about Defendants' lack of progress, and highlighted

Colony Hills' significant expenses to date and risk of default on the Transaction.

45.    Specifically, Kaufman's email noted:

> As you can imagine, Colony [Hills] has spent a huge amount of
> time and a significant sum of money taking this deal from concept,
> into contract, through Due Diligence, and into a position to close
> by year end.  At this point, Colony [Hills] and only Colony [Hills]
> is at risk relative to a buyer default, which includes a current
> deposit, as well as the large amount of time and significant
> working capital we have invested in this deal to date

46.    Given Colony Hills' significant exposure if the Transaction was not completed by

the approaching Closing/Expiration Date — of which Defendants were keenly aware and used to

their advantage — Kaufman expressed a desire to "continue working with [Defendants] on this

deal" and requested Defendants' reassurance on moving forward on the terms discussed at the

2014 Meeting, which Defendants provided.

47.    Indeed, between September and October 2014, the parties executed a

9

Memorandum of Understanding outlining the "agreed on and binding" terms from the CHC-JPC Oral Agreement (the, "2014 MOU").  (*See* Exhibit C).

48.    The 2014 MOU was executed by Kaufman, on behalf of Colony Hills Capital, and A-Puretz, on behalf of PF Holdings and its affiliates.[1]  (*Id.*)

49.    Colony Hills performed its obligations under the CHC-JPC Oral Agreement by, *inter alia*, forgoing its right to close on the Transaction, assisting with and facilitating the transition of the Transaction to Defendants, allowing Colony Hills' Purchase Rights to expire in March 2015, and allowing Defendants to close on the Transaction and acquire the Properties.

50.    While Colony Hills, as alleged herein, materially and fully performed its obligations under the CHC-JPC Oral Agreement, to the extent that Defendants contend otherwise, any such non-performance resulted solely from Defendants' fraudulent and wrongful conduct.

51.    On or about July 31, 2015, JPC and FARH entered into a Membership Sale and Acquisition Agreement (the "Sale Agreement") through which JPC would now acquire the Properties by purchasing FARH's membership interests in the Properties.  (*See* Exhibit D).

52.    JPC received substantial consideration from Colony Hills, including but not limited to (1) the Purchase Rights, which included the opportunity to engage in the Transaction, buy the Properties, and enjoy the gains derived from that purchase — an opportunity which Defendants ultimately took advantage of, and (2) the benefits of Colony Hills' efforts to create the Transaction, which required Colony Hills to incur the Transactional Expenses and Internal Costs.

53.    Under the CHC-JPC Oral Agreement, Defendants agreed to pay Colony Hills $5,000,000 at closing, among other compensation stated above.

---

[1] Although the name on the signature line notes "Leib Puretz, on behalf of, PF Holdings, et al.," the 2014 MOU appears to be signed by A-Puretz.

54.     To date, Defendants have paid Colony Hills only $1,800,000.

55.     Defendants have breached the CHC-JPC Oral Agreement by, among other things, failing to pay an additional $3.2 million to Colony Hills, make monthly payments of $5,000 during the "hold period," and pay twenty percent of the gross gain in the fair market value of the Properties based on an agreed upon formula.

56.     As a result of Defendants' breach of the CHC-JPC Oral Agreement, Colony Hills has suffered damages, including but not limited to, the value of the payments listed above, as well as the Transactional Expenses and Internal Costs.

## SECOND COUNT
### (Promissory Estoppel)

57.     Colony Hills repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

58.     Colony Hills asserts this Promissory Estoppel cause of action in the alternative to the First Count.

59.     As alleged herein, Defendants made repeated clear and unambiguous promises — verbally and in writing — that it would compensate Colony Hills several million dollars in exchange for Colony Hills forgoing its right to close on the Transaction, allow Colony Hills' Purchase Rights to expire, assisting with and facilitating the transition of the Transaction to Defendants, and allowing Defendants to close on the Transaction and acquire the properties.

60.     Colony Hills reasonably, foreseeably, and detrimentally relied on Defendants' promises.

61.     Indeed, on several occasions, Defendants promised to compensate Colony Hills between $4,575,000 and $5,000,000 for foregoing its Purchase Rights to the Properties.

