# AGREEMENT OF PURCHASE AND SALE

## BY AND AMONG

### TPI COMMUNITIES I, LLC

#### AND

#### FOUNDATION FOR AFFORDABLE RENTAL HOUSING, INC.

#### FARH-FOX LAKE AFFORDABLE HOUSING, INC.

#### FARH-SOUTH AFFORDABLE HOUSING, INC. AND

#### FARH-WEST AFFORDABLE HOUSING, INC.

### DATED

### April 14, 2014

# PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT ("**Agreement**") is made and entered into as of April 14, 2014 (the "Effective Date"), by and between TPI Communities I, LLC, a Florida limited liability company ("**Buyer**") on the one hand, and Foundation for Affordable Rental Housing, Inc. ("**FARH**"), FARH-Fox Lake Affordable Housing, Inc. ("**FARH-Fox Lake**"), FARH-South Affordable Housing, Inc. ("**FARH-South**") and FARH-West Affordable Housing, Inc. ("**FARH-West**"), each a Delaware non-profit 501(c)(3) corporation on the other hand. FARH, FARH-Fox Lake, FARH-South and FARH-West shall be referenced herein collectively as "**Sellers**".

## R E C I T A L S:

A.      Sellers are not-for-profit corporations that collectively own and operate seven low income, affordable multifamily apartment properties comprising 2,517 apartment units located in Indianapolis, Indiana; and

B.      Buyer desires to purchase the seven properties and continue to operate them as low income affordable multifamily housing; and

C.      On or after the Closing Date, Buyer intends to transfer the Properties to one or more single purpose entities, each of which will be formed prior to Closing and organized as a single member limited liability company whose sole member is a not-for-profit 501(c)(3) organization (the "SPEs").

## A G R E E M E N T S:

In consideration of the above recitals and the covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Buyer and the Sellers agree as follows:

1.      <u>DEFINITIONS</u>

1.1      <u>Certain Definitions</u>.  For all purposes of this Agreement, the following terms have the respective meanings set forth below:

"**Affiliate**" means with respect to a Person, any Person directly or indirectly controlling, controlled by or under common control with such Person.  For purposes of this definition, the term "**control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities or partnership interests, by contract or otherwise.

"**Business Day**" means each Monday, Tuesday, Wednesday, Thursday and Friday that is not a national holiday.

"**Closing**" means the consummation of the transactions contemplated by this Agreement in accordance with the provisions of Article 8.

"**Closing Date**" means the date on which the Closing occurs.

"**Code**" means the Internal Revenue Code of 1986, as amended, or any subsequent legislative enactment thereof, each as in effect from time to time.

"**Consent**" means any consent, permit, authorization or approval of any Governmental Authority or other third party that the Sellers are, under the terms of any Contract, Legal Rule or License, required to obtain in order for the Sellers to sell the Properties and/or assign the Loans to the SPEs.

"**Contract**" means any legally binding contract, agreement, lease or non-governmental license to which any of the Sellers (or agents and representatives acting on their behalves) are a party and which is used in the operation of the Properties, including without limitation loan, mortgage, management, maintenance, equipment, utility, security, software, occupancy, vendor and employment agreements.

"**Encumbrance**" means any security interest, pledge, mortgage, lien, charge, defect of title, or other encumbrance.

"**Environmental Law**" means any Legal Rule relating to the handling, treatment, transportation or disposal of Hazardous Substances.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations thereunder, as in effect from time to time.

"**Force Majeure**" means any prevention, delay or stoppage due to strikes, lockouts, acts of God, enemy or hostile governmental action, civil commotion, fire, natural or man-made disaster or other casualty beyond the control of the party obligated to perform that shall excuse the performance thereof by such party.

"**Governmental Authority**" means the United States government or any state government, or other political subdivision thereof or any entity exercising executive, legislative, judicial, regulatory or administrative functions on their behalf.

"**Hazardous Substance**" means any pollutant, contaminant, waste, hazardous or toxic substance, constituent, or material, including petroleum products and their derivatives, or other substances regulated under or pursuant to Environmental Law.

"**Intellectual Property**" means any or all of the following and all common law and statutory rights in, arising out of, or associated therewith:  (a) patents and applications therefor; (b) inventions, trade secrets, proprietary information, know-how and technical data; (c) copyrights, copyright registrations and applications therefor; (d) software and software programs; (e) domain names, uniform resource locators and other names and locators associated with the Internet; (f) trade names, logos, common law trademarks and service marks, trademark and service mark registrations and applications therefor; (g) trade dress (including banners, flags, nameplates, and mastheads); and (h) databases and data collections and all rights therein.

"**Knowledge**" means, with respect to the Sellers, the actual knowledge, or lack thereof, based on reasonable inquiry, of the individuals set forth on **Schedule 1.1(a)**, and with respect to Buyer, the actual knowledge, or lack thereof, based on reasonable inquiry, of the individuals set forth on **Schedule 1.1(b)**.

"**Legal Rule**" means any applicable statute, ordinance, code or other law, rule, regulation, order, or other written requirement enacted, adopted, promulgated, applied or followed by any Governmental Authority.

"**Lender**" means any individual, corporation, limited liability company, partnership, association, organization, Governmental Authority, agency or other entity who has made funds available to the Sellers by way of loan or other lending arrangement.

"**Liability**" means any debt, obligation or liability of any kind or nature, whether accrued or fixed, absolute or contingent, determined or determinable, matured or unmatured, and whether due or to become due, asserted or unasserted, or known or unknown.

"**License**" means any license, authorization, franchise or permit used exclusively in connection with the operation of the Businesses granted or issued to the Sellers or their agents by any Governmental Authority, including all amendments thereto and renewals or modifications thereof.

"**Loan Documents**" mean any and all documents, instruments and agreements evidencing, securing or otherwise relating to the Loans.

"**Loans**" mean the existing loans to which the Properties are subject as of the date of this Agreement in the aggregate approximate amount of Seventy-Seven Million Dollars ($77,000,000.00), as specified on **Schedule 1.1(c)** hereto and provided to Buyer pursuant to Section 2.5.

"**Losses**" mean any and all costs, expenses, damages, liabilities, losses, claims, judgments or settlements, including reasonable attorney and professional fees, imposed on or otherwise suffered by a Person.

"**Material Adverse Effect**" means a material adverse effect on (a) the Properties or operations of the Properties, taken as a whole, or (b) the ability of the Sellers to perform their obligations under this Agreement.

"**Permitted Encumbrances**" mean any of the following Encumbrances:  (a) liens of carriers, warehousemen, mechanics, laborers, and materialmen and other similar statutory liens incurred in the ordinary course of business for sums not yet due or being diligently contested in good faith; (b) liens incurred in the ordinary course of business in connection with worker's compensation and unemployment insurance or similar Legal Rules; (c) with respect to the Properties, leases, easements, rights to access, rights-of-way, mineral rights or other similar reservations, Encumbrances, defects of title, or other matters of record or matters revealed by a current survey of the Properties, in each such instance any of which individually or in the aggregate, does not materially impair the use or occupancy of the Properties in the operation of the Properties as currently operated; (d) leasehold interests in real property leased to third parties

by the Sellers or their agents; (e) restrictions set forth in, or rights granted to Governmental Authorities as set forth in the Licenses or Legal Rules; and (f) Encumbrances set forth on **Schedule 1.1(d)**.

"**Person**" means any individual, corporation, limited liability company, partnership, company, sole proprietorship, joint venture, trust, estate, association, organization, Governmental Authority or other entity.

"**Properties**" mean the following housing complexes located in Indianapolis, Indiana: Capital Place Apartments, The Woods at Oak Crossing, Covington Square Apartments, Fox Club Apartments, Lakeside Pointe at Nora, The Estates at Crystal Bay, Woodhaven Park, including without limitation the land and improvements thereon, as well as all of Sellers' rights, title and interest in and to adjacent streets, alleys, rights-of-way, adjacent strips or gores of real estate, and all of Sellers' rights, titles and interests appurtenant to the land and improvements.

"**Taxes**" mean all federal, state, local or foreign income, sales, use, ad valorem, value added, net or gross proceeds, gains, profits, capital, withholding, payroll, employment, unemployment, social security, excise or real or personal property taxes, together with any interest thereon and any penalties, additions to tax or additional amounts applicable thereto.

    1.2    Other Defined Terms.  Certain other defined terms shall have the respective meanings assigned to them elsewhere in this Agreement.

2.    AGREEMENT OF PURCHASE AND SALE.

    2.1    Properties.  On the terms and conditions stated in this Agreement, Sellers hereby agree to sell and convey the Properties to Buyer and Buyer hereby agrees to purchase and acquire the Properties from Sellers.

    2.2    Other Assets. In addition to the Properties, Sellers hereby agree to sell and convey to Buyer and Buyer hereby agrees to purchase and acquire from Sellers the following:

    2.2.1    All of Sellers' right, title and interest in and to any and all furniture, fixtures, equipment, vehicles, supplies or other similar personal property (except for items owned by Tenants) which is located upon, attached to or appurtenant to the improvements, and which is used or utilized for or in connection with the operation or maintenance of the Properties ("Personal Property");

    2.2.2    All of Sellers' right, title and interest in and to all Contracts relating to the operation of the Properties, including all utility deposits;

    2.2.3    With respect to the Properties, all of Sellers' right, title and interest in and to all (1) warranties and guaranties, (2) licenses, permits, or similar documents and (3) telephone exchanges, Intellectual Property and other identifying material, including without limitation the name of the Properties currently used by Sellers;

2.2.4   All of Sellers' right, title and interest in and to all residential tenant leases of the Properties (collectively the "Tenant Leases", and individually a "Tenant Lease");

2.2.5   All of Sellers' right, title and interest in and to all leases in the Properties other than the Tenant Leases (the "Other Leases") (collectively, the Tenant Leases and the Other Leases are referred to as the "Leases");

2.2.6   All prepaid rents collected by Sellers or their predecessors in interest from the residential tenants (collectively the "Tenants") holding under a Tenant Lease or from tenants under the Other Leases for any period subsequent to the Closing Date (the "Prepaid Rents");

2.2.7   All security and pet deposits collected by Sellers or their predecessors in interest from the Tenants or which the landlord may be obligated to return to the Tenants (the "Deposits"); and

2.2.8   All of Sellers' right, title and interest in and to any and all reserves (including without limitation replacement reserves), impounds, escrows and interest rate derivate products which products which are maintained in connection with the existing indebtedness under the Loans (the "Reserve Accounts").