62.     The Individual Defendants, on behalf of JPC, first promised to compensate

Colony Hills $5,000,000 for Colony Hills' exclusive rights to its Purchase Rights at the 2014 Meeting and under the CHC-JPC Oral Agreement.

63.     A-Puretz, on behalf of PF Holdings and its affiliates, again, promised to compensate Colony Hills $5,000,000, among other fees, for the exclusive rights to Colony Hills' Purchase Rights through the 2014 MOU.

64.     Then, as the Closing/Expiration Date approached, Defendants continued to promise Colony Hills substantial compensation to let its rights expire, and allow Defendants to enter into the Transaction and purchase the Properties.

65.     In mid-December 2014, as a symbol of Defendants' commitment, A-Puretz sent Colony Hills a financing term sheet assuring Colony Hills that JPC had the financing to step into Colony Hills' place consummate the Transaction.

66.     In late December 2014, representatives of JPC assured Colony Hills that JPC was "still at the table discussing how to finalize and proceed . . . . As a show of good faith [JPC] will send a deposit a deposit of $500,000 by Friday [January 2, 2015]."

67.     JPC did not send Colony Hills the $500,000 deposit by the deadline.

68.     In early January 2015, representatives of JPC thanked Colony Hills for its patience and, again, assured Colony Hills that an agreement had been reached and a wire transfer was forthcoming.

69.     Yet, again, Defendants did not follow through with the wire transfer.

70.     In or around January 2015, Hanson and Kaufman traveled to New York City to meet with L-Puretz.  At the meeting, L-Puretz assured Hanson and Kaufman that Defendants were committed to (a) compensating Colony Hills for the opportunity to enter into the Transaction, and (b) executing a final written agreement with Colony Hills before the

Closing/Expiration Date of March 11, 2015.

71.     In late January 2015, A-Puretz, on behalf of PF Holdings, provided Colony Hills with a letter of intent that included PF Holdings making a $5,000,000 payment to Colony Hills.

72.     As discussions continued into February 2015, the parties agreed to lower JPC's payment to Colony Hills to $4,575,000.

73.     Indeed, on February 8, 2015, JPC's attorney sent Colony Hills an email, which included A-Puretz, noting that the parties agreed on the material terms and reiterated to Colony Hills that "[i]t is my understanding that $4,575,000 amount is acceptable to you."

74.     Echoing its prior unequivocal promises to substantially compensate Colony Hills, A-Puretz, on behalf of PF Holdings, executed a letter agreement with Kaufman, on behalf of TPI, dated February 11, 2015 ("February Letter"), further confirming Defendants' acquisition of Colony Hill's Purchase Rights to the Properties in exchange for a multi-million-dollar payment. (*See* Exhibit E).

75.     The February Letter provided that, in exchange for the right and opportunity to engage in the Transaction and to purchase the Properties, Defendants would pay to Colony Hills, *inter alia*, $4,575,000.00. (*Id.*, ¶ 1).

76.     In the 2015 Letter, Defendants also promised not to circumvent Colony Hills. Specifically, Defendants:

> [A]gree[d] not to participate, directly or indirectly, in any transaction relating to any of the seven properties identified in the [CHC-FARH Purchase Agreement], whether as purchaser, lender, consultant, affiliate, co-venturer, partner or in any other capacity, for a period of two (2) years from the date of execution of this Letter of Intent

> (*Id.*, ¶ 5(b)).

77.     In recognition of Defendants' promises in the February Letter, Colony Hills

agreed to, "not list or market the Properties for sale, nor entertain or solicit any letters of intent, offers, or other similar documentation regarding the sale of the Properties to any third parties." (*Id.*, ¶ 5(a)).

78.     Just prior to the Closing/Expiration Date, A-Puretz continued to provide Colony Hills with assurances.

79.     In March 2015, A-Purtez sent Hanson and Kaufman an email assuring Colony Hills that "I am trying to makes this deal work . . . . At the end of the day, we are working as partners to get the deal closed."

80.     On March 11, 2015, in a series of emails with Hanson and Kaufman, A-Puretz wrote that to "build [Colony Hills'] trust, JPC would put $500,000 in an escrow account "earmarked as a deposit" for Colony Hills, and also noted that "I hope that you will consider my gesture and we will be able to finalize."