3.   <u>PURCHASE PRICE</u>

3.1   <u>Cash Payment</u>. The cash portion of the Purchase Price to be paid by Buyer to Sellers for the Properties and Other Assets is TEN MILLION FIVE HUNDRED THOUSAND AND NO/100 DOLLARS ($10,500,000.00) (the "Cash Payment"). Buyer shall deliver the cash payment via wire transfer of immediately available funds in U.S. Dollars in accordance with Sellers' written instructions provided at least two (2) Business Days prior to the Closing.

3.2   <u>Loan Assumption</u>. In addition to the Cash Payment described in Section 3.1, Buyer shall, at Buyer's sole cost and expense (including any and all loan assumption fees and all other costs and charges imposed by Lenders pursuant to Section 9.4.4. hereof), assume the Loans (the "Loan Assumption"; together with the Cash Payment, the "Purchase Price"); provided, Buyer's obligation under this Section 3.2 requires that Buyer has obtained the Lenders' approval in writing of (A) the assumption of the Loans by the SPEs, and (B) the release of Sellers from all liability arising under the Loans from and after the Closing Date.

3.3   <u>Purchase Price Adjustment</u>. Adjustments to the Purchase Price shall be made in accordance with this Agreement, including without limitation the provisions of Section 9.4 hereof.

3.4   <u>Deposits</u>. Within two (2) Business Days following execution of this Agreement, Buyer shall place into escrow as an earnest money deposit of FIFTY THOUSAND AND NO/100 DOLLARS ($50,000.00) (the "Initial Deposit"). Within two (2) days following the expiration of the Inspection Period described in Section 4.7, Buyer shall place an additional deposit of Two Hundred and Fifty Thousand Dollars ($250,000.000) ("Second Deposit";

together with the Initial Deposit, the "Earnest Money Deposit") into escrow.  The escrow funds shall be held by an escrow agent to mutually agreed upon by the parties hereto ("Escrow Agent").  The Escrow Agent shall act in accordance with the terms and conditions of this Agreement.

4.      TITLE, SURVEY AND INSPECTION PERIOD

        4.1     Title Commitment.  Prior to the expiration of the Inspection Period (as defined in Section 4.7), Buyer shall, at its sole cost and expense, obtain from a title company of its choosing ("Title Company") a current commitment for title insurance (the "Title Commitment") countersigned by the Title Company, as agent for the title underwriter. The Title Commitment shall be accompanied by copies of all instruments that create or evidence non-standard title exceptions affecting the Properties, including those exceptions pertaining to the indebtedness of Sellers secured by the Properties.

        4.2     Surveys.  Within the time period set forth in Section 4.7 herein, Sellers shall, to the extent same are in the Sellers' possession, provide Buyer a copy of the most current surveys of the Properties.  Prior to the expiration of the Inspection Period (as defined below), Buyer shall, at its sole cost and expense, obtain ALTA surveys ("Surveys") prepared by a licensed surveyor acceptable to the Title Company.  If Sellers' existing surveys are provided to Buyer, Sellers agree to reasonably cooperate with Buyer in Buyer's attempt to have the surveyor revise the surveys (including, without limitation, the surveyor's certificates) in accordance with the specifications of Buyer's lender.  The metes and bounds description of the Properties contained in the Surveys shall be used for purposes of describing the Properties in the Special Warranty Deed conveying the Properties from Sellers to Buyer.  The costs of the Surveys shall be borne by Buyer.

        4.3     Review of Title Commitment and Surveys.  Buyer shall have until the expiration of the Inspection Period (the "Title Review Period") in which to review the Title Commitment and the Surveys and give written notice to Sellers specifying Buyer's objections (the "Objections"), if any, to the Title Commitment and the Surveys.  If Buyer fails to give written notice of Objections to Sellers prior to the expiration of the Title Review Period, then all exceptions to title and other matters shown on Schedule B-2 of the Title Commitment and on the Surveys shall be deemed to be Permitted Exceptions.  Notwithstanding anything to the contrary provided herein, the standard printed exceptions on Schedule B-2 shall be deemed to be Objections. Sellers shall cause all items described on Schedule B-1 of the Title Commitment to be removed at Closing and such items shall not be deemed Permitted Exceptions (except as may be agreed to by Buyer and those matters relating to the Loans).  Sellers shall have until ten (10) Business Days following the receipt of the Objections (the "Cure Period") in which to use its best efforts in good faith to cure such Objections.

        4.4     No Obligation to Cure.  If Buyer timely notifies Sellers in writing of Objections to the Title Commitment and/or the Surveys, then Sellers may, but are not obligated to, at any time prior to the expiration of the Cure Period, give written notice ("Sellers' Title Cure Notice") to Buyer of Sellers' intention to satisfy the Objections prior to Closing.  If Sellers fail to timely give Buyer Sellers' Title Cure Notice or if Sellers notify Buyer in writing during the Cure Period that Sellers will not satisfy the Objections prior to Closing, then, in either event, Buyer shall have the

exclusive option, which must be exercised on or before the later of (A) ten (10) days after receipt of Sellers' Title Cure Notice, or (B) ten (10) days after the expiration of the Cure Period if Sellers fail to give Sellers' Title Cure Notice, to either (i) waive the unsatisfied Objections, in which event those unsatisfied Objections shall become Permitted Exceptions; provided, however, that with respect to any monetary lien or encumbrance of the type described below in this Section 4.4 (other than those relating to the Loans), Buyer shall be entitled to cure and remove such Objections and all of Buyer's costs and expenses incurred in connection with such cure shall be deducted from and credited against the Purchase Price, or (ii) terminate this Agreement, in which event the entire Earnest Money Deposit shall be returned to Buyer, and Sellers and Buyer shall have no further obligations, one to the other, with respect to the subject matter of this Agreement, except obligations expressly set forth herein as surviving termination; provided, however, that if Buyer elects to terminate this Agreement because of the existence of any Objection which results from a breach of Sellers' covenants under Section 5.7 hereof, Buyer's cancellation shall be without prejudice to Buyer's right to sue Sellers for damages suffered or incurred by Buyer as a result of Sellers' breach of such covenant. If Buyer fails to timely terminate this Agreement in accordance with this Section, Buyer is deemed to have waived the unsatisfied Objections (subject to the terms above).  Notwithstanding anything to the contrary herein contained, Sellers covenant and agree that at or prior to Closing, Sellers shall (i) pay in full and cause to be canceled and discharged or otherwise cause the Title Company to insure over all mechanics' and contractors' liens which encumber the Properties as of the Closing Date and which have been placed on the Properties through no fault of Buyer, (ii) pay in full all past due ad valorem taxes and assessments of any kind constituting a lien against the Properties, if any; and (iii) cause to be released any loan security documents which encumber the Properties other than documents evidencing the Loans.  Any documents of record securing the Loans shall be deemed "Permitted Exceptions".   Notwithstanding the foregoing, Buyer shall have the continuing right to examine title to the Properties after the expiration of the Inspection Period (as defined below) and, in connection with any document, instrument or notice filed subsequent to the effective date of the Title Commitment with respect to the Properties, Buyer shall be entitled to send an additional notice of Objection to Sellers, in which case, the time periods set forth herein to send a Sellers' Title Cure Notice and a response thereto shall apply (with a corresponding extension of the Closing Date, if so required), and the rights and obligations of Buyer and Sellers with regard to such additional notices shall be the same as the original notices.

4.5     Title Policy.  At Closing, the Title Company shall be unconditionally committed to furnish the Buyer, at Buyer's sole cost and expense, with the standard form ALTA 2006 Owner's Policy of Title Insurance (the "Owner's Title Policy").  The Owner's Title Policy (which the Title Company shall be committed to issue) shall be issued by the title underwriter, in the amount of the Purchase Price or such other amount as the title underwriter and Buyer shall agree on, and shall insure that Buyer has good and indefeasible fee simple title to the Properties, subject only to the Permitted Exceptions.

4.6     Building Code Compliance.  Prior to the expiration of the Inspection Period, Sellers shall have delivered to Buyer copies of any written notice given from the City of Indianapolis, Indiana or the county in which the Properties are located to Sellers indicating any violation of the City's or County's building code.

    4.7    <u>Inspection Period</u>.    To assist Buyer and its agents and representatives in conducting diligence, on or prior the Effective Date, Sellers have provided Buyer with copies of the documents and information, to the extent same are in the possession of Sellers or Seller's property management company, set forth on **Exhibit A** attached hereto. Buyer shall have a ninety (90) day period, commencing on the Effective Date (the "Inspection Period"), in which to review said documents and to conduct, at Buyer's sole cost and expense, whatever reasonable investigations, analyses and studies of the Properties and their operation, and the Loan Documents as it and its representatives deem appropriate.

    4.8    <u>Conduct of Inspections</u>. Buyer shall not cause any penetrations to be made in any structures or paved areas without the prior written consent of Sellers.  During the Inspection Period, Buyer shall supply Sellers with a project schedule and checklist of tasks pertaining to the due diligence required by Buyer. This schedule shall be updated regularly and communicated to Sellers by appropriate means. Sellers shall cooperate with Buyer in making the Properties available for Buyer's inspections, and shall make, to the extent such items are in Sellers' actual possession, any and all books, records and other information relating to the Properties and operations thereof available for Buyer's inspections. If Buyer desires copies of such information, the same shall be made at Buyer's expense.  All materials made available by Sellers that were prepared by a third party shall be deemed provided without representation or warranty by Sellers as to the accuracy of such materials or the ability of Buyer to rely upon such materials. All materials obtained by Buyer pursuant to this Section 4.8 shall be held in confidence by Buyer and disclosed only to its attorneys, accountants, business partners, consultants, advisors and prospective lenders.  If the parties fail to consummate the transaction described herein for any reason other than default of the Sellers, Buyer shall deliver to Sellers all information and reports obtained by Buyer pursuant to this Section 4.8 which obligation shall survive the termination of this Agreement.