81.     Ultimately, in March 2015, Colony Hills' reasonably and foreseeably relied on Defendants' — particularly A-Puretz's and L-Puretz's — repeated, clear, and unambiguous promises that it would be compensated between $5,000,000 and $4,575,000 for transferring the Purchase Rights to Defendants and foregoing the opportunity to purchase and reap the benefits of the Transaction and Properties for itself.

82.     Moreover, Colony Hills' reasonably and foreseeably relied on Defendants' clear and unambiguous promises of substantial compensation by not entertaining or soliciting any offers regarding the sale of the properties or its Purchase Rights to anyone besides Defendants.

83.     Relying on Defendants' aforementioned promises of compensation and noncircumvention, Colony Hills allowed the CHC-TPI Purchase Agreement to expire and Defendants to enter into the Transaction and close on the purchase of the Properties.

84.     In fact, the termination of the CHC-FARH Purchase Agreement was expressly acknowledged in a Letter of Intent executed by A-Puretz on behalf of Defendants (the "JPC LOI").  (*See* Exhibit F ¶ 15).

85.     The JPC LOI stated that "[FARH] and [Defendants] acknowledge the existence of the [CHC-FARH Purchase Agreement] between [FARH] and TPI covering the sale of the Properties which prior contract . . . has terminated."  (*Id.*).

86.     The JPC LOI also acknowledged Defendants' promise to compensate Colony Hills in that "neither [FARH nor Defendants] desires to enter into a transaction which excludes TPI from payment of compensation in an amount and manner that is satisfactory to TPI."  (*Id.*, ¶ 14).

87.     Consequently, and recognizing the value of Colony Hills' contributions and services in connection with the Properties, the JPC LOI set forth the following:

> (a) a condition of [FARH] and [Defendants] entering into the Contract of Sale is a compensation agreement by and between [Defendants] and TPI . . . which provides for payment to TPI at Closing (the "TPI Compensation"); and (b) a condition of Closing shall be simultaneous payment to TPI of the TPI Compensation.

88.     Again, JPC and FARH entered into the Sale Agreement whereby JPC acquired the Properties from FARH.  (*See* Ex. D).

89.     The Sale Agreement also explicitly recognized Defendants' promise to compensate Colony Hills, stating that "JPC shall pay any amounts owing to TPI relating to the transactions contemplated by this Agreement."  (*Id.*, ¶ 4.7).

90.     In sum, Colony Hills reasonably relied upon Defendants' repeated and unambiguous promises to compensate Colony Hills between $5,000,000 and $4,575,000, as well as Defendants' promise not to enter into a transaction with any third-parties concerning the Properties.

91.     To date, Defendants have paid Colony Hills only $1.8 million.

92.     As a result of such reliance, Colony Hills has suffered damages, including but not limited to the full value of the payment between $5,000,000 and $4,575,000, as well as the Transactional Expenses and Internal Costs.

<u>**THIRD COUNT**</u>
**(Breach of Contract as to the February Letter)**

93.     Colony Hills repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

94.     Colony Hills asserts this Breach of Contract cause of action, which is based on the February Letter, in the alternative to the First Count.

95.     Without waiving any claim as to the validity of the CHC-JPC Oral Agreement, key terms of which are outlined in the 2014 MOU, and any claims arising thereunder, Colony Hills alternatively alleges that certain provisions of the February Letter constitute a valid and enforceable contract.

96.     Under the February Letter, A-Puretz, on behalf of PF Holdings, and Kaufman, on behalf of TPI, mutually agreed to the following solicitation and no circumvention provision:

> (a) From the date of this LOI, [TPI] shall not list or market the Properties for sale, nor entertain or solicit any letters of intent, offers, or other similar documentation regarding the sale of the Properties to any third parties.
>
> (b) In consideration of [TPI] bringing this opportunity to [PF Holdings], [PF Holdings] agrees not to participate, directly or indirectly, in any transaction relating to any of the seven properties identified in the [CHC-FARH Purchase Agreement], whether as purchaser, lender, consultant, affiliate, co-venturer, partner or in any other capacity, for a period of two (2) years from the date of execution of this Letter of Intent.
>
> (Ex. E, ¶ 5) (the "Solicitation and Noncircumvention Provision").