EXCEPT WITH REGARD TO CLAIMS, DEMANDS, LIABILITIES, COSTS OR EXPENSES ARISING IN CONNECTION WITH THE SELLERS' (OR THEIR AGENTS', REPRESENTATIVES' OR EMPLOYEES') GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, BUYER AGREES TO RESTORE THE PROPERTIES TO THEIR ORIGINAL CONDITION AFTER THE CONDUCT OF ANY SUCH PHYSICAL INSPECTIONS OR TESTS.  EXCEPT WITH REGARD TO CLAIMS, DEMANDS, LIABILITIES, COSTS OR EXPENSES ARISING THE SELLERS' (OR THEIR AGENTS', REPRESENTATIVES' OR EMPLOYEES') GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, BUYER AGREES TO INDEMNIFY, DEFEND AND HOLD SELLERS HARMLESS FROM ANY AND ALL CLAIMS, DEMANDS, LIABILITIES, COSTS OR EXPENSES (COLLECTIVELY, "CLAIMS") SUFFERED BY OR ASSERTED AGAINST SELLERS AND/OR THE PROPERTIES, AND ARISING IN ANY MATTER OUT OF ANY ENTRY ON THE PROPERTIES DURING THE PENDENCY OF THIS AGREEMENT BY BUYER, ITS AGENTS OR CONTRACTORS, AND SUCH OBLIGATIONS SHALL SURVIVE CLOSING OR ANY TERMINATION OF THE AGREEMENT NOTWITHSTANDING ANY LIMITING LANGUAGE WHICH MIGHT OTHERWISE BE CONTAINED IN THIS AGREEMENT. Notwithstanding anything to the contrary contained in this Agreement, (i) the indemnity and hold harmless provision contained in this Section shall not apply to the extent such Claims arise in connection with Sellers' gross negligence or willful misconduct, and (ii) provided further that Buyer shall have no liability to Sellers or to any other

person or entity by reason of, nor shall Buyer have any duty to indemnify, defend or hold any person or entity harmless from or against, any Claims, including, without limitation, any claim for diminution in value of the Properties or for environmental remediation or clean-up costs, arising out of or in connection with the mere fact of having discovered and/or reported (as may be required by law) any adverse physical condition, title condition, environmental condition or other defect with respect to the Properties.  Any claim for indemnification must be made within twelve (12) months after the date of Closing or termination of this Agreement.

4.9     Termination During Inspection Period. Buyer shall have the right to terminate this Agreement for any reason, or no reason at all, during the Inspection Period.  If Buyer elects to terminate this Agreement within the Inspection Period, then Buyer shall deliver written notice thereof to Sellers on or before the expiration of the Inspection Period stating such election; provided, however, that if Buyer does not deliver said notice, (A) Buyer is deemed to have elected to keep this Agreement in full force and effect, and (B) the Earnest Money Deposit shall be nonrefundable to Buyer except in the event of Sellers' default hereunder or as otherwise provided in this Agreement or the inability to obtain Lender Consent by the Outside Closing Date, as defined below, in which event the Earnest Money Deposit shall be returned to Buyer.

5.     REPRESENTATIONS AND WARRANTIES OF SELLERS

The Sellers represent and warrant to Buyer as follows:

5.1     Organization, Standing and Authority.  The Sellers are each corporations validly existing and in good standing under the laws of the State of Delaware. The Sellers are each duly authorized, qualified or licensed to do business as a foreign company in Indiana and are in good standing under the legal rules of each jurisdiction in which the nature of their activities makes such qualifications necessary.

5.2     Tax Exempt Status. The Sellers are recognized as tax-exempt by the Internal Revenue Service pursuant to Section 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3), by the Indiana Department of Revenue, and by any other governmental authority that assesses taxes on income or property. The Sellers have taken all necessary actions to maintain the tax-exempt status of the Sellers and have no knowledge of any facts that would place at risk the tax-exempt status of any of the Sellers or the Properties.

5.3     Authorization and Binding Obligation.  The Sellers have the power and authority to execute and deliver this Agreement and to carry out and perform all of their other obligations under the terms of this Agreement. The execution and delivery of, and performance of the obligations contained in, this Agreement and the transactions contemplated hereby and thereby have been duly authorized by all necessary corporate action on the part of the Sellers. This Agreement has been duly executed and delivered by the Sellers and this Agreement constitutes the valid and legally binding obligation of the Sellers, enforceable against each of them in accordance with its terms.

5.4     Absence of Conflicting Terms; Consents.  Except as set forth on **Schedule 5.4**, the execution, delivery and performance by the Sellers of this Agreement: (a) assuming receipt of all Consents listed on **Schedule 5.4**, do not require the Consent of, notice to, or filing with,

- 9 -

any Governmental Authority or Lender (other than those in connection with the Loans and Buyer's assumption thereof); (b) will not conflict with any provision of the certificate of incorporation or by-laws of any of the Sellers; (c) assuming receipt of all Consents listed on **Schedule 5.4**, will not in any material way conflict with, result in a material breach of, constitute a material default under, or result in the acceleration of any performance required by the terms of any Contract, Loan, license, permit or any material Legal Rule applicable to the Sellers or to the Businesses; and (d) assuming receipt of all Consents listed on **Schedule 5.4**, will not result in the creation of any Encumbrances other than Permitted Encumbrances.

5.5     Unaudited Financial Statements.   Attached as **Schedule 5.5** hereto are the most recent practicably available complete and correct copies of (i) the unaudited balance sheets for the Sellers and (ii) an unaudited statement of operations of the Sellers (collectively, the "**Unaudited Financial Statements**"). The Unaudited Financial Statements were derived from the books and records of the Sellers and fairly represent the financial position of the Sellers as of the date thereof.

5.6     Tangible Personal Property.   **Schedule 5.6** lists, as of the date hereof, all tangible personal property, including without limitation all motor vehicles, furniture, fixtures, systems, equipment, and machinery owned or leased, as applicable, by the Sellers. All tangible personal property listed in **Schedule 5.6** is free and clear of all Encumbrances, other than Permitted Encumbrances.

5.7     Real Properties.   **Schedule 5.7(a)** lists, as of the date hereof, all real property owned by the Sellers.  The Sellers do not lease any real estate in connection with the operation of the Properties  and do not have any other interests in real property that are used in connection with the ownership and operation of the Properties (including unrecorded  easements, unrecorded licenses, unrecorded  rights to access and unrecorded rights-of-way) except as disclosed in **Schedule 5.7(b)**. To the Sellers' Knowledge, there are no existing or pending condemnation actions or other legal proceedings affecting the continued use of the entirety of the Properties. To the best of Seller's knowledge, there are no adverse or other parties in possession of the land of which the Properties are part or trespassers. There are no options to purchase or rights of first refusal with respect to all or any part of the Properties that have been granted by Sellers or are outstanding. The Sellers have not received any claim, demand, suit or action arising out of or relating in any way to water damage, water instruction, mold growth or mold infestations occurring in, on or about any of the Properties.

5.8     Contracts.

5.8.1   **Schedule 5.8.1** includes a list, as of the date hereof, of Contracts of the Sellers. The Sellers have made available to Buyer complete and correct copies of all the Contracts.

5.8.2   Except as set forth on **Schedule 5.8.2**, (a) each  Contract is in full force and effect and constitutes a valid, binding and enforceable obligation of the Sellers and/or the Properties in accordance with the respective terms thereof, and represents a valid, binding and enforceable obligation of each of the other parties thereto; (b) there exists no material breach or material default (or event that with notice or the lapse of time, or both, would constitute a

material breach or material default) on the part of the Sellers, or, to the Sellers' Knowledge, on the part of any other party thereto under any Contract and (c) each Contract can be terminated by Buyer, without charge or penalty, upon thirty (30) days' notice or less [NEED TO CONFIRM WHICH, IF ANY, CONTRACTS CAN'T BE TERMINATED AND/OR ASSIGNED].

    5.9    Intellectual Property.

    5.9.1  Set forth on **Schedule 5.9.1** is a list, as of the date hereof, of all material Intellectual Property relating to the Businesses.

    5.9.2  Except as disclosed on **Schedule 5.9.2** and assuming receipt of all Consents listed on **Schedule 5.4**, no material item of Intellectual Property is subject to any proceeding or outstanding decree, order or judgment materially restricting the transfer thereof, or the use thereof in connection with the operation of the Businesses as currently conducted, by the Sellers, or which may affect, in any material respect, the validity or enforceability thereof.

    5.9.3  Except as disclosed on **Schedule 5.9.3**, to the Sellers' Knowledge, the Sellers own or have the right to use each material item of Intellectual Property free and clear of any Encumbrances (excluding non-exclusive licenses and ordinary-course contractual restrictions to which the Sellers is subject), other than Permitted Encumbrances. To the Sellers' Knowledge, the operation of the Businesses as currently conducted does not infringe or misappropriate the intellectual property rights of any third party and, except as disclosed on **Schedule 5.9.3**, as of the date hereof, the Sellers have not received any written claims or threats from third parties alleging any such infringement or misappropriation.

    5.10   Tax Matters. The Sellers or their respective agents or representatives have filed or caused to be filed all federal, state and local Returns they are required to file with respect to the operation of the Businesses and the Properties, and all such Returns are correct in all material respects. All Taxes which are due and payable on such Returns in connection with the operation of the Businesses have been properly accrued or paid. Except for Permitted Encumbrances, there are no Encumbrances for Taxes. **Schedule 5.10** lists all Returns filed by or on behalf of the Sellers in any jurisdiction for the three most recently completed fiscal years.