16

97.     The Solicitation and Noncircumvention Provision was immediately enforceable against the parties.

98.     Colony Hills performed its obligations under the Solicitation and Noncircumvention Provision, by not soliciting any third-party offers regarding the sale of Colony Hill's Purchase Rights or the Properties, in general.

99.     Defendants breached the Solicitation and Noncircumvention Provision by, among other things, entering into the Sale Agreement within two years of the February Letter without compensating Colony Hills as outlined in the February Letter and as promised.

100.    As a result of Defendants' breach of the Solicitation and Noncircumvention Provision in the 2015 Letter, Colony Hills has suffered damages, including but not limited to forgoing it Purchase Rights, the full $4,575,000 payment, and the Transactional Expenses and Internal Costs.

## FOURTH COUNT
### (Fraudulent Inducement)

101.    Colony Hills repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

102.    Colony Hills asserts this Fraudulent Inducement cause of action in the alternative to the First and Third Counts.

103.    Colony Hills alleges that Defendants made misrepresentations of material facts and omitted material information in order to deceive and induce Colony Hills to forgo its Purchase Rights and let the CHC-FARH Purchase Agreement terminate.

104.    The Individual Defendants, on behalf of the Entity Defendants, repeatedly made material misrepresentations and omissions to Colony Hills concerning Defendants' intention to pay to Colony Hills for the Purchase Rights and opportunity to engage in the Transaction, and

finalize a written agreement with Colony Hills.

105.    Rather, the Individual Defendants never intended to follow through as promised and deceptively dangled the opportunity of multi-million-dollar compensation to induce Colony Hills to allow its Purchase Rights to expire.

106.    First, at the 2014 Meeting, the Individual Defendants, on behalf of JPC, each represented to Colony Hills that JPC would pay Colony Hills, among other compensation, $5,000,000 at closing.   After that meeting, Defendants assured Colony Hills that a written agreement would be finalized before the Closing/Expiration Date.

107.    Second, in December 2014 and January 2015, JPC's representatives stated that a written agreement with Colony Hills would be finalized and funds would be transferred to Colony Hills.

108.    Third, at a meeting in New York City in January 2015, L-Puretz assured Colony Hills that Defendants remained committed to acquiring Colony Hills' Purchase Rights and reaching a final written agreement.

109.    Fourth, A-Puretz, on behalf of JPC, sent Colony Hills a signed letter of intent in January 2015 that included a $5,000,000 payment to Colony Hills for the Purchase Rights.

110.    Fifth, A-Puretz, on behalf of JPC, through email correspondence, continued to represent Defendants' commitment to Colony Hills in January, February, and March 2015 by stating:

      i.   "I am trying to makes this deal work . . . . At the end of the day, we are working as partners to get the deal closed."

     ii.   That JPC would put $500,000 in an escrow account "earmarked as a deposit" for Colony Hills with the "hope that [Colony Hills] will consider

my gesture and we will be able to finalize."

111.    Sixth, on February 8, 2015, JPC's attorney told Colony Hills "[i]t is my understanding that $4,575,000 amount is acceptable to you."

112.    Seventh, the day before the parties executed the February Letter, C-Puretz emailed Colony Hills requesting its due diligence on the Properties, which provided Colony Hills with false comfort that Defendants intended to finalize a written agreement concerning the compensation Defendants would pay Colony Hills.

113.    These promises and representations were false at the time they were made as Defendants never intended to finalize the transaction with Colony Hills or fully compensate it.

114.    Defendants knew that the statements were false at the time they were made.

115.    During the ongoing discussions and emails with Colony Hills, the Individual Defendants also omitted material facts from Colony Hills when promising compensation between $4,575,000 and $5,000,000 and executing the 2014 MOU and February Letter, as well as the Individual Defendants' repeated verbal and written assurances on completing the transaction, including that Defendants would not fully compensate Colony Hills and that it would reduce the compensation if certain circumstances after Colony Hills' rights expired changed.

116.    Specifically, Defendants, failed disclose to Colony Hills that Defendants would unilaterally reduce the compensation owed to Colony Hills if Defendants had to pay unexpected out-of-pocket funds to FARH to close on the Properties.