    5.11   Conduct in the Ordinary Course; Absence of Changes or Events. Except as set forth on **Schedule 5.11**, from December 31, 2013 through and including the date hereof, (a) the Sellers have operated the Properties in the ordinary course of operating the Properties and (b) there has not been any event, change, state of facts or circumstances or development that has had or would reasonably be expected to have a Material Adverse Effect on the Properties. Specifically, but not in limitation of the foregoing, except as set forth on **Schedule 5.11**, from December 31, 2013 through and including the date hereof, the Sellers and their respective agents and representatives have not:

    5.11.1 amended or terminated any Contract, except in each case by reason of the occurrence of a contractually specified termination date or otherwise in the ordinary course of operating the Properties;

    5.11.2 made any change in accounting principles, practices or methods of the operation of the Properties;

5.11.3 created or assumed any Encumbrances on the Properties other than Permitted Encumbrances;

5.11.4 paid, discharged or satisfied any material Liability relating to or arising in connection with the Properties, other than the payment, discharge, or satisfaction of Liabilities in the ordinary course of operating the Properties; or

5.11.5 made any sale, assignment, lease, transfer or other disposition of any personal property belonging to and used in the operation of the Properties, other than in the ordinary course of operating the Properties.

5.12   Insurance.  The Sellers maintain insurance in respect of the Properties covering such risks, in such amounts, with such terms and with such insurers as the Sellers have determined is appropriate in light of the Properties and consistent with industry practice (such insurance, the "**Insurance Policies**").  All of the Insurance Policies are in full force and effect. The Sellers are not in default with respect to any material provision contained in any such Insurance Policy held by or on behalf of them.  The Sellers have not received any notice of cancellation or non-renewal of any such Insurance Policy.

5.13   Licenses; Legal Proceedings.

5.13.1 **Schedule 5.13.1** lists all material Licenses, as of the date hereof, that are held by the Sellers.  Except as set forth on **Schedule 5.13.1**, each of the Licenses is in full force and effect in accordance with its terms in all material respects.  As of the date hereof, no legal action or other formal proceeding is pending or, to the Sellers' Knowledge, threatened, to revoke, terminate, suspend, or cancel any of the Licenses or to impose any material forfeiture or penalty with respect to any of the Licenses.

5.13.2 **Schedule 5.13.2** contains a complete and correct list, as of the date hereof, of all suits, claims, actions, arbitrations, judgments, orders, injunctions, decrees, awards and investigations pending or, to the Sellers' Knowledge, threatened, which would reasonably be expected to materially and adversely affect the Properties.

5.14   Environmental Matters.  Except as disclosed on **Schedule 5.14**:

5.14.1 To the Sellers' Knowledge, the Properties are in compliance, in all material respects, with all Environmental Laws applicable to the Properties.  As of the date hereof, the Sellers have not received any written notice of any action by any Governmental Authority alleging the Sellers are not in compliance under any Environmental Law with respect to the Properties which action has not been resolved and for which all payments, fines or other amounts payable in connection therewith have not been paid in full.

5.14.2 To the Sellers' Knowledge, the Properties do not contain and have never contained Hazardous Substances not in compliance with Environmental Laws. Neither the Sellers nor their agents or employees have transported or arranged for the treatment, storage or disposal of any Hazardous Substances at any of the Properties that has resulted in a material Liability which has not been resolved and for which all payments, fines or other amounts payable in connection therewith have not been paid in full.

5.15     Transactions with Affiliates.  Except as set forth on **Schedule 5.15**, the Sellers are not a party to any material business arrangement or material business relationship with any of its Affiliates with respect to the operation of the Properties, and none of its Affiliates owns any material property or material right, tangible or intangible, that is used in the Sellers' operation of the Properties.

5.16     Bonds; Letters of Credit.  Except as set forth on **Schedule 5.16**, as of the date hereof, there are no material construction, fidelity, performance, or other bonds, guaranties in lieu of bonds or letters of credit posted by the Sellers in connection with the Sellers' operation or ownership of the Properties.[

5.17     Brokers on behalf of the Sellers.  There is no investment banker, broker, finder or other intermediary or advisor that has been retained by or is authorized to act on behalf of the Sellers who might be entitled to any fee, commission or reimbursement of expenses for which Buyer will be responsible or have any Liability as a result of the transactions contemplated by this Agreement.

5.18     No Violation of Law. Except as disclosed on **Schedule 5.18**, the Sellers are not engaging in any activity or omitting to take any action as a result of which it is in violation in any material respect of any law, rule, regulation, zoning or other ordinance, statute, order, injunction or decree, or any other requirement of any court or governmental or administrative body or agency, applicable to the Properties.

5.19     Accounts Payable; Prepaid Items.  All accounts payable related to the Properties are reflected in the Unaudited Financial Statements of Seller's property management company. **Schedule 5.19** sets forth the most recent practicably available true and correct aged list of all of the accounts payable. Except as disclosed in **Schedule 5.19**, all accounts payable have arisen in the ordinary course of business and represent valid arms-length accounts payable on behalf of the Properties.

5.20     Tenant Leases. Sellers (or their respective property management company) are the "landlord" or "lessor" under all of the Leases and own unencumbered legal and beneficial title to all of the Leases and the rents and other income thereunder. Except as set forth in **Schedule 5.20**, there currently exists no formal written claim by any Tenant as to any defense, set off, or counterclaim with respect to its tenancy or its obligation to pay rent and other charges pursuant to its Lease.

5.21     Sellers' Status. No Seller is a "foreign person" for purposes of the withholding rules of the Foreign Investment in Real Property Act, as revised by the Deficit Reduction Act of 1984.

5.22     Disclosures True and Accurate.  All documents delivered to Buyer by Sellers or their property management company pursuant to Section 4.7 hereof are, to the best of their Knowledge, true and accurate in all material respects.

6.    REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to the Sellers as follows:

6.1    Organization, Standing and Authority.  Buyer is a single member limited liability company validly existing and in good standing under the laws of the State of Florida, and is wholly-owned by a not-for-profit 501(c)(3) corporation.

6.2    Authorization and Binding Obligation.  Buyer has the limited liability company power and authority to execute and deliver this Agreement and to carry out and perform all of its obligations under the terms of this Agreement.  The execution and delivery of, and performance of the obligations contained in, this Agreement and the transactions contemplated hereby and thereby have been duly authorized by all necessary limited liability company action on the part of Buyer.  This Agreement has been duly executed and delivered by Buyer, and this Agreement constitutes the valid and legally binding obligation of Buyer, enforceable against it in accordance with its terms.

6.3    Absence of Conflicting Terms; Consents.  Except as set forth on **Schedule 6.3**, the execution, delivery and performance by Buyer of this Agreement (with or without the giving of notice, the lapse of time, or both): (a) assuming receipt of all consents listed on **Schedule 6.3,** do not require the consent of, notice to, or filing with, any Governmental Authority; (b) will not conflict with any provision of the certificate of formation of Buyer, or the limited liability company operating agreement of Buyer; (c) assuming receipt of all consents listed on **Schedule 6.3**, will not in any material way conflict with, result in a material breach of, or constitute a material default under any Legal Rule applicable to Buyer; and (d) assuming receipt of all consents listed on **Schedule 6.3**, will not conflict with, constitute grounds for termination of, result in a material breach of, constitute a default under, or accelerate or permit the acceleration of any performance required by the terms of, any material contract, loan, license or permit to which Buyer is a party or by which Buyer may be bound, such that Buyer could not perform hereunder.

6.4    Regulatory Matters.  There are no facts relating to Buyer under any Legal Rule that would disqualify it from consummating the transactions contemplated by this Agreement.

6.5    Brokers of Buyer.  There is no investment banker, broker, finder or other intermediary or advisor that has been retained by or is authorized to act on behalf of Buyer or its Affiliates who might be entitled to any fee, commission or reimbursement of expenses for which the Sellers will be responsible or have any Liability as a result of the transactions contemplated by this Agreement.

7.    CERTAIN COVENANTS OF THE PARTIES

7.1    Operation of the Properties Prior to Closing.  Except (a) as required by Legal Rules, (b) as contemplated by this Agreement, (c) as set forth on **Schedule 7.1** or (d) as consented to by Buyer (which consent shall not be unreasonably withheld or delayed), between the date hereof and the Closing Date, the Sellers shall operate the Properties in the ordinary course of business, subject to, and except as modified by, compliance with the following negative and affirmative covenants:

7.1.1   Negative Covenants. Neither the Sellers nor their property management company shall do any of the following between the date hereof and the Closing Date:

(i)     enter into any additional Contracts with respect to the Properties whose terms do not provide for a thirty (30) day cancellation provision without fee or penalty.

(ii)    materially amend, materially modify or terminate (other than at the expiration of their respective terms or due to a default of the other party thereunder) any Contract with respect to the Properties except in the ordinary course of business;

(iii)   sell, assign, lease, swap or otherwise transfer or dispose of any of the Properties or any personal property belonging to and used in the operation of the Properties , except for such personal property  consumed or disposed of in the ordinary course of operation of the Properties;

(iv)    create, assume or permit to exist any Encumbrance upon the Properties, other than Permitted Encumbrances;

(v)     waive any material right relating to the Properties;

(vi)    waive or cancel any debt or claim of substantial value relating to the Properties;

(vii)   permit any waste, any grading or any cutting of timber on the Properties; and

(viii)  enter into new Tenant Leases except in accordance with the following guidelines: (1) each lease for a vacant unit shall be for a term of not less than six (6) months or more than twelve (12) months; (2) unless approved in advance and in writing by Buyer, Sellers will not permit or grant rent concessions, specials or new non-paying or discounted-for-service leases (i.e., former employees, family, etc.); (3) unless otherwise agreed to by Buyer, the rent charged under each lease shall be substantially similar to the rental amount assessed for similar units at the Properties in the sixty (60) days immediately preceding the Effective Date as disclosed in the roll delivered to Buyer pursuant to this Agreement; (4) Sellers will screen prospective tenants in a manner consistent with prevailing industry standards; and (5) from the Effective Date through closing, Sellers will provide Buyer with monthly lease activity reports showing new leases and renewals and the terms thereof .