117.    The purpose of Defendants' misrepresentations and omissions was to deceive and induce Colony Hills' reliance.

118.    Indeed, in allowing the CHC-TPI Purchase Agreement to expire and Defendants to engage in the Transaction and close in the Properties, Colony Hills relied upon Defendants'

misrepresentations and omissions, including those concerning Defendants' intentions to compensate Colony Hills and finalize a written agreement.

119.    To its detriment, Colony Hills justifiably relied on Defendants' misrepresentations and omissions.  Colony Hills' justifiable reliance on Defendants' misrepresentations resulted in a detriment to Colony Hills, including but not limited to, foregoing the right to purchase the Properties themselves, foregoing the gains that would be realized from ownership of the Properties, and incurring the Transactional Expenses and Internal Costs without any corresponding benefit.

120.    Colony Hills would not have agreed to forgo its Purchase Rights but for their fraudulent inducement.

**FIFTH COUNT**
**(Unjust Enrichment)**

121.    Colony Hills repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

122.    Colony Hills asserts this Unjust Enrichment cause of action in the alternative to the First, Second, and Third Counts.

123.    The relationship between Colony Hills and Defendants was sufficiently close that it could have caused, and in fact did cause, reliance or inducement.

124.    Defendants were enriched, receiving benefits in the form of the Purchase Rights —which Defendants used to acquire the Properties — and the results of Colony Hills' expenditure of time, labor, money, and other resources in incurring the Transactional Expenses and Internal Costs.

125.    Defendants also were enriched by the absence of any broker's fees or commissions that they had to pay.

126.    Defendants were enriched at Colony Hills' expense.

127.    Among other things, Defendants failed to fully compensate Colony Hills for the Purchase Rights.

128.    Colony Hills also expended millions of dollars through the Transactional Expenses and Internal Costs, which were incurred in anticipation of the sale of the Properties.

129.    It is against equity and good conscience to permit Defendants to retain their benefits without compensating Colony Hills.

### SIXTH COUNT
### (Quantum Meruit)

130.    Colony Hills repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

131.    Colony Hills asserts this Quantum Meruit cause of action in the alternative to the First, Second, and Third Counts.

132.    Colony Hills performed services in good faith, including but not limited to the giving of the Purchase Rights to Defendants and the services performed in incurring the Transactional Expenses and Internal Costs.

133.    Defendants accepted the services performed by Colony Hills.  Indeed, they exercised the Purchase Rights to acquire the Properties and obtain the gains deriving from such ownership.

134.    Colony Hills had an expectation of compensation, as evidenced by the 2014 MOU, the February Letter, the JPC LOI, the Sale Agreement, the TPI Compensation Agreement, and the Promissory Notes, among other things.

135.    The reasonable value of the services performed by Colony Hills, and for which Defendants have not compensated Colony Hills, is at least $2.6 million.

## SEVENTH COUNT

**(Breach of Contract as to the TPI Compensation Agreement and Promissory Notes)**

136.    Colony Hills repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

137.    Colony Hills asserts this Breach of Contract cause of action, which is based on the TPI Compensation Agreement (as defined below), in the alternative to the other Counts in this Complaint.

138.    Without waiving any claim as to the validity of the CHC-JPC Oral Agreement, key terms of which are outlined in the 2014 MOU, or 2015 Letter, and any claims arising thereunder, Colony Hills alternatively alleges that in or around late October 2015, JPC and Colony Hills reached a new agreement concerning compensation to be paid to TPI in connection with the Sale Agreement (the "TPI Compensation Agreement"), which constitutes a valid and enforceable contract.  (*See* Exhibit G).

139.    Under the TPI Compensation Agreement, the "Payor" was deemed to include JPC Charities, A-Puretz, C-Puretz, L-Puretz, PF Holdings, and any other entity owned or controlled wholly or in part by A-Puretz, C-Puretz, L-Puretz, or PF Holdings.  (*Id.* at p. 1).

140.    Under the TPI Compensation Agreement, the "Payee" was deemed to include TPI, Colony Hills Capital, Kaufman, Hanson, and any other entity owned or controlled wholly or in part by Kaufman, Hanson, TPI, or Colony Hills Capital.  (*Id.*).