7.1.2   Affirmative Covenants. The Sellers and their property management company shall do the following between the date hereof and the Closing Date:

(i)     use commercially reasonable efforts to preserve and maintain in all material respects the goodwill and the current relationships of the Sellers with independent contractors, tenants, suppliers and others with significant and recurring business dealings with the Properties;

(ii)    maintain the Properties in good order and condition and maintain insurance coverage set forth in the Insurance Policies;

(iii)    promptly notify Buyer in writing of any litigation, arbitration or administrative hearing before any court or governmental agency, to the extent not prohibited by law, concerning or affecting the Properties that is instituted after the date hereof and any notice of violation of any health or building code relating to the Properties that is received after the date hereof;

(iv)    pay any unpaid bills or claims in connection with any construction or repair of the Properties occurring or contracted by Sellers prior to Closing (unless expressly assumed by Buyer);

(v)    continue to rent, and to make vacant apartments rent ready, in the ordinary course of operations consistent with management's customary and past practices at the Properties.  Within thirty (30) days after the Effective Date, Buyer shall have inspected all units at the Properties and shall notify Sellers of all apartment units that Buyer believes are not rent-ready and Sellers and Buyer shall act in good faith to determine a mutually acceptable plan for making such units rent-ready; and

(vi)    complete all construction and repairs relating to the fire at The Woods and obtain all necessary certificates of occupancy and other approvals from the municipality such that the project is fully operational.

7.2    Obtaining Consents. The Sellers and Buyer covenant and agree that as soon as practicable after the execution of this Agreement, Buyer and the Sellers shall make appropriate requests and shall use commercially reasonable efforts to obtain any Consents set forth on **Schedule 4.4**, which requests shall include approval from Governmental Authorities, Lenders, regulators and/or any other agency for the assumption of the Loans by the SPEs and the release of Sellers from all liability under the Loans.

7.3    Tax Matters. The Sellers shall provide Buyer with such cooperation and information as it reasonably requests in preparing and filing any tax return, report or form ("**Returns**"), amended Return or claim for refund, determining or contesting a liability for Taxes or a right to a refund of Taxes, participating in or conducting any audit or other proceeding in respect of Taxes.  Such cooperation and information shall include providing copies of relevant Returns or portions thereof, together with accompanying schedules, related work papers and documents relating to rulings or other determinations by Tax authorities. The Sellers shall retain all Returns, schedules and work papers, records and other documents in its possession relating to Tax matters of the Properties for each taxable period first ending after the Closing Date and for all prior taxable periods until the later of (a) the expiration of the statute of limitations of the taxable periods to which such Returns and other documents relate, without regard to extensions except to the extent notified by the other party in writing of such extensions for the respective Tax periods, or (b) six (6) years following the due date (without extension) for filing such Returns.

7.4    Access to Properties, Books and Records. The Sellers agree that for the duration of the Inspection Period,  it shall permit Buyer and its authorized agents and representatives reasonable access, upon reasonable notice and during normal business hours, to the Sellers' books, records and documents to the extent they are related to the Properties and are not

protected by any applicable privileges or obligations of confidentiality. Any examination or request for information shall be conducted in such a manner so as not to interfere with the operations of the Properties.

7.5     Further Actions; Cooperation.  Subject to the other provisions of this Agreement, which may impose additional or different obligations, the Sellers and Buyer shall each use commercially reasonable efforts to take, or cause to be taken, all appropriate actions and to do, or cause to be done, and to assist and cooperate with the other party in doing, all things necessary, proper or advisable to satisfy as soon as practicable all of the conditions required to be satisfied by it hereunder and to consummate the transactions contemplated hereby as expeditiously as possible. The Sellers and Buyer further understand and agree that they shall not take, or cause or permit to be taken any action that is materially inconsistent with the terms of this Agreement, nor shall a party take, or cause or permit to be taken any action that might delay or hinder the timely consummation of the transactions contemplated hereby.

7.6     Intentionally omitted.

7.7     Non-Disparagement. At no time prior to or after the Closing shall (a) the Sellers, directly or indirectly, disparage the commercial, business or financial reputation of Buyer, or (b) Buyer, directly or indirectly, disparage the commercial, business or financial reputation of the Sellers.

8.     CONDITIONS PRECEDENT TO OBLIGATIONS OF PARTIES TO CLOSE

8.1     Conditions Precedent to Obligations of Buyer to Close.  Upon expiration of the Inspection Period and provided this Agreement shall not have been terminated by Buyer in accordance with Section 4.9 above, the obligations of Buyer to consummate the transactions contemplated by this Agreement to occur at the Closing shall be subject to the satisfaction, on or before the Closing Date, of each and every one of the following conditions, all or any of which may be waived in writing, in whole or in part, by Buyer to the extent permitted by applicable Legal Rules:

8.1.1     Approval by Regulators and Lenders. The sale of the Properties and assumption of the Loans by the SPEs shall be approved in writing by FHA, Fannie Mae and/or any other agency or Lender with regulatory or contractual authority in connection with control of the Properties.

8.1.2     Representations and Warranties of the Sellers. The representations and warranties of the Sellers set forth in this Agreement shall be true and correct as of the Closing Date, as though made on the Closing Date (except for representations or warranties which expressly relate to an earlier date, in which case such representations and warranties shall be true and correct as of such earlier date), except where the failure of such representations and warranties to be true and correct has not had and would not reasonably be expected to have a Material Adverse Effect.

8.1.3     The Sellers' Covenants and Conditions. The Sellers shall have performed and complied in all material respects with the covenants and agreements required by this

Agreement to be performed or complied with by them prior to or on the Closing Date, including without limitation the covenants contained in Section 7.1.

8.1.4   <u>No Governmental Proceeding or Injunction</u>.   No suit, action or administrative proceeding shall have been instituted by any Governmental Authority which questions the validity or legality of the transactions contemplated by this Agreement (which has not been subsequently dismissed, settled or otherwise terminated). On the Closing Date there shall be no effective injunction, preliminary restraining order or any other order of any nature issued by a court of competent jurisdiction directing that the Closing not be consummated.

8.1.5   <u>Deliveries</u>. The Sellers shall have made or stand willing and able to meet the obligations set forth in Section 2.

8.2   <u>Conditions Precedent to Obligations of the Sellers to Close</u>. The obligations of the Sellers to consummate the transactions contemplated by this Agreement to occur at the Closing shall be subject to the satisfaction, on or before the Closing Date, of each and every one of the following conditions, all or any of which may be waived in writing, in whole or in part, by the Sellers to the extent permitted by applicable Legal Rules:

8.2.1   <u>Representations and Warranties of Buyer</u>.   The representations and warranties of Buyer set forth in this Agreement shall be true and correct in all material respects as of the Closing Date, as though made on the Closing Date (except for representations or warranties which expressly relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date).

8.2.2   <u>Buyer's Covenants and Conditions</u>.   Buyer shall have performed and complied in all material respects with the covenants and agreements required by this Agreement to be performed or complied with by it prior to or on the Closing Date.

8.2.3   <u>No Governmental Proceeding or Injunction</u>.   No suit, action or administrative proceeding shall have been instituted by any Governmental Authority which questions the validity or legality of the transactions contemplated by this Agreement (which has not been subsequently dismissed, settled or otherwise terminated). On the Closing Date there shall be no effective injunction, preliminary restraining order or any other order of any nature issued by a court of competent jurisdiction directing that the Closing not be consummated.

8.2.4   <u>Deliveries</u>. Buyer shall have made or stand willing and able to perform the obligations set forth in Section 3.

8.2.5   <u>Release from Loans</u>. Sellers shall have been released from all liability and obligations arising under the Loans.

9.   <u>CLOSING AND CLOSING DELIVERIES</u>

9.1   <u>Closing</u>. Subject to satisfaction of the closing conditions described in Article 8, the Closing shall take place via escrow on the date specified by Buyer by written notice to the Sellers' counsel, which specified date shall be no earlier than ten (10) Business Days after the

date hereof and no later than October 31, 2014 ("Outside Closing Date"), except as otherwise agreed by the parties.

9.2     Deliveries by the Sellers.  Prior to or on the Closing Date, the Sellers shall deliver to Buyer the following, in form and substance consistent with the terms of this Agreement and reasonably satisfactory to Buyer:

9.2.1     Special Warranty Deeds conveying each of the Properties, duly executed and acknowledged by Sellers, subject to the Permitted Exceptions;

9.2.2     Assignments and Assumption of Leases and Security Deposits for each of the Properties, whereby Sellers shall assign to Buyer all of Sellers' rights, titles, and interests with respect to the Leases and Security Deposits and shall agree to indemnify Buyer against and hold Buyer harmless from any claims, causes of action, damages and expenses, including court costs and attorneys' fees, resulting from any failure by Sellers to perform the duties and obligations of the landlord or lessor arising prior to the date of Closing under such Leases (and Buyer shall similarly indemnify Sellers for any such matters arising from and after the date of Closing);

9.2.3     a non-foreign certificate, in compliance with Section 1445 of the Internal Revenue Code of 1986, as amended, and any regulations promulgated thereunder, stating under penalty of perjury Sellers' United States identification number and that Sellers are not a "foreign person" as that term is defined in Section 1445, duly executed by Sellers;

9.2.4     appropriate evidence of authorization reasonably satisfactory to the Title Company regarding the consummation of the transaction contemplated by this Agreement;

9.2.5     any other items reasonably requested by the Title Company for consummating Closing;

9.2.6     Bills of Sale and Assignment (i) conveying Sellers' interest in the Personal Property and the Intellectual Property to Buyer, without warranty, and (ii) assigning, without warranty, Seller's interest in the Other Assets set forth in Section 2.2, with Buyer assuming such obligations;

9.2.7     originals, to the extent in Seller's possession, of all Leases and security deposit receipts, and a Rent Roll (including a schedule of security deposits) dated not earlier than five (5) days prior to Closing certified as true and accurate by Sellers or its management company;

9.2.8     such original plans and specifications, site plans, building and development permits, certificates of occupancy, operating permits, and other documents as shall be in the possession of Sellers, if any, and which relate to the development, construction, governmental compliance, occupancy, or operation of the Properties;

9.2.9     such documentation as Lenders reasonably require to be executed by Sellers in connection with the assumption of the Loans and the obligations thereunder by the SPEs and the release of Sellers' from all obligations under the Loans (the "Loan Assignments").