141.    On the condition that the Payor succeeded to the ownership of the membership interests of FARH in the Properties, the TPI Compensation Agreement called for Payor to pay Payee $2,100,000, or a pro rata share of that amount if Payor succeeded to less than all of the membership interests.  (*Id.*).

142.    The TPI Compensation Agreement was executed by JPC Charities, PF Holdings,

A-Puretz, L-Puretz, TPI, Colony Hills Capital, and David Kaufman.  (*Id.* at pp. 4-6).

143.    At or about the same time as the TPI Compensation Agreement, A-Puretz and L-Puretz each delivered to Colony Hills an executed promissory note (each a "Promissory Note" and together the "Promissory Notes") for the compensation that would be due to Colony Hills under the TPI Compensation Agreement.  (*Id.* at pp. 9-16).

144.    The Promissory Notes provided with the TPI Compensation Agreement required A-Puretz and L-Puretz, as individuals, to pay the compensation due under the TPI Compensation Agreement in the event that JPC Charities or its nominee failed to pay TPI at the time of the closing of the Sale Agreement.

145.    The Promissory Notes provided for the accrual of interest on the unpaid amount from the day following the closing until payment in full at the rate of seven percent per annum.

146.    On or about February 3, 2016, Defendants contended that the TPI Compensation Agreement and the Promissory Notes were void and of no force and effect.

147.    In particular, Defendants claimed that an email sent on their behalf on or about October 30, 2016, constituted an offer that was never accepted by Colony Hills.  In that email, which had attached to it the TPI Compensation Agreement and the Promissory Note, Defendants stated that "the current signatories have the right to withdraw their 'offer' of an agreement until such time as TPI, Colony, David and Glenn execute and deliver the fully executed TPI Compensation Agreement to my [attention]."

148.    Stating that "TPI, Colony, David and Glenn have failed to fully execute and deliver the TPI Compensation Agreement, and [that] the time for TPI, Colony, David and Glenn to execute and deliver the TPI Compensation Agreement has expired," Defendants communicated their belief that the TPI Compensation Agreement and the Promissory Notes were

unenforceable.

149.    Accordingly, Defendants purportedly authorized their counsel "to negotiate an agreement with the TPI group minus certain flaws in the previous draft."

150.    However, no new agreement was negotiated.

151.    On or about February 18, 2016, JPC and FARH closed on the Sale Agreement.

152.    As a result of the closing of the Sale Agreement, JPC acquired all of the membership interests of FARH in the Properties.

153.    In exchange for the Purchase Rights, Defendants agreed to pay Colony Hills $2,100,000 at closing, among other compensation.

154.    To date, Defendants have paid Colony Hills only $1,800,000.   An additional $300,000 is owed to Colony Hills under the TPI Compensation Agreement.

155.    Colony Hills performed its obligations under the TPI Compensation Agreement by giving Defendants the Purchase Rights to the Properties.

156.    Defendants breached the TPI Compensation Agreement by, among other things, failing to pay an additional $300,000 to Colony Hills.

157.    Defendants also breached the Promissory Notes by, among other things, failing to pay the full compensation due under the TPI Compensation Agreement plus interest once Defendants failed to pay Colony Hills $2,100,000 at the time of the closing of the Sale Agreement.

158.    As a result of Defendants' breach, Colony Hills has suffered damages, including but not limited to the value of the full $2,100,000 payment plus interest, as well as the Transactional Expenses and Internal Costs.

**WHEREFORE**, Colony Hills demands that judgment be rendered against Defendants, jointly and severally, for compensatory, actual, consequential, and special damages, plus interest due and owning, attorneys' fees and costs, and such other relief as the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs Colony Hills Capital, LLC, TPI Communities I, LLC, David Kaufman, and Glenn Hanson hereby demand a jury trial.

**CALCAGNI & KANEFSKY LLP**
One Newark Center
1085 Raymond Blvd., 14th Floor
Newark, New Jersey 07102
(T) 862-397-1796
(F) 862-902-5458
mateo@ck-litigation.com

By:  _s/ Ray A. Mateo_____
       Ray A. Mateo, Esq.

Dated:  January 12, 2018