9.2.10 such documentation as is needed to evidence the Sellers' assignment to Buyer all of the right, title and interest of such Sellers in and to any and all Deposits and Reserve Accounts;

9.2.11 a recertification of Seller's representations and warranties contained in this Agreement; and

9.2.12 the originals or copies of any Consents received on or before the Closing Date.

9.3     <u>Deliveries by Buyer</u>.  Prior to or on the Closing Date, Buyer shall deliver to the Sellers the following, in form and substance consistent with the terms of this Agreement and reasonably satisfactory to the Sellers:

9.3.1     the cash portion of Purchase Price, in cash or good funds, as required by Section 3.1;

9.3.2     appropriate evidence of authorization reasonably satisfactory to the Title Company for the consummation of the transaction contemplated by this Agreement;

9.3.3     any other items reasonably requested by the Title Company for consummating Closing;

9.3.4     the Bill of Sale and Assignment referenced in Section 9.2.7 hereof, duly executed by Buyer;

9.3.5     the Assignment and Assumption of Leases and Security Deposits referenced in Section 9.2.3 hereof, duly executed by Buyer, whereby Buyer shall assume from Sellers all of Sellers' rights, titles, interests and obligations with respect to the Leases and shall agree to indemnify Sellers against and hold Sellers harmless from any claims, causes of action, damages and expenses, including court costs and attorneys' fees, resulting from any failure by Buyer to perform the duties and obligations of the landlord or lessor arising on or after the date of Closing under such Leases (and Sellers shall similarly indemnify Buyers for any such matters arising prior to the date of Closing).

9.3.6     a Tenant Notice Letter, in a form reasonably acceptable to Sellers and Buyer and in compliance with Indiana law, executed by Buyer acknowledging that Buyer has received and is responsible for the Tenants' security deposits.  Sellers shall be entitled to make copies of the executed original, fill in each respective tenant's name and address, deliver such Notice to Tenant and a copy of same to Buyer, and fill-in the exact dollar amount of each respective Tenants' security deposit in accordance with the schedule of security deposits referenced herein.  Buyer hereby agrees that such copies of the Tenant Notice Letter shall carry the same force and effect as if each Tenant Notice Letter had been executed by Buyer, provided that a copy of same has been sent to Buyer; and

9.3.7     The Loan Assignments and all other documents as may be reasonably required by Lender and Sellers to be executed by the Buyer and/or SPEs in connection with the SPEs' assumption of the Loans and the release of Sellers from all obligations under the Loans.

9.4     Adjustments at Closing.   Except as otherwise set forth in this Agreement, all income and obligations relating to or arising from the Properties or the Loans attributable to days preceding the Closing Date shall be allocated to Sellers, and all income and obligations relating to or arising from the Properties or the Loans attributable to days from and after the Closing Date shall be allocated to Buyer. The following items shall be adjusted or prorated between Sellers and Buyer as set forth below:

9.4.1   Ad valorem and personal property taxes relating to the Property, if any, for the calendar year in which Closing occurs shall be prorated between Sellers and Buyer as of the Closing Date based upon taxes actually paid by Sellers if Sellers have paid such taxes prior to Closing, and otherwise upon the ad valorem taxes due assuming payment in December of the year of Closing.

9.4.2   Rents under the Leases shall be prorated as of 12:01 a.m. on the Closing Date.  At Closing, Buyer shall be given a credit for rents actually collected under the Leases attributable to all periods from and after the Closing Date.  After Closing, Buyer has the right to collect rents from tenants for the entire month of Closing and thereafter.  Sellers shall retain the rights related to uncollected rents from such tenants for all  times attributable to periods prior to the Closing Date ("Sellers' Uncollected Rents"), provided, however, if Buyer collects any amount attributable to Sellers' Uncollected Rents, Buyer shall promptly pay such amount to Sellers after Closing.  Notwithstanding the fact that Sellers shall retain the right to Sellers' Uncollected Rents, after Closing Sellers shall have no right to commence any forcible entry or detainer proceedings with respect to the Properties.  All rents under the Leases shall be attributed first to such tenant's current rent, and then to each month immediately preceding such month. No security deposits shall be applied to Sellers' Uncollected Rents unless the tenant has vacated the Properties.  The provisions of this Section 9.4.2 shall survive Closing. Any Rents received by Buyer after the Closing that are for time periods prior to Closing shall be forwarded by Buyer to Sellers within three (3) Business Days of Buyer's receipt thereof.

9.4.3   Except as set forth in Sections 9.4.1 and 9.4.2, all deposits, escrows and reserves relating to the operation of Properties shall be transferred to Buyer as of the Closing Date, and no credits shall be given Sellers and no adjustment shall be made to the Purchase Price as a result of such transfers.

9.4.4   Buyer shall be responsible for any loan assumption fees and all other costs and charges imposed by Lenders in connection with the assumption of the Loans, including, without limitation any processing or application fees, attorneys' fees or other costs and any and all amounts which are imposed by Lenders as a condition of approval of assumption of the Loans, such as amounts in order to secure required rehabilitation, repair, maintenance or capital expenditures related to the Properties.

9.5     Possession.  Possession of the Properties shall be delivered to Buyer by Sellers at Closing, subject only to the Permitted Exceptions and the Leases.

9.6     Costs of Closing.  Each party is responsible for paying the legal fees of its counsel in negotiating, preparing, and closing the transaction contemplated by this Agreement. Sellers are responsible for any transfer taxes or documentary stamp taxes applicable to the conveyance

of the Properties. Buyer shall pay the cost of all title premiums for the Owner's Title Policy described in Section 4.5 and the cost of the Surveys. Buyer shall also be responsible for any additional cost attributable to the issuance of the mortgagee title policies, the cost of any title policy endorsements, mortgage taxes, and any filing/recording fees for the conveyance documents. Sellers and Buyer shall each pay one-half of any reasonable and customary escrow fees charged by the Title Company.

10.    TERMINATION, DEFAULT AND CASUALTY

10.1    Termination if Conditions Precedent not Satisfied or Waived.  If any of the conditions precedent to the performance of Buyer's obligations under this Agreement, including without limitation the approvals required in Section 8.1.1, have not been satisfied, waived, or deemed waived by Buyer on the Closing Date then Buyer shall give Sellers written notice of the specific conditions that have not been satisfied, waived or deemed waived, and if such specific conditions remain unsatisfied for seven (7) days after Sellers have received written notice thereof, then Buyer may, at its option, by written notice delivered to Sellers within one (1) Business Day following the expiration of such seven (7) day period, terminate this Agreement in writing, in which event the entire Earnest Money Deposit shall be returned to Buyer and Buyer and Sellers shall have no further obligations, one to the other, with respect to the subject matter of this Agreement, except for obligations expressly surviving termination.

10.2    Default of Buyer. If Buyer fails or refuses to consummate the transaction contemplated by this Agreement at Closing, or Buyer fails to perform any of its other obligations hereunder for any reason other than the termination of this Agreement pursuant to a right to so terminate expressly set forth in this Agreement or on account of default by the Sellers, then such event(s) shall constitute a default by Buyer hereunder and the Sellers may, as their sole and exclusive remedy for such default, terminate this Agreement by giving written notice thereof to Buyer prior to or at Closing, whereupon none of the parties hereto shall have any further rights or obligations hereunder (except as expressly set forth herein as surviving termination), and the Escrow Agent shall deliver the Earnest Money Deposit (to the extent not previously delivered and including the interest earned thereon) to the Sellers which shall constitute liquidated damages hereunder. It is agreed that the Earnest Money Deposit is a reasonable forecast of just compensation for the harm that would be caused by such default, which the parties agree is one that is incapable or very difficult of accurate estimation, and that payment of the Earnest Money Deposit upon such default shall constitute full satisfaction of Buyer's obligations hereunder, except as expressly set forth herein. This provision shall survive termination of this Agreement.

10.3    Default of the Sellers.  If all representations and warranties made by the Sellers hereunder as remade on the Closing Date are not true, complete and accurate in all material respects as of the Closing Date, or the Sellers fail or refuse to consummate the transaction pursuant to this Agreement at Closing, or the Sellers fail to perform any of their other obligations hereunder for any reason other than Buyer's failure to perform Buyer's obligations under this Agreement or a Force Majeure, then such event(s) shall constitute a default by the Sellers hereunder and Buyer shall have the right, as its sole and exclusive remedy, to either: (i) enforce specific performance of the Sellers' obligations under this Agreement if the nature of said default has not rendered specific performance unavailable, or (ii) if the nature of the Sellers' default has rendered specific performance unavailable or ineffective as a remedy, Buyer shall terminate this

Agreement and receive a return of the entire Earnest Money Deposit (including the interest earned thereon) and Buyer may seek damages (including without limitation all out-of-pocket expenses incurred); provided, however, in no event shall Buyer be entitled to recover consequential, punitive, or speculative damages from the Sellers as a result of any such default. This provision shall survive termination of this Agreement.

10.4    Casualty, Condemnation or Adverse Tax Ruling. The Sellers shall give Buyer prompt notice of any fire or other casualty affecting the Properties occurring after the date of execution of this Agreement, or of any taking or condemnation of all or any portion of the Properties, or of any adverse ruling regarding the tax exempt status of any of the Businesses.  If after the Effective Date and prior to Closing there shall occur (A) damage to any of the Properties caused by fire or other casualty, which would cost more than Three Hundred Thousand and No/100 Dollars ($300,000.00) repair (as determined by Buyer's architect, engineer or independent insurance adjuster), or (B) a taking or condemnation of all or any portion of any of the Properties which would materially interfere with the present use of the Properties, or (C) an adverse tax ruling which would subject any of the Properties to the imposition of real estate taxes, then, in such event, Buyer shall have the right, as its exclusive remedy, to either (i) terminate this Agreement by written notice delivered to Sellers within ten (10) days after Buyer has received notice from Sellers of such event or the date on which Buyer learns of such event, whichever shall first occur, and the Earnest Money Deposit shall be returned to Buyer and the parties shall have no further obligations to each other with respect to the subject matter of this Agreement, except as expressly delineated herein, provided, however, that if Buyer does not timely deliver such termination notice, Buyer shall have waived its right to elect this provision; or (ii) not terminate this Agreement and proceed to Closing, without a reduction in the Purchase Price, in which event Sellers shall assign their rights to any insurance proceeds (including, but not limited to, loss-of-rents proceeds) or condemnation proceeds resulting from such event, less any reasonable costs which Sellers shall have actually incurred prior to the Closing to repair any of the damage, and Sellers shall give a credit, for the benefit of Buyer, to the Purchase Price the amount of any deductible amount under such insurance policies (if such event is a casualty).  Notwithstanding the foregoing, in the event that the cost of repairing or restoring such damage (referenced above) shall be covered by available insurance and such cost shall be reasonably estimated by Buyer's architect, engineer or independent insurance adjuster to be equal to or less than Three Hundred Thousand and No/100 Dollars ($300,000.00) or in the event of a taking or condemnation which does not materially interfere with the present use of the Property, then Buyer shall proceed to Closing and Sellers shall assign to Buyer at Closing Sellers' rights to any insurance proceeds or condemnation proceeds resulting from such event, less any costs which Sellers shall have incurred prior to the Closing to repair any of the damage, and, in addition, Sellers shall credit the Purchase Price with the amount of any deductible under such insurance policies (if such event is a casualty).

11.    SURVIVAL OF REPRESENTATIONS AND WARRANTIES

All representations, warranties, covenants and agreements contained in this Agreement shall be deemed continuing representations, warranties, covenants and agreements, and in the case of representations and warranties and in the case of covenants and agreements to be performed prior to the Closing (said covenants and agreements, collectively, "Pre-Closing Covenants") shall survive for a period ending six (6) months after the Closing Date, and all

covenants and agreements other than Pre-Closing Covenants contained in this Agreement shall, if not waived by the party for whose benefit the covenant and/or agreement is, survive until performed and discharged in full.

12.    MISCELLANEOUS

    12.1    Management Contract. Sellers shall have the option, but not the obligation, to require Buyer to enter into a property management contract with Sellers' current property management company, Greystone Property Management Corporation ("GPMC"), pursuant to which GPMC will management the Properties for one year after Closing (the "Management Contract"). The Management Contract for each of the Properties shall contain such reasonable and customary terms as are typical for property management agreements for similar properties, will be at fair, market rate and terms not to exceed three percent (3%) of collections, and will be on Buyer's standard form of property management agreement that permits early termination by Buyer for GPMC's noncompliance with the terms of the Management Contract executed by the parties.

    12.2    Notices. All notices, demands and requests which may be or are required or permitted to be given, served, sent or delivered under the provisions of this Agreement shall be (a) in writing, (b) delivered by personal delivery, or sent by either overnight courier service with signature required service or certified US mail, return receipt requested, (c) deemed to have been given on the earliest of: the date of personal delivery or the date set forth in the records of the overnight delivery service or on the return receipt and (d) addressed as follows:

| | |
|---|---|
| If the Sellers: | Foundation for Affordable Rental Housing<br>c/o Greystone Property Management Corporation<br>111 Rockville Pike<br>Suite 1150<br>Rockville, MD 20850<br>Attention: Bill Guessford |
| With copies to: | Greystone & Co., Inc.<br>152 West 57th Street, 60th Floor<br>New York, NY 10019<br>Attention: General Counsel |
| | Joseph E. Thomas, III<br>c/o TechCare, Inc.<br>6629 Spring Street<br>Douglasville, GA  30134 |
| If to Buyer: | TPI Communities I, LLC<br>2001 West Blue Heron Blvd.<br>Riviera Beach, FL 33404<br>Attention: John Corbett |

|  |  |
|---|---|
| With copies to: | Brady & Brady, P.A.<br>350 Camino Gardens Blvd., Suite 300<br>Boca Raton, FL 33432<br>Attention: Frank Brady, Esq. |
| and | CHC Indiana LLC<br>2040 Boston Road, Suite 20<br>Wilbraham, MA 01095<br>Attention: David Kaufman, Manager |
| and | Fierst, Kane & Bloomberg, LLP<br>64 Gothic Street, Suite 4<br>Northampton, MA 01060<br>Attention:  Jonathan Kane, Esq.<br>Email: kane@fierstkane.com |

or to any such other persons or addresses as the parties may from time to time designate in a writing delivered in accordance with this Section 12.2.  Rejection or other refusal to accept or inability to deliver because of a change of address of which no notice was given shall be deemed to be receipt of the notice.

12.3   No Assignment; Benefit and Binding Effect.   No party shall assign this Agreement (or its rights or obligations hereunder) without the prior written consent of the other parties, which consent shall not be unreasonably withheld; *provided, however*, Buyer may assign its rights and obligations under this Agreement without consent to any 501(c)(3) non-profit entity controlled by or under common control with Buyer. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

12.4   Governing Law.   This Agreement shall be governed, construed and enforced in accordance with the internal laws of the State of Indiana, without regard to the choice of law provisions or conflicts of law principles of such state.

12.5   Waiver of Jury Trial.   Each of the parties hereto hereby irrevocably waives all right to trial by jury in any action, proceeding or counterclaim (whether based on contract, tort or otherwise) arising out of or relating to this Agreement or the actions of any party in the negotiation, performance or enforcement hereof or thereof.

12.6   Submission to Jurisdiction; Venue.   Each of the parties hereto agrees to submit to the jurisdiction of any court of the State of Delaware or the United States District Court, District of Delaware in any action or proceeding arising out of or relating to this Agreement or any of the matters contemplated hereby or thereby.   Each party hereto irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement in any such Delaware state or federal court.   Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by Legal Rules, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.   Each of the parties

hereto agrees not to bring any action arising out of this Agreement other than in a court of the State of Delaware or the United States District Court, District of Delaware.

12.7   Heading; Interpretation.   The descriptive headings of the several Articles and Sections of this Agreement are inserted for convenience only and do not constitute a part of this Agreement.   References to Sections or Articles (whether or not capitalized), unless otherwise indicated, are references to Sections and Articles of this Agreement.   References to Schedules and Exhibits (whether or not capitalized), unless otherwise indicated, are references to the disclosure schedules and exhibits to this Agreement.   The word "including" means including without limitation.   The terms "hereof", "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole (including all of the schedules and exhibits hereto) and not to any particular provision of this Agreement.

12.8   Gender and Number.   Words used herein, regardless of the gender and number specifically used, shall be deemed and construed to include any other gender, masculine, feminine or neuter, and any other number, singular or plural, as the context requires.

12.9   Entire Agreement.   This Agreement represents the entire understanding and agreement between the parties with respect to the subject matter hereof.   All schedules and exhibits attached to this Agreement shall be deemed part of this Agreement and incorporated herein, as if fully set forth herein.   This Agreement supersedes all prior negotiations between the parties with respect to the transactions contemplated hereby, and all letters of intent and other writings relating to such negotiations, and cannot be amended, supplemented or modified except by an agreement in writing which makes specific reference to this Agreement or an agreement delivered pursuant hereto, as the case may be, and which is executed by the party against which enforcement of any such amendment, supplement or modification is sought.

12.10   Further Assurances.   From time to time after the Closing Date, Buyer and the Sellers shall execute or deliver or cause to be executed or delivered such further instruments of conveyance, assignment, transfer and assumption, as may reasonably be requested by the other party in order to more effectively carry out the purposes and intent of this Agreement.

12.11   Waiver of Compliance.   Except as otherwise provided in this Agreement, any failure of any of the parties to comply with any obligation, representation, warranty, covenant, agreement or condition herein may be waived by the party entitled to the benefits thereof, but such waiver or failure to insist upon strict compliance with such obligation, representation, warranty, covenant, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure not so specifically waived.

12.12   Severability.   Any provision of this Agreement that is held to be invalid, illegal or unenforceable in any respect by a court of competent jurisdiction, shall be ineffective only to the extent of such invalidity, illegality or unenforceability, without affecting in any way the remaining provisions hereof; provided, however, that the parties will attempt in good faith to reform this Agreement in a manner consistent with the intent of any such ineffective provision for the purpose of carrying out such intent.

12.13   Enforcement of Agreement.   The parties acknowledge and agree that money damages would not be a sufficient remedy for any breach of this Agreement by a party, that the parties hereto would suffer irreparable harm as a result of any such breach, and that, in addition to all other remedies available under this Agreement or at law or in equity, the parties hereto shall be entitled to specific performance and injunctive or other equitable relief as a remedy for any such breach or threatened breach.   In the event of any action by any party to enforce this Agreement, the other parties hereto hereby waive the defense that there is an adequate remedy at law.

12.14   Counterparts.   This Agreement may be signed in any number of counterparts with the same effect as if the signature on each such counterpart were upon the same instrument, and a facsimile or portable document format (pdf) transmission shall be deemed to be an original signature for all purposes under this Agreement.

12.15   No Third Party Beneficiaries.   This Agreement constitutes an agreement solely among the parties hereto, and, except as otherwise provided herein, is not intended to and shall not confer any rights, remedies, obligations or liabilities, legal or equitable on any Person other than the parties hereto and their respective successors or assigns, or otherwise constitute any Person a third party beneficiary under or by reason of this Agreement.

12.16   Construction.   This Agreement has been negotiated by all parties and their respective legal counsel, and legal or equitable principles that might require the construction of this Agreement or any provision of this Agreement against the party drafting this Agreement shall not apply in any construction or interpretation of this Agreement.   In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

12.17   Public Announcements.   Prior to Closing, each party shall consult with the other before issuing any press release or otherwise making any public statements with respect to this Agreement and shall not issue any such press release or make any such public statement without the prior written approval of the other.   Notwithstanding the foregoing, the parties hereto acknowledge and agree that they may, without each other's prior consent, issue such press releases or make such public statements as may be compelled by Legal Rules, in which case the issuing party shall consult with the other party and use all commercially reasonable efforts to agree upon the nature, content and form of such press release or public statement.

12.18   No Personal Liability.   Notwithstanding any other provision set forth in this Agreement, no director, officer, employee or individual representative of the parties shall have any personal liability as a result of any breach by any party of its respective representations, warranties, covenants or agreements contained herein.

12.19   Expenses.   Except as expressly set forth elsewhere in this Agreement, the parties shall bear their own costs and expenses incurred in connection with the negotiation, preparation or execution of this Agreement (including, but not limited to, fees and expenses of attorneys, accountants, consultants, finders and investment bankers) whether or not the Closing occurs.

11.20 <u>Time of the Essence</u>. It is expressly agrees by the parties that time is of the essence with respect to this Agreement.

11.21 <u>Liability of Escrow Agent</u>. The parties acknowledge that the Escrow Agent is acting solely as a stakeholder at their request and for their convenience, that the Escrow Agent shall not be deemed to be the agent of any of the parties, and that the Escrow Agent shall not be liable to any of the parties for any action or omission on its part taken or made in good faith, and not in disregard of this Agreement, but shall be liable for its negligent acts and for any loss, cost or expense incurred by Buyer resulting from the Escrow Agent's mistake of law respecting the Escrow Agent's scope or nature of its duties.  The parties shall jointly and severally indemnify and hold the Escrow Agent harmless from and against all costs, claims and expenses, including reasonable attorneys' fees, incurred in connection with the performance of the Escrow Agent's duties hereunder, except with respect to actions or omissions taken or made by the Escrow Agent in bad faith, in disregard of this Agreement or involving negligence on the part of the Escrow Agent.

IN WITNESS WHEREOF, this Agreement has been executed by the parties as of the date first above written.

*[Signatures on Following Page]*

**TPI COMMUNITIES I, LLC**

By: _____
Print:   *JOHN CORBETT*
Title:   *MANAGER*
Date:   *4/15/2014*

**FOUNDATION FOR AFFORDABLE RENTAL HOUSING, INC.**

By: _____
Print:
Title:
Date:

**FARH-FOX LAKE AFFORDABLE HOUSING, INC.**

By: _____
Print:
Title:
Date:

**FARH-SOUTH AFFORDABLE HOUSING, INC.**

By: _____
Print:
Title:
Date:

**FARH-WEST AFFORDABLE HOUSING, INC.**

By: _____
Print:
Title:
Date:

29

**TPI COMMUNITIES I, LLC**

By: _____
Print:
Title:
Date:

        **FOUNDATION FOR AFFORDABLE RENTAL
HOUSING, INC.**

        By: _____
        Print:
        Title:
        Date:

        **FARH-FOX LAKE AFFORDABLE HOUSING, INC.**

        By: _____
        Print:
        Title:
        Date:

        **FARH-SOUTH AFFORDABLE HOUSING, INC.**

        By: _____
        Print:
        Title:
        Date:

        **FARH-WEST AFFORDABLE HOUSING, INC.**

        By: _____
        Print:
        Title:
        Date:

**EXHIBIT A**

| | | |
|---|---|---|
| 1. | Bank Statements: last 12 months for Properties and all computer bank reconciliations related thereto, certified, to Seller's Knowledge, as complete and accurate in all material respects. | |
| 2. | Capital Expenditures: Past five years, detailed with dollar amounts. Planned/needed detailed list. | |
| 3. | Certificates of occupancy, permits, license, copies thereof and of all amendments, if any. | |
| 4. | Concessions: Details of any concessions currently being offered or in effect for existing leases. | |
| 5. | Computers: 1) A list of all computers on the site detailing: model name, model number, operating system, software packages used for apartment management and version number. 2) A list of all printers with the same information. 3) Are they networked? 4) What type of internet access do they have? 5) Need name of a contact person who will be able to create a file to transfer the data to our system. Need Vendor Ledger, Resident Ledger.  All reports in last 90 days. | |
| 6. | Delinquency:  List of delinquent tenant rent payments for prior year & yr-to-date. | |
| 7. | Floor plans – Digital files, if any. | |
| 8. | Intentionally omitted. | |
| 9. | Loss Run report for last 5 years for general liability and property insurance. | |
| 10. | Addresses of every unit and building and square footage for insurance purposes. | |
| 11. | Market Survey of Competitor Properties. | |
| 12. | Loan Documents, including without limitation mortgage documents and other liens/deeds on the Properties | |
| 13. | Occupancy:  Two-year history of monthly occupancy. | |
| 14. | Operating Statements:  Past three calendar years detailing revenue and expenses month by month, as well as the 2014 budget, certified, to Seller's Knowledge, as complete and accurate in all material respects. | |
| 15. | Real Estate Tax bills - copies for previous two years | |
| 16. | Rent Rolls | |
| 17. | Rental information including a general description of tenant qualification standards, blank lease form including all addenda (pets, appliances, security, | |

| | | parking, etc.), method of rent ledger accounting, etc. | |
|---|---|---|---|
| | 18. | Salaries: breakdown per employee including benefits such as free or reduced rent. | |
| | 19. | Service and Vendor Contracts: Copies of service contracts, vendor agreements, equipment leases, warranties, vehicles and other agreements relating to the operation of the properties, including contact person and information | |
| | | -Copying Machine | |
| | | -Equipment | |
| | | -Golf Carts | |
| | | -Pool | |
| | | -Security | |
| | | -Trash | |
| | | -Cable Agreements: copy of agreement; name and contact information. | |
| | | -Landscape | |
| | | -Laundry Agreement | |
| | | -Marketing:  Advertising | |
| | | -Pest Agreement | |
| | | -Roofs Warranty | |
| | | -Termite Agreements | |
| | | - Website contracts | |
| | | - uniform contracts | |
| | | - furniture contracts | |
| | 20. | Security Deposit Detailed List | |
| | 21. | Tenant leases and copies of court agreements or out-of-court agreements relating to payment of rent (to be made available at the Properties) | |
| | 22. | Tenant claims as to defenses, set-off or counterclaims regarding the obligation to pay rent and other charges | |
| | 23. | Utility Bills for the Properties for the most recent month | |
| | | -Electric Bills | |
| | | -Gas Bills | |
| | | -Telephone Bills | |
| | | -Water & Sewer Bills | |
| | 24. | Personal Property Inventory List | |
| | 25. | Contracts not listed elsewhere | |
| | 26. | Form 990s for 2010, 2011, 2012, 2013 | |
| | 27. | Tax board rulings, private letter rulings, administrative findings and other tax-related decisions relating to the Sellers (state and federal) | |
| | 28. | Evidence of required reserves, taxes and insurance monthly contribution amounts | |
| | 29. | Ground leases | |

| | | |
|---|---|---|
| 30. | Cash deposits detail for previous 12 months | |
| 31. | Maintenance work orders for past 90 days and all open work orders | |
| 32. | Turnover ratios for last 24 months | |
| 33. | Listing of leases entered into or renewed in last 2 months | |
| 34. | Evidence of Sellers' good standing in Delaware and Indiana | |

Third Party Reports

| | | |
|---|---|---|
| 1. | Most recent available appraisals for all Properties. | |
| 2. | Engineering reports / Property condition reports for all Properties | |
| 3. | Environmental reports – Phase I for all Properties | |
| 4. | Physical reports: asbestos and mechanical reports or any other physical reports of the Properties, including without limitation Soils Reports. | |
| 5. | Most current surveys of the Properties | |
| 6. | Title Insurance documents relating to the Properties | |
| 7. | Traffic Reports monthly for past 2 years, weekly for last two months | |
| 8. | Fire inspection Reports | |

## SCHEDULES

| | |
|---|---|
| Schedule 1.1(a) | Sellers Knowledgeable Individuals |
| Schedule 1.1(b) | Buyer Knowledgeable Individuals |
| Schedule 1.1(c) | Loans |
| Schedule 1.1(d) | Certain Permitted Encumbrances |
| Schedule 5.4 | Certain the Sellers Consents |
| Schedule 5.5 | Unaudited Financial Statements |
| Schedule 5.6 | Tangible Personal Property |
| Schedule 5.7(a) | Real Properties |
| Schedule 5.7(b) | Other Interests in Real Property |
| Schedule 5.8.1 | Contracts |
| Schedule 5.8.2 | Exceptions to Contracts |
| Schedule 5.9.1 | Intellectual Property |
| Schedule 5.9.2 | Proceedings Regarding Intellectual Property |
| Schedule 5.9.3 | Exceptions to Exclusive Right to Intellectual Property |
| Schedule 5.10 | Tax Returns |
| Schedule 5.11 | Exceptions to Conduct in the Ordinary Course |
| Schedule 5.13.1 | Licenses |
| Schedule 5.13.2 | Legal Proceedings |
| Schedule 5.14 | Environmental Matters |
| Schedule 5.15 | Transactions with Affiliates |
| Schedule 5.16 | Bonds; Letters of Credit |
| Schedule 5.18 | Violations of Law |
| Schedule 5.19 | Accounts Payable |
| Schedule 5.20 | Tenant Leases |
| Schedule 6.3 | Certain Buyer Consents |