## MEMBERSHIP SALE AND ACQUISITION AGREEMENT

THIS MEMBERSHIP SALE AND ACQUISITION AGREEMENT ("**Agreement**") is made and entered into as of July 31, 2015 (the "Effective Date"), by and amongst the following parties: (i) FSR/TENNESSEE AFFORDABLE HOUSING FOUNDATION, a Tennessee not-for-profit corporation ("FSR"), FOUNDATION FOR AFFORDABLE RENTAL HOUSING, INC. ("FARH"), FARH-FOX LAKE AFFORDABLE HOUSING, INC. ("FARH-Fox Lake"), FARH-SOUTH AFFORDABLE HOUSING, INC. ("FARH-South"), and FARH-WEST AFFORDABLE HOUSING, INC. ("FARH-West"), each a Delaware non-profit corporation and 501(c)(3) public charity (FSR, FARH, FARH-Fox Lake, FARH-South and FARH-West shall be referenced herein collectively as the "FARH Entities") and GULF COAST HOUSING ASSISTANCE CORP., a Texas non-profit corporation ("Gulf Coast") on the one hand; and (ii) JPC CHARITIES, an Ohio nonprofit corporation and 501(c)(3) public charity ("JPC") on the other hand.

## R E C I T A L S:

A. The FARH Entities are not-for-profit corporations operated primarily to foster, support, provide, develop, acquire, construct, rehabilitate and operate qualified affordable housing for low-income persons and families, elderly persons and/or mentally or physically disabled persons, all in a manner that qualifies them for exemption from income tax as organizations described in Section 501(c)(3) of the Internal Revenue Code of 1986 (the "Code").

B. FARH, FARH-West, FARH-Fox Lake and FARH-South, collectively own and operate seven low income, affordable multifamily apartment properties comprising approximately 2,517 apartment units located in Indianapolis, Indiana (as more fully defined in Section 1 below, the "Properties").

C. FARH is a supporting organization of FSR, pursuant to Section 509(a)(3) of the Code. FARH intends on converting from a Delaware non-profit corporation to an Indiana non-profit corporation and to amend its bylaws as necessary to provide for a membership interest in FARH, which membership interest will be held 100% by Gulf Coast (the "Membership Interest").

D. FARH is the 100% member of FARH-West, FARH-Fox Lake and FARH-South.

E. The members of the boards of directors of the FARH Entities wish to expand the number of affordable housing units they can make available on a non-profit basis to low-income persons and families, and believe that they can do so by shifting their focus from the Properties to newer, more energy efficient housing stock in other communities. At the same time, they wish to have the Properties maintained as qualified non-profit housing.

F. JPC's mission includes fostering the provision of affordable housing on a non-profit basis, and it wishes to support the continued ownership and operation of the Properties as low income, affordable multifamily apartment properties. JPC has therefore proposed to

acquire the Membership Interest and simultaneously therewith replace the current directors of the FARH Entities (the "FARH Directors") with the JPC Nominees (as defined below), as of the Closing Date (as defined below), for $10.1 million (as may be adjusted by the Closing Adjustments Amount at Closing in accordance with Section 7.4 below, the "Purchase Price").

G.  JPC shall have until the Closing Date (as defined below) to satisfy, in addition to all conditions and terms of this Agreement, including, but not limited to, those set forth in Section 6.2 below, all, but not some, of the following conditions precedent ("FARH Conditions Precedent"), all at JPC's sole cost and expense, and in accordance with, and subject to the terms and conditions of, this Agreement, (including without limitation the FARH Entities' Closing Obligations, as defined below):

> (i)   JPC shall, prior to or upon Closing, either obtain all Lender Consents (as defined below) or pay off any and all amounts due with respect to a Loan (as defined below) for which a Lender Consent is not obtained;
>
> (ii)  JPC shall pay the Purchase Price to Gulf Coast; and
>
> (iii) JPC or its property management company shall obtain and bind casualty and liability insurance for the Properties and liability and D&O insurance for the FARH Entities and the new members of the Boards of Directors.

## A G R E E M E N T S:

In consideration of the above recitals, which are incorporated herein and made a part hereof, and the covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the FARH Entities, Gulf Coast and JPC agree as follows:

1.   DEFINITIONS

1.1   Certain Definitions.  For all purposes of this Agreement, the following terms have the respective meanings set forth below:

"**Affiliate**" means with respect to a Person, any Person directly or indirectly controlling, controlled by or under common control with such Person.  For purposes of this definition, the term "**control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person.

"**Business Day**" means each Monday, Tuesday, Wednesday, Thursday and Friday that is not a national holiday.

"**Closing**" means the consummation of the Sale.

**"Closing Date"** means November 24, 2015.

**"Code"** means the Internal Revenue Code of 1986, as amended, or any subsequent legislative enactment thereof, each as in effect from time to time.

**"Consent"** means any consent, permit, authorization or approval of any Governmental Authority or other third party, including but not limited to the Lenders, that the FARH Entities are, under the terms of any Contract, Legal Rule or License, required to obtain before undertaking the FARH Conversion, the Sale and the resignation of the FARH Directors and appointment of the JPC Nominees as new board members.

**"Contract"** means any legally binding contract, agreement, lease or non-governmental license to which any of the FARH Entities (or agents and representatives acting on their behalves) are a party and which is used in the operation of the Properties, including without limitation management, maintenance, equipment, utility, security, software, occupancy, vendor and employment agreements.

**"Director"** means any individual serving as a member of any board or governing body of a legal entity, including a corporation or limited liability company.

**"FARH Names"** means the legal names of the FARH Entities as of the Effective Date and prior to the Name Changes, as listed on **Schedule 5.4**.

**"Force Majeure"** means any prevention, delay or stoppage due to strikes, lockouts, acts of God, enemy or hostile governmental action, civil commotion, fire, natural or man-made disaster or other casualty beyond the control of the party obligated to perform that shall excuse the performance thereof by such party.

**"GFC Credit Facilities"** means those certain loan or credit facilities between Greystone Funding Corporation ("GFC") or an affiliate thereof and one or more of the FARH Entities.

**"GFC Payable"** means the aggregate amount owed by the FARH Entities to GFC under the GFC Credit Facilities as of the Closing Date.

**"GPMC Accrued Fees"** means the aggregate amount of all outstanding property management fees due and owing, but not yet paid to, Greystone Property Management Corp. ("GPMC") from one or more of the FARH Entities for services rendered by GPMC with respect to the Properties through and including the Closing Date.

**"GPMC Payable"** means the aggregate amount of the GPMC Accrued Fees pursuant the terms of the property management agreements between GPMC and the FARH Entities, as of the Closing Date.

**"Governmental Authority"** means the United States government or any state government, or other political subdivision thereof or any entity or office exercising executive, legislative, judicial, regulatory or administrative functions on their behalf.

"**Intellectual Property**" means any or all of the following and all common law and statutory rights in, arising out of, or associated therewith: (a) patents and applications therefor; (b) inventions, trade secrets, proprietary information, know-how and technical data; (c) copyrights, copyright registrations and applications therefor; (d) software and software programs; (e) domain names, uniform resource locators and other names and locators associated with the Internet; (f) trade names, logos, common law trademarks and service marks, trademark and service mark registrations and applications therefor; (g) trade dress (including banners, flags, nameplates, and mastheads); and (h) databases and data collections and all rights therein.

"**JPC Names**" means the names that will replace the current legal names of the FARH Entities as listed on **Schedule 1.1**.

"**JPC Nominees**" means the Persons identified on **Schedule 1.1**.

"**Knowledge**" means, with respect to the FARH Entities, the actual knowledge, or lack thereof, based on reasonable inquiry, of the Board of Directors of the FARH Entities.

"**Leases**" means the residential tenant leases for the Properties as set forth in the applicable rent rolls, as described on Schedule 3.16 as of the Effective Date, and as the same may be modified by the addition or deletions of Leases from time to time in the normal course of business of the FARH Entities in operating the Properties.

"**Legal Rule**" means any applicable statute, ordinance, code or other law, rule, regulation, order, or other written requirement enacted, adopted, promulgated, applied or followed by any Governmental Authority.

"**Lender**" means any individual, corporation, limited liability company, partnership, association, organization, Governmental Authority, agency or other entity who has made funds available to the FARH Entities by way of loan or other lending arrangement, as listed on **Schedule 2.3** hereto.

"**Liability**" means any debt, obligation or liability of any kind or nature, whether accrued or fixed, absolute or contingent, determined or determinable, matured or unmatured, and whether due or to become due, asserted or unasserted, or known or unknown.

"**License**" means any license, authorization, franchise or permit used exclusively in connection with the operation of the FARH Entities' business granted or issued to the FARH Entities or their agents by any Governmental Authority, including all amendments thereto and renewals or modifications thereof.

"**Loan Documents**" mean any and all documents, instruments and agreements evidencing, securing or otherwise relating to the Loans.

"**Loans**" mean the existing mortgage loans to which the Properties are subject as of the Effective Date as specified on **Schedule 2.3** hereto for which copies of the relevant loan documents have been provided, or made available via an internet sharesite (the "Sharesite"), by FARH to JPC.

"**Losses**" mean any and all costs, expenses, damages, liabilities, losses, claims, judgments or settlements, including reasonable attorney and professional fees, imposed on or otherwise suffered by a Person.

"**Person**" means any individual, corporation, limited liability company, partnership, company, sole proprietorship, joint venture, trust, estate, association, organization, Governmental Authority or other entity.

"**Properties**" mean the following multifamily apartment housing complexes located in Indianapolis, Indiana: Capital Place Apartments, The Woods at Oak Crossing, Covington Square Apartments, Fox Club Apartments, Lakeside Pointe at Nora, The Estates at Crystal Bay, Woodhaven Park, including without limitation the land and improvements thereon, as well as all of FARH Entities' rights, title and interest in and to adjacent streets, alleys, rights-of-way, adjacent strips or gores of real estate, and all of FARH Entities' rights, titles and interests appurtenant to the land and improvements and to any unpaid aware of any taking by condemnation or damage to the Properties, fixtures, equipment, and personal property, attached or appurtenant to, located at or used in connection with therewith.

"**Sale**" means the sale and transfer of the Membership Interest by Gulf Coast and the purchase and acquisition of the Membership Interest by JPC in accordance with the terms and conditions of this Agreement.

1.2    <u>Principles of Construction</u>.    All references to sections and schedules are to sections and schedules in or to this Agreement unless otherwise specified.  All uses of the word "including" shall mean "including, without limitation" unless the context shall indicate otherwise.  Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined.

1.3    <u>Other Defined Terms</u>.  Certain other defined and capitalized terms shall have the respective meanings assigned to them elsewhere in this Agreement.

2.    <u>AGREEMENT OF PURCHASE AND SALE; CHANGE OF BOARD CONTROL; LENDER CONSENTS; FARH CONVERSION; NAME CHANGES</u>

2.1    <u>Purchase and Sale; Purchase Price; Down Payment</u>.  Subject to and in accordance with the terms and conditions of this Agreement, JPC agrees to purchase, and Gulf Coast agrees to sell, the Membership Interest for TEN MILLION ONE HUNDRED THOUSAND AND NO/100 DOLLARS ($10,100,000.00).  On or prior to the Effective Date, JPC shall pay directly to Gulf Coast the sum of THREE HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($350,000.000)(the "Down Payment"), which Down Payment shall be deemed fully earned and non-refundable except as specifically provided for in this Agreement.

2.2    <u>Change of Board Control</u>.  On the terms and conditions stated in this Agreement, including but not limited to FARH obtaining reasonably acceptable background checks on each of the JPC Nominees, the FARH Entities agree that upon the Closing, the FARH Directors will

resign and appoint the JPC Nominees as new board members (the "Board Change") pursuant to a resolution in a form substantially similar to the resolution in **Schedule 2.2** hereto.

2.3     Lender Consents; Loan Payoff.    Prior to the fifteenth (15th) Business Day following the Effective Date, JPC shall have commenced the processing of contacting all of the FARH Entities' lenders and obtaining their consent and approval of the Board Change, the conversion of FARH from a Delaware non-profit corporation to an Indiana non-profit corporation and the Sale, as set forth or required by the Loan Documents or any applicable law, regulation or requirement relating to the Loans listed on **Schedule 2.3** (the "Lender Consents"), and JPC shall diligently pursue and take all reasonable steps necessary to obtain the written Lender Consents, on or prior to the Closing Date. If JPC is unable to obtain all the Lender Consents on or prior to the Closing Date, this Agreement shall terminate and neither party shall have any further obligations to the other hereunder. It is specifically understood and agreed that the entire Down Payment is non-refundable notwithstanding JPC's inability or failure to obtain the Lender Consents and the Down Payment shall be retained by Gulf Coast if this Agreement is terminated pursuant to the prior sentence.   JPC acknowledges and agrees that the Lender Consents are not within the control of FARH Entities, Gulf Coast or the FARH Directors or the servicer of the Loans but are dependent upon approval by the Lenders and/or any government sponsored entities or Governmental Authorities not within the control of the FARH Entities, FARH Directors or the servicer of the Loans. Notwithstanding the forgoing, Lender Consents shall not include or require the consent from any lender whose Loan is paid off, by or on behalf of JPC, on or prior to the Closing Date, provided, however, that JPC shall have, in lieu of obtaining a Lender Consent with respect to a Loan, deposited with the Escrow Agent sufficient funds, separate and apart from, and in addition to, the Purchase Price, in an amount necessary to pay off all amounts owing with respect to such Loan and to obtain the release of any and all security and/or guaranty instruments or agreements with respect thereto (a "Loan Payoff and Release"), provided further, however, that such Loan Payoff and Release is completed on or prior to the Closing Date (or the funds necessary to obtain such Loan Payoff and Release have been deposited into escrow with the Escrow Agent). JPC shall be responsible for any and all fees, costs and charges imposed by Lenders in connection with the Lender Consents or the payoff of any Loans.

2.4     FARH Conversion. JPC has requested, and, subject to the terms and conditions of this Agreement, FARH has agreed, to convert from a Delaware not-for-profit corporation to an Indiana not-for-profit corporation (the "FARH Conversion"). FARH's obligation to complete the FARH Conversion shall be conditioned upon the following:

2.4.1     Non-Profit Counsel Opinion.  Delivery to FARH and Gulf Coast of a legal opinion from JPC's non-profit counsel, reasonably acceptable to FARH, that the FARH Conversion: (i) does not adversely affect FARH's status as a 501(c)(3) public charity under the Code, (ii) does not constitute a dissolution or other change to the corporate status of FARH, except for its place of incorporation; and (iii) has been approved by all applicable and required Governmental Authorities in Delaware and Indiana.

2.4.2     Additional Down Payment. Prior to submission to the applicable Governmental Authorities of the necessary documents, notices and requests for approval for the FARH Conversion (the "FARH Conversion Documents"), JPC shall deposit with the Escrow

Agent (as defined below), FIVE HUNDRED THOUSAND AND NO/DOLLARS ($500,000.00)(the "Additional Down Payment"). Upon submission of the FARH Conversion Documents, which shall be available to JPC's counsel for its reasonable review and approval, the Additional Down Payment shall become non-refundable (other than as expressly provided herein due to an intentional breach or willful failure to close by the FARH Entities or Gulf Coast) and part of the Down Payment.

2.5     Name Changes. On or prior to the Closing Date, provided JPC is not in actual or anticipatory breach hereunder,  the FARH Entities will either: (i) change their legal names from the FARH Names (as defined in Section 5.4 below) to the JPC Names (the "Name Changes"); or (ii) request that the JPC Nominees execute and deliver to the Document Escrow Agent (as defined below), such resolutions and certificates of name change as may be necessary or appropriate to effect the Name Changes upon the Closing.

3.     REPRESENTATIONS AND WARRANTIES OF FARH ENTITIES AND GULF COAST

The FARH Entities and Gulf Coast represent and warrant to JPC, as of the Effective Date and, except as expressly provided below, on the Closing Date (as applicable), as follows:

3.1     Organization, Standing and Authority.  The FARH Entities are each corporations validly existing and in good standing under the laws of the State of Delaware, except for FSR, which is a corporation validly existing and in good standing under the laws of the State of Tennessee. The FARH Entities are each duly authorized, qualified or licensed to do business as a foreign company in Indiana and are in good standing under the legal rules of each jurisdiction in which the nature of their activities makes such qualifications necessary. It is anticipated that FARH will become an Indiana non-profit corporation on or prior to the Closing Date. If FARH is unable to become an Indiana non-profit corporation or such migration from Delaware to Indiana would adversely impact FARH's status as a 501(c)(3) public charity or adversely impact or change FARH's tax identification number, FARH may terminate this Agreement at which time this Agreement will become null and void and neither party shall have any further obligations to the other hereunder.  Gulf Coast is a corporation validly existing and in good standing under the laws of the State of Texas.

3.2     Tax Exempt Status. As of the Effective date, but prior to the FARH Conversion, if any, the FARH Entities are (or have been) recognized as tax-exempt by the Internal Revenue Service ("IRS") pursuant to Section 501(c)(3) of the Code, 26 U.S.C. § 501(c)(3). The FARH Entities have taken all necessary actions to maintain the tax-exempt status of the FARH Entities and have no Knowledge of any specific facts that would place at risk the tax-exempt status of any of the FARH Entities. Notwithstanding the forgoing, JCP acknowledges and agrees that the FARH Entities make no representation or warranty as to the effect, if any, the FARH Conversion may have on their tax-exempt status.

3.3     Authorization and Binding Obligation.  Subject to the receipt of any necessary Consents from any Governmental Authority, the FARH Entities and Gulf Coast have the power and authority to execute and deliver this Agreement and to carry out and perform all of their other obligations under the terms of this Agreement. The execution and delivery of, and

performance of the obligations contained in, this Agreement and the transactions contemplated hereby and thereby have been duly authorized by all necessary corporate action on the part of the FARH Entities and Gulf Coast. This Agreement has been duly executed and delivered by the FARH Entities and Gulf Coast and this Agreement constitutes the valid and legally binding obligation of the FARH Entities and Gulf Coast, enforceable against each of them in accordance with its terms.

3.4     Unaudited Financial Statements.  The FARH Entities have provided to, and JPC hereby acknowledges receipt of, the most recent practicably available complete and correct copies of (i) the unaudited balance sheets for the FARH Entities and (ii) an unaudited statement of operations of the FARH Entities (collectively, the "**Unaudited Financial Statements**"), which Unaudited Financial Statements were provided to JPC via access to the Sharesite (as defined above in Section 1.1 in the definition of "Loans"). The Unaudited Financial Statements were derived from the books and records of the FARH Entities and fairly represent the financial position of the FARH Entities as of the date thereof.  Audited financial statements, if available, shall be provided to JPC upon request.

3.5     Tangible Personal Property.  **Schedule 3.5(a)** lists, as of the date hereof, all tangible personal property, including without limitation all motor vehicles, furniture, fixtures, systems, equipment, and machinery owned by the FARH Entities and **Schedule 3.5(b)** lists, as of the date hereof, all tangible personal property, including without limitation all motor vehicles, furniture, fixtures, systems, equipment, and machinery leased by the FARH Entities, all in connection with the operation of the Properties. JPC has been advised and acknowledges that all computer and other electronic and/or communications equipment used by GPMC in connection with GPMC's management of the Properties is not owned by any of the FARH entities but rather is owned by either GPMC or its affiliate and is thus intentionally and expressly excluded from any schedule herein.

3.6     Real Properties.  **Schedule 3.6(a)** lists, as of the date hereof, all real property owned by the FARH Entities.  The FARH Entities do not lease any real estate in connection with the operation of the Properties and do not have any other interests in real property that are used in connection with the ownership and operation of the Properties (including unrecorded easements, unrecorded licenses, unrecorded rights to access and unrecorded rights-of-way) except as disclosed in **Schedule 3.6(b)**. To the FARH Entities' Knowledge, there are no existing or pending condemnation actions or other legal proceedings adversely affecting the continued present use of the entirety of the Properties. To the best of FARH Entities' Knowledge, there are no adverse or other parties in possession of the land of which the Properties are part or trespassers. There are no options to purchase or rights of first refusal with respect to all or any part of the Properties that have been granted by FARH Entities or are outstanding. Except as may be set forth in **Schedule 3.10.2**, the FARH Entities have not received any claim, demand, suit or action arising out of or relating in any way to water damage, water instruction, mold growth or mold infestations occurring in, on or about any of the Properties.  The FARH Entities have not granted or contracted to grant any development rights appurtenant to the Properties.

3.7     Contracts.

3.7.1   **Schedule 3.7.1** includes a list, as of the date hereof, of Contracts of the FARH Entities. The FARH Entities have made available to JPC complete and correct copies of all the Contracts.

3.7.2   Each  Contract is in full force and effect and constitutes a valid, binding and enforceable obligation of the FARH Entities and/or the Properties in accordance with the respective terms thereof, and represents a valid, binding and enforceable obligation of each of the other parties thereto; and (b) there exists no material breach or material default (or event that with notice or the lapse of time, or both, would constitute a material breach or material default) on the part of the FARH Entities, or, to the FARH Entities' Knowledge, on the part of any other party thereto under any  Contract.

3.8     Absence of Changes or Events. From the Effective Date through the Closing Date, unless otherwise approved by JPC in writing, which consent shall not be unreasonably withheld conditioned or delayed, the FARH Entities and their respective agents and representatives have not:

3.8.1   amended or terminated any Contract, except in each case by reason of the occurrence of a contractually specified termination date or otherwise in the ordinary course of operating the Properties;

3.8.2   made any change in accounting principles, practices or methods of the operation of the Properties;

3.8.3   paid, discharged or satisfied any material Liability relating to or arising in connection with the Properties, other than the payment, discharge, or satisfaction of Liabilities in the ordinary course of operating the Properties; or

3.8.4   made any sale, assignment, lease, transfer or other disposition of any personal property belonging to and used in the operation of the Properties, other than in the ordinary course of operating the Properties.

3.9     Insurance.  The FARH Entities maintain insurance in respect of the Properties covering such risks, in such amounts, with such terms and with such insurers as the FARH Entities have determined is appropriate in light of the Properties and consistent with industry practice, as more particularly listed on **Schedule 3.9** hereto (such insurance, the "**Insurance Policies**").  All of the Insurance Policies are in full force and effect. The FARH Entities are not in default with respect to any material provision contained in any such Insurance Policy held by or on behalf of them.  The FARH Entities have not received any notice of cancellation or non-renewal of any such Insurance Policy or notice to remedy any specific defects or deficiencies with respect to the Properties as a condition to insurance coverage.  On or prior to the Closing Date, JPC shall have obtained and bound replacement coverage for the Insurance Policies.  Upon cancellation of the Insurance Policies on the Closing Date, all premiums refunded to the FARH Entities with respect to the Insurance Policies (the "Premium Refund"), whether such refund is received on or after the Closing Date, shall be credited to Gulf Coast pursuant to Section 7.4 below.

3.10    Licenses; Legal Proceedings.

3.10.1 **Schedule 3.10.1** lists all material Licenses, as of the date hereof, that are held by the FARH Entities.  Each of the Licenses is in full force and effect in accordance with its terms in all material respects.  As of the date hereof, no legal action or other formal proceeding is pending or, to the FARH Entities' Knowledge, threatened, to revoke, terminate, suspend, or cancel any of the Licenses or to impose any material forfeiture or penalty with respect to any of the Licenses.

3.10.2 **Schedule 3.10.2** contains a complete and correct list, as of the date hereof, of all pending and outstanding, or, to the FARH Entities' Knowledge threatened, lawsuits, legal actions or arbitrations, which would are reasonably be expected to materially and adversely affect the  Properties.

3.11    Transactions with Affiliates.  The FARH Entities are not a party to any material business arrangement or material business relationship with any of its Affiliates with respect to the operation of the Properties, and none of its Affiliates owns any material property or material right, tangible or intangible, that is used in the FARH Entities' operation of the Properties. The foregoing notwithstanding, the existing property management agreements between the FARH Entities and GPMC, to the extent GPMC is deemed an Affiliate of the FARH Entities, have been reviewed and approved by JPC. In addition, JPC has reviewed and is familiar with the terms and conditions of the GFC Credit Facilities, which will be terminated upon GFC's receipt of payment in full of the GFC Payment on or prior to the Closing Date.

3.12    Bonds; Letters of Credit.    There are no material construction, fidelity, performance, or other bonds, guaranties in lieu of bonds or letters of credit posted by the FARH Entities in connection with the FARH Entities' operation or ownership of the Properties, other than those associated with utility or other services provided to the Properties as set forth in **Schedule 3.12**, all of which shall be apportioned as of the Closing Date in accordance with Section 7.4 below.

3.13    Brokers on behalf of the FARH Entities.  There is no investment banker, broker, finder or other intermediary or advisor that has been retained by or is authorized to act on behalf of the FARH Entities who might be entitled to any fee, commission or reimbursement of expenses for which JPC will be responsible or have any Liability as a result of the transactions contemplated by this Agreement.

3.14    No Violation of Law. The FARH Entities are not engaging in any activity or omitting to take any action as a result of which it is in violation in any material respect of any law, rule, regulation, zoning or other ordinance, statute, order, injunction or decree, or any other requirement of any court or Governmental Authority or administrative body or agency, applicable to the Properties.

3.15    Accounts Payable; Prepaid Items.  All accounts payable related to the Properties are reflected in the Unaudited Financial Statements of FARH Entities' property management company. **Schedule 3.15** sets forth the most recent practicably available true and correct aged list of all of the accounts payable. Except as disclosed in **Schedule 3.15**, all accounts payable have

arisen in the ordinary course of business and represent valid arms-length accounts payable on behalf of the Properties.

3.16    Tenant Leases. FARH Entities (or their respective property management company) are the "landlord" or "lessor" under all of the Leases and own unencumbered legal and beneficial title to all of the Leases and the rents and other income thereunder. Except as set forth in **Schedule 3.16**, there currently exists no formal written claim by any tenant as to any defense, set off, or counterclaim with respect to its tenancy or its obligation to pay rent and other charges pursuant to its Lease or any formal written notice of default issued by or on behalf of the landlord to any tenant that remains outstanding. **Schedule 3.16** sets for the accurate rent roll for each Property.

3.17    Escrows, Deposits and Reserves. **Schedule 3.17** sets forth all the Debt Escrows (as defined below) and Security Deposits (as defined below) as of the Effective Date.

3.18    Disclosures True and Accurate.   All documents delivered to JPC by FARH Entities or their property management company pursuant to Section 4.5 hereof are, to the best of their Knowledge, true and accurate in all material respects.

3.19    Outstanding Debt/Obligations. Except for the Contracts, the Loans or any additional obligations undertaken by the FARH Entities upon Closing on the Sale, and upon repayment of the GPMC Payable and the GFC Payable, the FARH Entities shall have no other debt or obligations on the Closing Date.

4.    REPRESENTATIONS, COVENANTS AND WARRANTIES OF JPC

JPC represents and warrants to the FARH Entities as follows:

4.1    Organization, Standing and Authority.  JPC is a 501(c)(3) non-profit corporation validly existing and in good standing under the laws of the State of Ohio and is a public charity.

4.2    Authorization and Binding Obligation.   JPC has the power and authority to execute and deliver this Agreement and to carry out and perform all of its obligations under the terms of this Agreement**.**  The execution and delivery of, and performance of the obligations contained in, this Agreement and the transactions contemplated hereby and thereby have been duly authorized by all necessary action on the part of JPC.  This Agreement has been duly executed and delivered by JPC, and this Agreement constitutes the valid and legally binding obligation of JPC, enforceable against it in accordance with its terms.

4.3    Absence of Conflicting Terms; Consents.  Delivery and performance by JPC of this Agreement (with or without the giving of notice, the lapse of time, or both): (a) assuming receipt of all the Lender Consents**,** do not require the consent of, notice to, or filing with, any Governmental Authority or any other Person; (b) will not conflict with any provision of the Articles of Incorporation of JPC, or any amendments thereto; (c) assuming receipt of all Lender Consents, will not in any material way conflict with, result in a material breach of, or constitute a material default under any Legal Rule applicable to JPC; and (d) assuming receipt of all Lender Consents, will not conflict with, constitute grounds for termination of, result in a material breach of, constitute a default under, or accelerate or permit the acceleration of any performance

required by the terms of, any material contract, loan, license or permit to which JPC is a party or by which JPC may be bound, such that JPC could not perform hereunder.

      4.4    <u>Regulatory Matters</u>.  There are no facts relating to JPC under any Legal Rule that would disqualify it from consummating the transactions contemplated by this Agreement.

      4.5    <u>Due Diligence and Disclosure</u>. The consummation by JPC of the Sale pursuant to this Agreement shall be deemed an acknowledgement by JPC that they it has had an adequate opportunity to make such legal, factual and other inspections, inquiries and investigations as it deems necessary, desirable or appropriate with respect to the FARH Entities and the Properties. Such inspections, inquiries and investigations of the FARH Entities and the Properties shall be deemed to include, but shall not be limited to, the review of any leases and/or contracts pertaining to the Properties, the physical components of all portions of the Properties, the physical condition of the Properties, such state of facts as an accurate survey, environmental report and inspection would show, the present and future zoning ordinance, ordinances, resolutions and an examination of the books and records of the FARH Entities and all information requested, to extent same exists and is the control or custody of the FARH Entities, has been made available to JPC. Except as expressly set forth in this Agreement, JPC shall not be entitled to and shall not rely upon the FARH Entities' or its agent's or consultant's or any of the FARH Directors with respect to: (i) the quality, nature, adequacy or physical condition of the Properties including, but not limited to, the structural elements, foundation, roof, appurtenances, access, landscaping, parking facilities, or the electrical, mechanical, HVAC, plumbing, sewage or utility systems (including, without limitation, cable, phone and other similar utilities), facilities, or appliances at the Properties, if any; (ii) the quality, nature, adequacy or physical condition of soils or the existence of ground water at the Properties; (iii) the existence, quality, nature, adequacy or physical condition of any utilities serving the Properties (including, without limitation, cable, phone and other similar utility services); (iv) the development potential of the Properties, its habitability, merchantability, or the fitness, suitability, or adequacy of the Properties for any particular purpose; (v) the zoning or other legal status of the Properties; (vi) the Properties or its operations' compliance with any applicable codes, laws, regulations, statutes, ordinances, covenants, conditions or restrictions of any Governmental Authority or quasi-governmental entity or of any other person or entity; (vii) the quality of any labor or materials relating in any way to the Properties ; or (viii) the condition of title to the Properties or the nature, status and extent of any right-of-way, lease, right of redemption, possession, lien, encumbrance, license, reservation, covenant, condition, restriction, or any other matter whatsoever relating to or affecting the Properties or the maintenance, use, operation or condition thereof or any other matter related thereto, except as expressly set forth in this Agreement. EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT, NONE OF THE FARH ENTITIES OR THE FARH DIRECTORS HAS OR WILL MAKE ANY WARRANTIES OR REPRESENTATIONS WITH RESPECT TO THE FARH ENTITIES OR THE PROPERTIES (OR THE MAINTENANCE, USE, OPERATION, OR CONDITION THEREOF OR ANY OTHER MATTER RELATED THERETO AND THE FARH ENTITIES AND THE FARH DIRECTORS EACH SPECIFICALLY DISCLAIMS ANY OTHER WARRANTIES (INCLUDING WITHOUT LIMITATION IMPLIED WARRANTIES OR WARRANTIES ARISING BY OPERATION OF LAW, INCLUDING, BUT IN NO WAY LIMITED TO, ANY WARRANTY OF CONDITION, MERCHANTABILITY, HABITABILITY, OR FITNESS FOR A PARTICULAR PURPOSE OR USE).  FURTHERMORE, NONE OF THE FARH ENTITIES NOR THE FARH DIRECTORS HAS OR WILL MAKE ANY REPRESENTATION OR WARRANTY WITH REGARD TO COMPLIANCE WITH ANY ENVIRONMENTAL PROTECTION, POLLUTION,

OR LAND USE LAWS, RULES, REGULATIONS, ORDERS, OR REQUIREMENTS INCLUDING, BUT NOT LIMITED TO, THOSE PERTAINING TO THE HANDLING, GENERATING, TREATING, STORING OR DISPOSING OF ANY HAZARDOUS MATERIALS OR SUBSTANCES INCLUDING, WITHOUT LIMITATION, ASBESTOS, PCB AND RADON.

4.6     Intended Use of the Properties.  JPC will ensure that the members of the boards of directors of the FARH Entities post-Closing will take such actions as may be appropriate with respect to the Properties to further the charitable missions of JPC and the FARH Entities by providing affordable housing on a tax-exempt non-profit basis.

4.7     Brokers of JPC.   There is no investment banker, broker, finder or other intermediary or advisor that has been retained by or is authorized to act on behalf of JPC or its Affiliates who might be entitled to any fee, commission or reimbursement of expenses for which the FARH Entities will be responsible or have any Liability as a result of the transactions contemplated by this Agreement, except for TPI Communities I, LLC ("TPI"). JPC shall pay any amounts owing to TPI relating to the transactions contemplated by this Agreement. JPC shall provide to the FARH Entities and the FARH Directors, on the Closing Date, a waiver, release and indemnity agreement from the Persons listed on **Schedule 4.7** (the "Broker Releases and Indemnity") and JPC shall defend, indemnify and hold harmless the FARH Entities and Gulf Coast from and against any losses, claims, damages, suits, actions or any other proceedings initiated or sought by any Person claiming by, through or under JPC that a fee, commission or reimbursement is due in connection with any transactions relating to or involving the FARH Entities, the Properties or the transactions contemplated by this Agreement.

4.8     Payoff of Existing Loans. To the extent JPC has determined not to obtain Lender Consents for any Loans and such Loans are to be paid off simultaneously with the Closing of the Sale, JPC represents, warrants and covenants that, it shall effectuate and close on the payoff of any such Loans immediately and simultaneously with the Closing of the Sale and all funds necessary for obtaining the related Loan Payoff and Releases shall and will be deposited into escrow on the Closing Date. JPC further represents, warrants and covenants to obtain the Loan Payoff and Releases for any of the Loans for which Lender Consent was not obtained within thirty (30) days of the Closing Date.  The obligations under this Section 4.8 shall survive the Closing.

5.     CERTAIN COVENANTS OF THE PARTIES

5.1     Operation of the Properties Prior to Closing.  From the Effective Date until the Closing Date, unless this Agreement is terminated prior to the Closing Date, the FARH Entities shall operate the Properties in the ordinary course of business, subject to the following negative and affirmative covenants:

5.1.1     Negative Covenants. Neither the FARH Entities nor their property management company shall do any of the following between the date hereof and the Closing Date:

(i)     enter into any additional Contracts with respect to the Properties whose terms do not provide for a thirty (30) day cancellation provision

without fee or penalty, provided that FARH shall give JPC prompt written notice of each new Contract, if any, entered into after the Effect Date;

(ii)     materially amend, materially modify or terminate (other than at the expiration of their respective terms or due to a default of the other party thereunder) any Contract with respect to the Properties except in the ordinary course of business, provided that FARH shall give JPC prompt written notice of each such amendment, modification or termination, if any, of any Contract after the Effect Date;

(iii)    sell, assign, lease, swap or otherwise transfer or dispose of any of the Properties or any personal property belonging to and used in the operation of the Properties, except for such personal property  consumed or disposed of in the ordinary course of operation of the Properties;

(iv)    waive or cancel any debt or claim of material value relating to the Properties;

(v)     permit any waste, any grading or any cutting of timber on the Properties; and

(vi)    enter into new Tenant Leases with terms of less than six (6) months or more than twelve (12) months or otherwise not in accordance and consistent with its customary and current practices and standards, unless otherwise agreed to by JPC, provided that FARH shall, upon request, give JPC a list of any new Tenant Leases entered into after the Effective Date.

    5.1.2    Affirmative Covenants.  The FARH Entities and their property management company shall do the following from the Effective Date until the Closing Date:

(i)     use commercially reasonable efforts to preserve and maintain in all material respects the goodwill and the current relationships of the FARH Entities with independent contractors, tenants, suppliers and others with significant and recurring business dealings with the Properties;

(ii)    maintain the Properties in good order and condition and maintain insurance coverage set forth in the Insurance Policies;

(iii)    promptly notify JPC in writing of any new material litigation or arbitration, to the extent not prohibited by law, concerning or affecting the Properties that is instituted after the date hereof;

(iv)    pay any unpaid bills or claims by contractors or vendors with respect to work, services or materials provided for the Properties at the request of the FARH Entities in the ordinary course prior to Closing (unless expressly assumed by JPC);

(v)     continue to rent, and to make vacant apartments rent ready, in the ordinary course of operations consistent with management's customary and past practices at the Properties;

(vi)    screen prospective tenants in a manner consistent with its current practices and standards;  and

(vii)   provide JPC with monthly lease activity reports showing new leases and renewals and the terms thereof .

5.2     Further Actions; Cooperation.  Subject to the other provisions of this Agreement, which may impose additional or different obligations, the FARH Entities and JPC shall each use commercially reasonable efforts to take, or cause to be taken, all appropriate actions and to do, or cause to be done, and to assist and cooperate with the other party in doing, all things necessary, proper or advisable to satisfy in a timely manner all of the conditions required to be satisfied by it hereunder and to consummate the Sale as expeditiously as possible.  The FARH Entities and JPC further understand and agree that they shall not take, or cause or permit to be taken any action that is materially inconsistent with the terms of this Agreement, nor shall a party take, or cause or permit to be taken any action that is undertaken in order to delay or hinder the timely consummation of the Sale.

5.3     Non-Disparagement. At no time prior to or after the Closing shall (a) the FARH Entities, GPMC or Gulf Coast, directly or indirectly, disparage the commercial, business or financial reputation of JPC, or (b) JPC, directly or indirectly, disparage the commercial, business or financial reputation of the FARH Entities, GPMC or Gulf Coast.

5.4     Covenant Not to Use Names. JPC covenants and agrees that, upon the Name Changes taking effect and the JPC Names becoming the legal names of the FARH Entities, the FARH Entities shall not use the FARH Names from and after the Closing Date for any purpose whatsoever. The names of the FARH Entities immediately prior to changing to the JPC Names are set forth on **Schedule 5.4** (the "FARH Names") This covenant shall survive closing.

5.5     Covenant Not to Solicit or Communicate.  JPC covenants and agrees that it shall not communicate with or solicit or attempt to contact any tenant at the Properties or any employee or agent for GPMC, without the prior, written consent of the FARH Entities and GPMC.

6.      CONDITIONS PRECEDENT TO OBLIGATIONS OF PARTIES TO CLOSE

6.1     Conditions Precedent to Obligations of JPC to Close.  The obligations of JPC to consummate the Sale contemplated by this Agreement to occur at the Closing are absolute and unconditional, only subject to the satisfaction, on or before the Closing Date, of each and every one of the following conditions (the "FARH Entities' Closing Obligations"), all or any of which may be waived in writing, in whole or in part, by JPC to the extent permitted by applicable Legal Rules:

6.1.1   Representations and Warranties of the FARH Entities. The representations and warranties of the FARH Entities set forth in this Agreement shall be true and correct

- 15 -

as of the Closing Date, as though made on the Closing Date (except for representations or warranties which expressly relate to an earlier date, in which case such representations and warranties shall be true and correct as of such earlier date), except where the failure of such representations and warranties to be true and correct would not reasonably be expected to have more than a *de minimus* adverse effect on the Properties or the FARH Entities.

6.1.2   The FARH Entities' Covenants and Conditions. The FARH Entities shall have performed and complied in all material respects with the covenants and agreements required by this Agreement to be performed or complied with by them prior to or on the Closing Date.

6.1.3   No Governmental Proceeding or Injunction.   No suit, action or administrative proceeding shall have been instituted by any Governmental Authority which questions the validity or legality of the Sale (which has not been subsequently dismissed, settled or otherwise terminated).   On the Closing Date there shall be no effective injunction, preliminary restraining order or any other order of any nature issued by a court of competent jurisdiction directing that the Closing not be consummated.

6.1.4   Deliveries.  The FARH Entities shall have made or stand willing and able to perform, the obligations set forth in Section 2.

6.2   Conditions Precedent to Obligations of the FARH Entities to Close.   The obligations of the FARH Entities to consummate the Sale at the Closing shall be subject to the satisfaction, on or before the Closing Date, of each and every one of the following conditions, all or any of which may be waived in writing, in whole or in part, by the FARH Entities to the extent permitted by applicable Legal Rules:

6.2.1   Representations and Warranties of JPC.   The representations and warranties of JPC set forth in this Agreement shall be true and correct in all material respects as of the Closing Date, as though made on the Closing Date (except for representations or warranties which expressly relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date).

6.2.2   JPC's Covenants and Conditions.  JPC shall have performed and complied in all material respects with the covenants and agreements required by this Agreement, including the FARH Conditions Precedent, to be performed or complied with by it prior to or on the Closing Date.

6.2.3   No Governmental Proceeding or Injunction.   No suit, action or administrative proceeding shall have been instituted by any Governmental Authority which questions the validity or legality of the transactions contemplated by this Agreement (which has not been subsequently dismissed, settled or otherwise terminated). On the Closing Date there shall be no effective injunction, preliminary restraining order or any other order of any nature issued by a court of competent jurisdiction directing that the Closing not be consummated.

6.2.4    Name Changes. The names of each of each of FARH Entities shall have been changed to the JPC Names, or resolutions and documents, signed by the JPC Nominees, as necessary to approve and effectuate the Name Changes, have been placed into escrow and are released/filed upon the Closing.

6.2.5    Insurance. JPC has or has caused to be bound new insurance coverage for the Properties and the FARH Entities in the same amounts and coverages or better, to replace the Insurance Policies, which will be cancelled as of the Closing Date.

6.2.6    Deliveries. JPC shall have made or stand willing and able to perform the obligations set forth in Section 2.

6.2.7    GFC and GPMC Payoff. On or prior to the Closing Date, JPC shall pay the GFC Payable and the GPMC Payable on behalf of the FARH Entities, which amounts so paid shall be included as a credit to JPC towards the Purchase Price (the "GFC/GPMC Credit").

6.2.8    Background Checks. Prior to the Effective Date, each of the JPC Nominees have provided FARH with a signed background check consent form. Within five (5) business days of the full execution of this Agreement by the parties, FARH shall order background searches (including criminal, litigation, bankruptcy and judgment searches) for each of the JPC Nominees. It shall be a condition precedent to the FARH Entities' and/or Gulf Coast's obligations under this Agreement that all of the background searches are reasonably acceptable to the FARH Directors. If the results of any background check for any of the JP Nominees are not acceptable to the FARH Directors, FARH shall so notify JPC and JPC shall then have five (5) business days to provide one or more signed background check consent forms (in the same form as those provided prior to the Effective Date for the original JPC Nominees) from one or more alternate JPC Nominees for whom FARH will order background searches.

7.    CLOSING AND CLOSING DELIVERIES

7.1    Closing. Subject to satisfaction of the closing conditions described in Section 6, the Closing shall take place via escrow on the date specified by JPC by written notice to the FARH Entities' counsel, which specified date shall be no later than the Closing Date, except as otherwise agreed by the parties in writing. Upon receipt by the parties of written confirmation from the Document Escrow Agent (as defined below) and the Escrow Agent (as defined below) of their respective receipt of the parties' deliverables as set forth below, the Document Escrow Agent and the Escrow Agent shall be obligated to release the Purchase Price to Gulf Coast and the other deliverables to the respective parties as applicable. The parties shall establish a written escrow arrangement by and amongst the FARH Entities, Gulf Coast, JPC, Chicago Title/Precision Title Agency, Inc., 23366 Commerce Park, Suite 201, Cleveland, OH  44122, Tel. (216) 397-9499, Attention: Bruce Cweiber (the "Document Escrow Agent") and Riverside Abstract, LLC, 3839 Flatlands Avenue, Suite 208, Brooklyn, NY 11234 Tel. (718) 226-0300 (the "Escrow Agent")

7.2     Deliveries by the FARH Entities.  Prior to or on the Closing Date, the FARH Entities shall deliver to the Document Escrow Agent the following, in form and substance consistent with the terms of this Agreement and reasonably satisfactory to JPC:

7.2.1    a recertification of FARH Entities' representations and warranties contained in this Agreement;

7.2.2    Resolutions effectuating the Sale; and

7.2.3    Such other necessary or reasonable documents.

7.3     Deliveries by JPC.  Prior to or on the Closing Date, JPC shall deliver to the Document Escrow Agent the following, in form and substance consistent with the terms of this Agreement and reasonably satisfactory to the FARH Entities:

7.3.1    a recertification of JPC's representations and warranties contained in this Agreement;

7.3.2    The Lender Consents or proof of payoff of each Loan for which Lender Consent is not obtained;

7.3.3    Resolutions approving the purchase by JPC of the Membership Interest and the other transactions under this Agreement, all in form reasonably acceptable to Gulf Coast;

7.3.4    The Broker Releases and Indemnity;

7.3.5    Written proof in the form of proper certificates from the State of Ohio and the IRS of JPC's continuing status as a public charity;

7.3.6    Copies of the replacement insurance policies (or evidence of such insurance being bound, reasonably acceptable to the FARH Directors);

7.3.7    Resolutions approving the Name Changes upon the Closing and the necessary and appropriate certificates of change as required by the Governmental Authority or department formalizing the Name Changes; and

7.3.8    Such other necessary or reasonably requested documents.

7.4     Adjustments at Closing. Except as otherwise set forth in this Agreement, all income and obligations relating to or arising from the Properties or the Loans attributable to the time period preceding the Closing Date shall be allocated to Gulf Coast and all income and obligations relating to or arising from the Properties or the Loans attributable to the time period from and after the Closing Date shall be allocated to JPC. The following items set forth below shall be so adjusted or prorated to determine whether a net amount is credited to Gulf Coast, in which case the Purchase Price will increase, or a net amount is credited to JPC, in which case the Purchase Price shall decrease (such net amount, the "Closing Adjustments Amount"):

- 18 -

7.4.1    The GFC/GPMC Credit, as provided in Section 6.2.7 above, shall be a credit to JPC.

7.4.2    Ad valorem and personal property taxes relating to the Properties, if any, for the calendar year in which Closing occurs shall be prorated between Gulf Coast and JPC as of the Closing Date based upon taxes actually paid by FARH Entities if FARH Entities have paid such taxes prior to Closing, and otherwise upon the ad valorem taxes due assuming payment in December of the year of Closing.

7.4.3    Rents under the Leases shall be prorated as of 12:01 a.m. on the Closing Date.  At Closing, JPC shall be given a credit for rents actually collected under the Leases attributable to all periods from and after the Closing Date.  After Closing, JPC has the right to collect rents from tenants for the entire month of Closing and thereafter.  Gulf Coast  shall retain the rights related to uncollected rents from such tenants for all  times attributable to periods prior to the Closing Date ("Gulf Coast's Uncollected Rents"), provided, however, if JPC collects any amount attributable to Gulf Coast's Uncollected Rents, JPC shall promptly pay such amount to Gulf Coast after Closing.  Notwithstanding the fact that Gulf Coast shall retain the right to Gulf Coast's Uncollected Rents, after Closing, Gulf Coast shall have no right to commence any forcible entry or detainer proceedings with respect to the Properties .  All rents under the Leases shall be attributed first to such tenant's current rent, and then to each month immediately preceding such month.  No security deposits shall be applied to Gulf Coast's Uncollected Rents unless the tenant has vacated the Properties.  The provisions of this Section 7.4.2 shall survive Closing. Any Rents received by JPC after the Closing that are for time periods prior to Closing shall be forwarded by JPC to Gulf Coast within ten (10) calendar days of JPC's receipt thereof. Any Rents received by Gulf Coast or any Affiliate thereof after the Closing that are for the time period after Closing shall be forwarded by Gulf Coast to JPC promptly but in any event within ten (10) business days of it receipt thereof.

7.4.4    The estimated aggregate amount of outstanding and unpaid invoices relating to vendor services or operating expenses for the Properties for the time period prior to Closing Date ("Pre-Transfer Payables") shall be a credit for JPC towards the Purchase Price, which shall be decreased by the Pre-Transfer Payables. The estimated aggregate amount of invoices paid by the FARH Entities on or prior to the Closing Date but relating to vendor services or operating expenses for the Properties for the time period on or after the Closing Date ("Post-Transfer Payables") shall be added to Purchase Price, which shall be increased by the Post-Transfer Payables. The estimated amount of Premium Refund received after cancellation of the Insurance Policies pursuant to Section 3.9 above shall be deemed a Post-Transfer Payable that is credited to Gulf Coast. JPC shall be obligated to pay all Pre-Transfer Payables and Post-Transfer Payables in timely manner .

7.4.5    All deposits, escrows and reserves relating to the Loans (the "Debt Escrows") or to tenant leases (the "Security Deposits"), to the extent required to be funded by the applicable Loan Documents or applicable law as of the Closing Date, shall remain the property of the FARH Entities after the JPC Nominees have been appointed to the FARH Entities' boards, provided, however, that the aggregate amount of the

following items: (i) all Security Deposits; (ii) all excess cash or other reserves or funds held by or on behalf of the FARH Entities not constituting Debt Escrows; and (iii) any amounts on deposit with, or bonds or letters of credit issued in favor of, any utility or other service provider for the Properties shall be credited to Gulf Coast and added to the Closing Adjustments Amount.

7.5   <u>Post-Closing Adjustment</u>.  On the date that is ninety (90) days after the Closing Date (the "Reconciliation Date"), Gulf Coast shall have GPMC prepare a reconciliation of the Pre-Transfer Payables and the Post-Transfer Payables as estimated on the Closing Date and as actually determined on the Reconciliation Date.  If, on the Reconciliation Date the actual Pre-Transfer Payables are determined to be higher than the Closing Date estimate, then the positive difference shall be paid by Gulf Coast to JPC. But, if, on the Reconciliation Date the actual Pre-Transfer Payables are determined to be less than the Closing Date estimate, then the negative difference shall be paid by JPC to Gulf Coast. Likewise, if, on the Reconciliation Date the actual Post-Transfer Payables are determined to be higher than the Closing Date estimate, then the positive difference shall be paid by JPC to Gulf Coast. But, if, on the Reconciliation Date the actual Post-Transfer Payables are determined to be less than the Closing Date estimate, then the negative difference shall be paid by Gulf Coast to JPC.

7.6   <u>Costs of Closing</u>.  Each party is responsible for paying the legal fees of its counsel in negotiating, preparing, and closing the transaction contemplated by this Agreement. The FARH Entities shall pay the reasonable and customary escrow fees charged by the Document Escrow Agent and JPC shall pay the reasonable and customary escrow fees charged by the Escrow Agent.


8.   <u>TERMINATION, DEFAULT AND CASUALTY</u>

8.1   <u>Termination if Conditions Precedent not Satisfied or Waived</u>.

(a) If: (i) any of the conditions precedent to the performance of JPC's obligations under this Agreement have not been satisfied by Gulf Coast or waived or deemed waived by JPC, on the Closing Date then JPC shall give Gulf Coast written notice of the specific conditions that have not been satisfied, waived or deemed waived, and if such specific conditions remain unsatisfied for seven (7) days after Gulf Coast has received written notice thereof; and (ii) JPC has satisfied or is ready, willing and able to satisfy, all of JPC's obligations under this Agreement, then JPC may, at its option, by written notice delivered to Gulf Coast within three (3) Business Day following the expiration of such seven (7) day period, terminate this Agreement in writing, in which event the entire Down Payment previously received by Gulf Coast shall be returned by Gulf Coast to JPC and the Additional Deposit received by Escrow Agent shall be returned to JPC and JPC and the FARH Entities and Gulf Coast shall have no further obligations, one to the other, with respect to the subject matter of this Agreement, except for obligations expressly surviving termination.

(b) If: (i) any of the conditions precedent to the performance of FARH Entities' or Gulf Coast's obligations under this Agreement, including the FARH Conditions

- 20 -

Precedent, have not been satisfied by JPC or waived or deemed waived by FARH Entities and Gulf Coast, on the Closing Date then FARH Entities or Gulf Coast shall give JPC written notice of the specific conditions that have not been satisfied, waived or deemed waived, and if such specific conditions remain unsatisfied for seven (7) days after JPC has received written notice thereof; and (ii) FARH Entities and Gulf Coast have satisfied or is ready, willing and able to satisfy, all of FARH Entities' obligation under this Agreement, then FARH Entities and/or Gulf Coast may, at their option, by written notice delivered to JPC within three (3) Business Days following the expiration of such seven (7) day period, terminate this Agreement in writing, in which event the entire Down Payment shall be retained (as fully earned) by Gulf Coast and the Additional Deposit shall be released by the Escrow Agent to Gulf Coast and the FARH Entities and Gulf Coast and JPC shall have no further obligations, one to the other, with respect to the subject matter of this Agreement, except for obligations expressly surviving termination.

8.2     <u>Default of JPC</u>. If JPC fails or refuses to consummate the transaction contemplated by this Agreement at Closing, or JPC fails to perform any of its other obligations hereunder for any reason other than the termination of this Agreement pursuant to a right to so terminate expressly set forth in this Agreement or on account of default by the FARH Entities or Gulf Coast then such event(s) shall constitute a default by JPC hereunder and the FARH Entities and Gulf Coast may, as their sole and exclusive remedy for such default, terminate this Agreement by giving written notice thereof to JPC prior to or at Closing, whereupon Gulf Coast shall retain the entire Down Payment and the Additional Deposit shall be released by the Escrow Agent to Gulf Coast and none of the parties hereto shall have any further rights or obligations hereunder (except as expressly set forth herein as surviving termination). This provision shall survive termination of this Agreement.

8.3     <u>Default of the FARH Entities or Gulf Coast</u>. If all representations and warranties made by the FARH Entities and Gulf Coast hereunder as remade on the Closing Date are not true, complete and accurate in all material respects as of the Closing Date, or the FARH Entities or Gulf Coast fail(s) or refuse(s) to consummate the Sale pursuant to this Agreement at Closing, or the FARH Entities or Gulf Coast fail to perform any of the FARH Entities' Closing Obligations hereunder for any reason other than JPC's failure to perform JPC's obligations under this Agreement or a Force Majeure, then such event(s) shall constitute a default by the FARH Entities or Gulf Coast hereunder and JPC shall have the right, as its sole and exclusive remedy, to terminate this Agreement receive a return of the entire Down Payment, or, alternatively, JPC shall be entitled to pursue all rights and remedies available to it at law and in equity to recover its actual damages caused such default, provided, however, in no event shall JPC be entitled to recover any consequential, punitive, or speculative damages. This provision shall survive termination of this Agreement.

8.4     <u>Casualty, Condemnation or Adverse Tax Ruling</u>. The FARH Entities shall give JPC prompt notice of any fire or other casualty affecting the Properties occurring after the date of execution of this Agreement, or of any taking or condemnation of all or any portion of the Properties, or of any adverse ruling regarding the tax exempt status of any of the FARH Entities. If after the Effective Date and prior to Closing there shall occur, in one or more occurrences, (A) damage to any of the Properties caused by fire or other casualty, which in the aggregate would cost more than Two Million and No/100 Dollars ($2,000,000.00) to repair (as determined by

JPC's architect, engineer or independent insurance adjuster), or (B) a taking or condemnation of all or any portion of any of the Properties which would materially interfere with the present use of, or income generated by, the Properties, or (C) an adverse tax ruling which would subject any of the Properties to the imposition of real estate taxes, then, in such event, JPC shall have the right, as its exclusive remedy, to either (i) terminate this Agreement by written notice delivered to FARH Entities within ten (10) days after JPC has received notice from FARH Entities of such event or the date on which JPC learns of such event, whichever shall first occur, and the Down Payment shall be returned to JPC and the parties shall have no further obligations to each other with respect to the subject matter of this Agreement, except as expressly delineated herein, provided, however, that if JPC does not timely deliver such termination notice, JPC shall have waived its right to elect this provision; or (ii) not terminate this Agreement and proceed to Closing, without a reduction in the Purchase Price, in which event FARH Entities shall assign their rights to any insurance proceeds (including, but not limited to, loss-of-rents proceeds) or condemnation proceeds resulting from such event, less any reasonable costs which FARH Entities shall have actually incurred prior to the Closing to repair any of the damage, and FARH Entities shall give a credit, for the benefit of JPC, to the Purchase Price the amount of any deductible amount under such insurance policies (if such event is a casualty).  Notwithstanding the foregoing, in the event that the cost of repairing or restoring such damage (referenced above) shall be covered by available insurance and such cost shall be reasonably estimated by JPC's architect, engineer or independent insurance adjuster to be equal to or less than Two Million and No/100 Dollars ($2,000,000.00) or in the event of a taking or condemnation which does not materially interfere with the present use of, or income generated by, the Properties, then JPC shall proceed to Closing and FARH Entities shall assign to JPC at Closing FARH Entities' rights to any insurance proceeds or condemnation proceeds resulting from such event, less any costs which FARH Entities shall have incurred prior to the Closing to repair any of the damage, and, in addition, FARH Entities shall credit an amount equal to any deductible applied under such insurance policies (if such event is a casualty) towards the Purchase Price.

9.      INDEMNIFICATION; SURVIVAL OF REPRESENTATIONS AND WARRANTIES

        9.1     Indemnification.

                9.1.1    JPC agrees that all rights to indemnification, advancement of expenses and exculpation by the FARH Entities now existing in favor of each Person who is now, or has been at any time prior to the date hereof or who becomes prior to the Closing Date, an officer or director of the FARH Entities, as provided in the certificate of incorporation or by-laws of the FARH Entities, in each case as in effect on the date of this Agreement, shall survive the Closing Date and shall continue in full force and effect in accordance with their respective terms.

                9.1.2    The FARH Entities shall, and JPC shall cause the FARH Entities to (i) acquire and maintain in effect for a period of six (6) years after the Closing Date directors' and officers' liability insurance in the same amounts and coverages maintained by the FARH Entities immediately prior to the Closing Date (provided that the FARH Entities may substitute therefor policies, of at least the same coverage and amounts and containing terms and conditions that are not less advantageous to the directors and officers of the FARH Entities when compared to the insurance maintained by the FARH Entities as of the date hereof), or (ii) obtain as of the Closing Date "tail" insurance policies with a claims period of six (6) years from the Closing Date with at

least the same coverage and amounts, and containing terms and conditions that are not less advantageous to the directors and officers of the FARH Entities, in each case with respect to claims arising out of or relating to events which occurred on or prior to the Closing Date (including in connection with the transactions contemplated by this Agreement).

9.1.3   The obligations of JPC and the FARH Entities under this Section 9 shall not be terminated or modified in such a manner as to adversely affect any director or officer to whom this Section 9 applies without the consent of such affected director or officer (it being expressly agreed that the directors and officers to whom this Section 9 applies shall be third-party beneficiaries of this Section 9, each of whom may enforce the provisions of this Section 9).

9.1.4   In the event JPC, the FARH Entities or any of their respective successors or assigns (i) consolidates with or merges into any other Person and shall not be the continuing or surviving corporation or entity in such consolidation or merger or (ii) transfers all or substantially all of its properties and assets to any Person, then, and in either such case, proper provision shall be made so that the successors and assigns of JPC or the FARH Entities, as the case may be, shall assume all of the obligations set forth in this Section 9.

9.2   Survival. All representations, warranties, covenants and agreements contained in this Agreement shall be deemed continuing representations, warranties, covenants and agreements, and in the case of representations and warranties and in the case of covenants and agreements to be performed prior to the Closing (said covenants and agreements, collectively, "Pre-Closing Covenants") shall survive for a period ending six (6) months after the Closing Date, and all covenants and agreements other than Pre-Closing Covenants contained in this Agreement shall, if not waived by the party for whose benefit the covenant and/or agreement is, survive until performed and discharged in full.

10.   MISCELLANEOUS

10.1   Notices.  All notices, demands and requests which may be or are required or permitted to be given, served, sent or delivered under the provisions of this Agreement shall be (a) in writing, (b) delivered by personal delivery, or sent by either overnight courier service with signature required service or certified US mail, return receipt requested, (c) deemed to have been given on the earliest of: the date of personal delivery or the date set forth in the records of the overnight delivery service or on the return receipt and (d) addressed as follows:

| | |
|---|---|
| If the FARH Entities: | Foundation for Affordable Rental Housing<br>c/o Greystone Property Management Corporation<br>111 Rockville Pike, Suite 1150<br>Rockville, MD 20850<br>Attention: Bill Guessford |
| With copies to: | Greystone & Co., Inc.<br>152 West 57th Street, 60th Floor<br>New York, NY 10019<br>Attention: General Counsel |
| | Joseph E. Thomas, III<br>c/o TechCare, Inc.<br>6629 Spring Street<br>Douglasville, GA  30134 |
| If to JPC: | JPC Charities<br>1230 Eirewood Ave.<br>Rocky River, OH 44116 |

or to any such other persons or addresses as the parties may from time to time designate in a writing delivered in accordance with this Section 10.1.  Rejection or other refusal to accept or inability to deliver because of a change of address of which no notice was given shall be deemed to be receipt of the notice.

10.2    <u>No Assignment; Benefit and Binding Effect</u>.   No party shall assign this Agreement (or its rights or obligations hereunder) without the prior written consent of the other parties, which consent shall not be unreasonably withheld; *provided*, *however*, JPC may assign its rights and obligations under this Agreement without consent to any 501(c)(3) non-profit entity controlled by or under common control with JPC. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

10.3    <u>Governing Law</u>.  This Agreement shall be governed, construed and enforced in accordance with the internal laws of the State of Indiana, without regard to the choice of law provisions or conflicts of law principles of such state.

10.4    <u>Waiver of Jury Trial</u>.  Each of the parties hereto hereby irrevocably waives all right to trial by jury in any action, proceeding or counterclaim (whether based on contract, tort or otherwise) arising out of or relating to this Agreement or the actions of any party in the negotiation, performance or enforcement hereof or thereof.

10.5    <u>Submission to Jurisdiction; Venue</u>.  Each of the parties hereto agrees to submit to the jurisdiction of any state or federal court located in the state of Indiana in any action or proceeding arising out of or relating to this Agreement or any of the matters contemplated hereby or thereby.  Each party hereto irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection it may now or hereafter have to the laying of venue

of any action or proceeding arising out of or relating to this Agreement in any such Indiana state or federal court. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by Legal Rules, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court. Each of the parties hereto agrees not to bring any action arising out of this Agreement other than in a court of the State of Indiana or a court of the United States located in the State of Indiana.

10.6    Heading; Interpretation.   The descriptive headings of the several Articles and Sections of this Agreement are inserted for convenience only and do not constitute a part of this Agreement. References to Sections or Articles (whether or not capitalized), unless otherwise indicated, are references to Sections and Articles of this Agreement. References to Schedules and Exhibits (whether or not capitalized), unless otherwise indicated, are references to the disclosure schedules and exhibits to this Agreement. The word "including" means including without limitation. The terms "hereof", "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole (including all of the schedules and exhibits hereto) and not to any particular provision of this Agreement.

10.7    Gender and Number.   Words used herein, regardless of the gender and number specifically used, shall be deemed and construed to include any other gender, masculine, feminine or neuter, and any other number, singular or plural, as the context requires.

10.8    Entire Agreement.   This Agreement represents the entire understanding and agreement between the parties with respect to the subject matter hereof. All schedules and exhibits attached to this Agreement shall be deemed part of this Agreement and incorporated herein, as if fully set forth herein. This Agreement supersedes all prior negotiations between the parties with respect to the transactions contemplated hereby, and all letters of intent and other writings relating to such negotiations, and cannot be amended, supplemented or modified except by an agreement in writing which makes specific reference to this Agreement or an agreement delivered pursuant hereto, as the case may be, and which is executed by the party against which enforcement of any such amendment, supplement or modification is sought.

10.9    Further Assurances.   From time to time after the Closing Date, JPC and the FARH Entities shall execute or deliver or cause to be executed or delivered such further instruments of conveyance, assignment, transfer and assumption, as may reasonably be requested by the other party in order to more effectively carry out the purposes and intent of this Agreement.

10.10   Waiver of Compliance.   Except as otherwise provided in this Agreement, any failure of any of the parties to comply with any obligation, representation, warranty, covenant, agreement or condition herein may be waived by the party entitled to the benefits thereof, but such waiver or failure to insist upon strict compliance with such obligation, representation, warranty, covenant, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure not so specifically waived.

10.11   Severability.   Any provision of this Agreement that is held to be invalid, illegal or unenforceable in any respect by a court of competent jurisdiction, shall be ineffective only to the extent of such invalidity, illegality or unenforceability, without affecting in any way the remaining provisions hereof; provided, however, that the parties will attempt in good faith to

reform this Agreement in a manner consistent with the intent of any such ineffective provision for the purpose of carrying out such intent.

10.12    Enforcement of Agreement.    The parties acknowledge and agree that money damages would not be a sufficient remedy for any breach of this Agreement by a party, that the parties hereto would suffer irreparable harm as a result of any such breach, and that, in addition to all other remedies available under this Agreement or at law or in equity, the parties hereto shall be entitled to specific performance and injunctive or other equitable relief as a remedy for any such breach or threatened breach.    In the event of any action by any party to enforce this Agreement, the other parties hereto hereby waive the defense that there is an adequate remedy at law.

10.13    Counterparts.    This Agreement may be signed in any number of counterparts with the same effect as if the signature on each such counterpart were upon the same instrument, and a facsimile or portable document format (pdf) transmission shall be deemed to be an original signature for all purposes under this Agreement.

10.14    No Third Party Beneficiaries.    This Agreement constitutes an agreement solely among the parties hereto, and, except as otherwise provided herein, is not intended to and shall not confer any rights, remedies, obligations or liabilities, legal or equitable on any Person other than the parties hereto and their respective successors or assigns, or otherwise constitute any Person a third party beneficiary under or by reason of this Agreement.

10.15    Construction.    This Agreement has been negotiated by all parties and their respective legal counsel, and legal or equitable principles that might require the construction of this Agreement or any provision of this Agreement against the party drafting this Agreement shall not apply in any construction or interpretation of this Agreement.    In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

10.16    Public Announcements.    Prior to Closing, each party shall consult with the other before issuing any press release or otherwise making any public statements with respect to this Agreement and shall not issue any such press release or make any such public statement without the prior written approval of the other.    Notwithstanding the foregoing, the parties hereto acknowledge and agree that they may, without each other's prior consent, issue such press releases or make such public statements as may be compelled by Legal Rules, in which case the issuing party shall consult with the other party and use all commercially reasonable efforts to agree upon the nature, content and form of such press release or public statement.

10.17    No Personal Liability.    Notwithstanding any other provision set forth in this Agreement, no director, officer, employee or individual representative of the parties shall have any personal liability as a result of any breach by any party of its respective representations, warranties, covenants or agreements contained herein.

10.18    Expenses.    Except as expressly set forth elsewhere in this Agreement, the parties shall bear their own costs and expenses incurred in connection with the negotiation, preparation

or execution of this Agreement (including, but not limited to, fees and expenses of attorneys, accountants, consultants, finders and investment bankers) whether or not the Closing occurs.

10.19   Time of the Essence. It is expressly agrees by the parties that time is of the essence with respect to this Agreement.

**[*Remainder of page left blank; Signatures Begin on Following Page*]**

IN WITNESS WHEREOF, this Agreement has been executed by the parties as of the date first above written.

**JPC CHARITIES**, an Ohio non-profit corporation

By: _____

Print: _____ Jason Cook

Title: _____ President

**FARH ENTITIES:**

**FOUNDATION FOR AFFORDABLE RENTAL HOUSING, INC.**

By: _____

Print:    Joseph E. Thomas, III

Title:    President

**FARH-FOX LAKE AFFORDABLE HOUSING, INC.**

By: _____

Print:    Joseph E. Thomas, III

Title:    President

**FARH-SOUTH AFFORDABLE HOUSING, INC.**

By: _____

Print:    Joseph E. Thomas, III

Title:    President

- 28 -

**FSR/TENNESSEE AFFORDABLE HOUSING FOUNDATION**


By: _____
Print:   Joseph E. Thomas, III
Title:   President


**GULF COAST:**


**GULF COAST HOUSING ASSISTANCE CORP.**


By: _____
Print:   Joseph E. Thomas, III
Title:   President

## SCHEDULES

| | |
|---|---|
| Schedule 1.1 | List of JPC Names and JPC Nominees |
| Schedule 2.2 | Form of Resolution by FARH Directors |
| Schedule 2.3 | Loans and Lenders (UPB as of Effective Date) |
| Schedule 3.5(a) | Tangible Personal Property Owned by FARH |
| Schedule 3.5(b) | Tangible Personal Property Leased by FARH |
| Schedule 3.6(a) | Real Properties |
| Schedule 3.6(b) | Other Interests in Real Property |
| Schedule 3.7.1 | List of Contracts |
| Schedule 3.9 | List of Insurance Policies/Coverages |
| Schedule 3.10.1 | Licenses |
| Schedule 3.10.2 | Legal Proceedings |
| Schedule 3.12 | List of any Bonds/Security/LCs relating to utility/service accounts |
| Schedule 3.15 | Accounts Payable Not in the Ordinary Course |
| Schedule 3.16 | Rent Rolls (listing tenant Leases, claims/setoffs) |
| Schedule 3.17 | Debt Escrows and Security Deposits |
| Schedule 4.7 | Indemnity list of brokers from attorney letter, dated 6/1/15 |
| Schedule 5.4 | FARH Entity Names |

## SCHEDULE 1.1

[List of JPC Names and JPC Nominees]

**SCHEDULE 1.1**

**JPC Nominees**

(1) Meredith Rosenbeck;

(2) Tracy Hughey;

(3) Thomas Kern;

(4) Kristine Webb; and

(5) Christopher Harris Bond.

**New Entity Names**

| Existing Entity Name | New Name |
|---|---|
| Foundation for Affordable Rental Housing, Inc. (FARH) | JCP Affordable Housing Foundation, Inc. |
| FARH-Fox Lake Affordable Housing, Inc. | Fox Lake AHF, Inc. |
| FARH-South Affordable Housing, Inc. | South AHF, Inc. |
| FARH-West Affordable Housing, Inc. | West AHF, Inc. |

**<u>SCHEDULE 2.2</u>**

[Form of Resolution by FARH Directors]

SCHEDULE 2.2
[FORM OF UWC CHANGE OF CONTROL]

UNANIMOUS COMBINED WRITTEN CONSENT

OF THE BOARD OF DIRECTORS

OF

FSR/TENNESSEE AFFORDABLE HOUSING FOUNDATION

FOUNDATION FOR AFFORDABLE RENTAL HOUSING, INC.

FARH-FOX LAKE AFFORDABLE HOUSING, INC.

FARH-SOUTH AFFORDABLE HOUSING, INC.

FARH-WEST AFFORDABLE HOUSING, INC.

The undersigned, being all the Directors of FSR/TENNESSEE AFFORDABLE HOUSING FOUNDATION; FOUNDATION FOR AFFORDABLE RENTAL HOUSING, INC., FARH-FOX LAKE AFFORDABLE HOUSING, INC.; FARH-SOUTH AFFORDABLE HOUSING, INC. and FARH-WEST AFFORDABLE HOUSING, INC. (collectively, the "Corporations"), do hereby unanimously consent to and hereby unanimously adopt the following actions, as of _____, 2015 (the "Effective Date"), as the duly authorized actions of the Corporations without a formal meeting:

RECITALS

WHEREAS, Foundation for Affordable Rental Housing, Inc. ("FARH") is a supporting organization of FSR/Tennessee Affordable Housing Foundation ("FSR"), pursuant to Section 509(a)(3) of the Internal Review Code; and

WHEREAS, FARH owns three (3) multifamily properties located in Indianapolis, Indiana, known as Capital Place Apartments, The Woods at Oak Crossing and Covington Square Apartments (the "FARH Properties); and

WHEREAS, FARH's wholly-controlled subsidiary, FARH-Fox Lake Affordable Housing, Inc. ("FARH-Fox Lake") owns two (2) multifamily properties located in Indianapolis, Indiana, known as Fox Club Apartments and Lakeside Pointe at Nora (the "Fox Lake Properties"); and

WHEREAS, FARH's wholly-controlled subsidiary, FARH-South Affordable Housing, Inc. ("FARH-South") owns one (1) multifamily property located in Indianapolis, Indiana, known as The Estates at Crystal Bay (the "South Property"); and

WHEREAS, FARH's wholly-controlled subsidiary, FARH-West Affordable Housing, Inc. ("FARH-West") owns one (1) multifamily property located in Indianapolis, Indiana, known as Woodhaven Park (the "West Property"; the West Property, South Property, Fox Lake Properties and FARH Properties are referred to herein, individually as a "Property" and collectively as the "Properties"); and

WHEREAS, the Board of Directors of each of the Corporations is comprised of the same Directors; and

WHEREAS, the Corporations have negotiated with JPC Charities ("JPC"), which is interested in assuming control of the Corporations' Board of Directors and thereby continuing to operate the Properties as low income housing, and refinancing or restructuring the mortgage loans on the Properties; and

WHEREAS, the Corporations entered into that certain Membership Sale and Acquisition Agreement, dated as of July ___, 2015, with Gulf Coast Housing Assistance Corp. ("Gulf Coast") and JPC (as amended, the "Agreement"); and

WHEREAS, the undersigned had previously approved the transactions contemplated by the Agreement by Unanimous Written Consent dated July ___, 2015; and

WHEREAS, the undersigned find the transactions contemplated by the Agreement to be in the best interests of the Corporations and in furtherance of their charitable purposes.

**NOW, THEREFORE, BE IT RESOLVED THAT:**

1.    Commencing upon Closing, as that term is defined in the Agreement, the Board of Directors of each of the Corporations henceforth shall be the five individuals listed herein (the "New Board of Directors"):

(1) Meredith Rosenbeck;
(2) Tracy Hughey;
(3) Thomas Kern;
(4) Kristine Webb; and
(5) _____.

2.    Upon its conversion to an Indiana nonprofit corporation, FARH shall be operated as a nonprofit corporation in accordance with the applicable provisions of the Indiana Nonprofit Corporation Act, its Articles of Incorporation and its Bylaws, as may be amended from time to time.

3.    Upon Closing, the New Board of Directors shall immediately elect the officers of each Corporation, and the newly elected President and Secretary of FARH

-2-

shall immediately execute the Change of Registered Agent and Registered Office and other appropriate documents (to the extent not previously filed) with the Secretary of State of Indiana and with the Secretary of State of Delaware.

4.      Upon Closing, the New Board of Directors shall immediately change the names of the Corporations pursuant to the Agreement and adopt a new and amended form of seal for each of the Corporations reflecting the Corporations' new names.

5.      To become effective contemporaneously with the consummation of the aforesaid transfer of control on the Closing Date, each of the undersigned Directors hereby tenders its resignation from the Board of Directors of the Corporations, to be replaced by the New Board of Directors.

6.      Without limiting the foregoing, the undersigned hereby authorize, approve and ratify the negotiation, execution, delivery and performance by the President on behalf of the Corporations of those agreements or other documents deemed necessary or appropriate in order to effectuate, facilitate or consummate the matters contemplated by the Agreement.

7.      The appropriate officers of the Corporations are hereby authorized and directed to do and take any and all further actions as may be required in order to effectuate the intent of this Unanimous Written Consent.

8.      This Unanimous Written Consent shall take effect immediately upon the unanimous consent hereto in writing by all of the Directors of the Corporations as of the aforesaid Effective Date.

*[signatures appear on the next page]*

-3-

This Unanimous Combined Written Consent has been duly adopted and approved by the unanimous written consent of the undersigned, being all the Directors of each of the following Corporations, namely FSR/TENNESSEE AFFORDABLE HOUSING FOUNDATION, a Tennessee not-for-profit corporation, FOUNDATION FOR AFFORDABLE RENTAL HOUSING, INC., FARH-FOX LAKE AFFORDABLE HOUSING, INC., FARH-SOUTH AFFORDABLE HOUSING, INC., and FARH-WEST AFFORDABLE HOUSING, INC., each a Delaware non-profit corporation and 501(c)(3) public charity, as of the Effective Date set forth hereinabove.

_____
Joseph E. Thomas, III


_____
Terence Schwartz

_____
Stephen Rosenberg


_____
Lisa Lifshitz


_____
Kenneth Rogozinski

-4-

## <u>SCHEDULE 2.3</u>

Loans and Lenders (UPB as of July 15, 2015)

**Schedule 2.3 Loans & Lenders**
**Loans and Lenders (UPB as of Effective Date)**

As of July 15, 2015

|  | UPB |
|---|---|
| FARH Fox Lake Affordable Rental Housing | |
| City of Indianapolis Bond Series 2007 | $ 29,500,000.00 |
| | |
| Foundation for Affordable Rental Housing | |
| City of Indianapolis Bond Series 2008 | $ 26,600,000.00 |
| *Greystone Funding Corporation Line of Credit | $ 729,913.14 |
| *Greystone Funding Corporation Line of Credit | $ 484,850.56 |
| | |
| FARH South Affordable Rental Housing | |
| HUD | $ 11,427,132.01 |
| | |
| FARH West Affordable Rental Housing | |
| HUD | $ 8,466,060.30 |
| *Greystone Funding Corporation Line of Credit | $ 224,288.88 |
| *Greystone Funding Corporation Surplus Cash Note | $ 268,611.47 |

**\*Unpaid Prinicipal Balances DO NOT include accrued interest**

**FARH Loan Detail**

| Property | Lender | Servicer | Loan # |
|---|---|---|---|
| Fox Club | FannieMae | Greystone Servicing | 9250 |
| Lakeside Pointe at Nora | FannieMae | Greystone Servicing | 9250 |
| Fox Club Lake Nora Supp | FannieMae | Greystone Servicing | 9244 |
| Capital Place | FannieMae | Greystone Servicing | 9379 |
| Covington Square | FannieMae | Greystone Servicing | 9379 |
| Woods at Oak Crossing | FannieMae | Greystone Servicing | 9379 |
| Estates at Crystal Bay | FHA | Midland Loan Servicing | 030304122 |
| Woodhaven Park | FHA | Greystone Servicing | 012981 |

## SCHEDULE 3.5(a)

[Tangible Personal Property Owned by FARH ]

**CAPITAL PLACE**

| ITEM | QTY. | ITEM | QTY. |
|---|---|---|---|
| **Leasing Office:** | | **Outdoor Recreation Equipment:** | |
| Desk (double pedestal) | 1 | Chair Lounge | 15 |
| Desk (single pedestal) | 1 | | |
| Chair (desk) | 1 | **Housekeeping:** | |
| File cabinet (2 drawer) | 5 | Vacuum | 1 |
| Tables | 1 | Wet/dry vacuum | 1 |
| Telephones | 4 | Mop | 1 |
| | | | |
| **Reception Area:** | | **Maintenance, Outdoor:** | |
| Chair | 1 | Golf Cart | 3 |
| Table | 1 | Snow Blower | 2 |
| Pictures | 4 | Shovels | 3 |
| | | Brooms | 1 |
| | | Garden Hoses | 1 |
| **Assistant's Office:** | | | |
| Desk (double pedestal) | 1 | **Painting Equipment** | |
| Chair | 2 | Ladder, step | 2 |
| File cabinet (4 drawer) | 1 | Caulk guns | 1 |
| Lamps | 5 | Drain, snake | 1 |
| Wall covering | 1 | Saw, hand | 1 |
| Floor covering | 1 | Sander/polisher | 1 |
| | | | |
| **Manager's Office:** | | **Safety Equipment:** | |
| Chair (desk) | 1 | Fire Cabinet | 1 |
| Chair | 2 | | |
| Rug | 1 | **Other:** | |
| | | Key machine | 1 |
| **Club House:** | | Electronic Charging Scale | 1 |
| Refrigerator | 1 | Torch Kit | 1 |
| Coffee Maker | 1 | Power washer | 1 |
| Microwave | 1 | Vacume Pump | 1 |
| Tables | 1 | Cart Charger | 1 |
| Couch | 1 | Chain Saw | 1 |
| Vases (large) | 3 | Leaf Blower | 1 |
| 32 inch flat screen | 1 | Flat Saw | 1 |
| Radio | 1 | | |
| | | | |
| **Maintenance Office:** | | | |
| Desk | 1 | | |
| Chair (desk) | 2 | | |
| Chair | 2 | | |
| File cabinet (2 drawer) | 1 | | |

**Model Apartment:**

| | |
|---|---|
| Ammoire | 1 |
| Sofa | 1 |
| Coffee table | 1 |
| Dinning room table | 1 |
| Dinning room chairs | 4 |
| Rug | 1 |
| Wall covering | 4 |
| Floor covering | 1 |
| Window treatment | 2 |

**COVINGTON SQUARE**

Wooden rectangular table w/4 chairs
Fake fruit in bowl
Fridge
Stove
Microwave
Entertainment cabinet w/ tv
Two sitting chairs
Two cafe tables w/ two chairs and decorations
Couch
Dresser
Coffee table
Square glass table w/4 chairs
Flower decorations
Small desk
Two large desks
Three computer chairs
4 lounge chairs
One large three drawer filing cabinet
One small three drawer filing cabinet

1 Med size shop vac
1 small carpet fan
1 vaccum pump serial 0415
1 recovery mahcine
1 key machine
1 bench grinder
1 table saw
1 small snow blower

**ESTATES AT CRYSTAL BAY**

| ITEM | QTY. | ITEM | QTY. |
|---|---|---|---|
| **Leasing Office:** | | **Outdoor Recreation Equipment:** | |
| Desk (double pedestal) | 2 | Pool Deck Furniture: | |
| Desk (single pedestal) | 1 | Chair | 35 |
| Chair (desk) | 3 | Chair Lounge | 7 |
| Bench | 1 | Table with umbrella | 4 |
| Floor Covering | 3 | Misc. Outdoor Rec. Equip. | 2 |
| Window Treatment | 4 | | |
| Telephones | 3 | **Housekeeping:** | |
| Credenza | 1 | Vacuum | 1 |
| | | Window washing equip. | 2 |
| **Reception Area:** | | Straw broom | 1 |
| Chair | 8 | Wet/dry vacuum | 1 |
| Table | 2 | Wet/dry vacuum | 1 |
| Pictures | 6 | | |
| Ficus tree | 2 | **Maintenance, Outdoor:** | |
| | | Spreader-Salt | 2 |
| **Assistant's Office:** | | Trimmer-Electric | 1 |
| Desk (double pedestal) | 1 | Shovels | 5 |
| Desk hutch | 1 | Rakes | 3 |
| Chair (desk) | 1 | Brooms | 2 |
| Chair | 2 | Garden Hoses | 2 |
| File cabinet (2 drawer) | 1 | Chain Saw-Husqvarna | 1 |
| File cabinet (4 drawer) | 6 | Ladder | 3 |
| Window treatment | 1 | Caulk guns | 2 |
| | | Tables, folding | 3 |
| **Manager's Office:** | | | |
| Desk bridge | 1 | **Maintenance, Tools:** | |
| Credenza | 1 | Grinder | 1 |
| Storage cabinet tall | 1 | Vise | 1 |
| Chair (desk) | 2 | Drain Machine | 1 |
| Chair | 1 | Dolly | 2 |
| Window treatment | 1 | Propane Torch | 1 |
| Space heaters | 1 | Saw, circular | 1 |
| | | Saw, table | 1 |
| **Club House:** | | Hammers | 2 |
| Wall covering | 2 | | |
| Floor covering | 2 | **Maintenance, Cleaning:** | |
| Window coverings | 4 | Extractor/shampooer | 1 |
| Kitchen equipment | 1 | Extension cords, outdoor | 3 |
| Refrigerator | 1 | Carpet Blowers | 2 |
| Coffee Maker | 1 | | |
| Microwave | 1 | **Safety Equipment:** | |
| Tables | 3 | Fire Cabinet | 2 |

| | | | | |
|---|---|---|---|---|
| Couch | 2 | First Aid Kit | 1 |
| Chairs | 6 | Safety Can | 1 |
| Ammoire | 1 | Hard Hat | 2 |
| 19" tv | 1 | | |
| | | **Other:** | |
| **Maintenance Office:** | | Nitrogen Tank | 1 |
| Desk | 1 | Carbon Monoxide Tester | 1 |
| Chair (desk) | 1 | TIF Gas Detector | 1 |
| | | Ozone Machine | 1 |
| **Communications:** | | Echo Backpack Blower | 1 |
| Telephones | 5 | Boss Key Cutter | 1 |
| | | Golf Cart-Maintenance#1 | 1 |
| **Model Apartment:** | | Golf Cart-Maintenance#2 | 1 |
| Sofa | 2 | Golf Cart-Office | 1 |
| Chair | 1 | Snow Blower #1 | 1 |
| End tables | 3 | Snow Blower #2 | 1 |
| Coffee table | 1 | Drain Machine-Speedrooter | 1 |
| Lamps | 10 | Tile Cutter-Wet Saw | 1 |
| Dinning room table | 3 | Saw Horses | 2 |
| Dinning room chairs | 12 | Solomander-Gas Blower | 1 |
| Bed | 6 | Air Compressor-30Gal | 1 |
| Dresser | 3 | Air Compressor-5Gal | 1 |
| Lamps | 10 | Brick Cutter | 1 |
| Nightstand | 8 | Troybilt Pressure Washer | 1 |
| Chairs | 1 | Graco HVLP Machine 3/4 HP | 1 |
| Desk | 2 | Troy Built Snow Blower | 1 |
| Rug | 2 | Cable Hausfield Welder | 1 |
| Wall covering | 11 | | |
| Floor covering | 3 | | |

## FOX CLUB

| ITEM | QTY. |
|---|---|
| **Leasing Office:** | |
| Desk (double pedestal) | 1 |
| Chair (desk) | 1 |
| File cabinet (2 drawer) | 1 |
| Telephones | 1 |
| | |
| **Reception Area:** | |
| Chair | 6 |
| Table | 1 |
| Pictures | 2 |
| Ficus tree | 1 |
| | |
| **Assistant's Office:** | |
| Desk (double pedestal) | 2 |
| Desk hutch | 1 |
| 5 Shelf bookcase | 1 |
| Chair (desk) | 1 |
| Chair | 1 |
| File cabinet (2 drawer) | 1 |
| File cabinet (4 drawer) | 4 |
| File cabinet (3 drawer) | 1 |
| Window treatment | 1 |
| | |
| **Manager's Office:** | |
| Desk bridge | 1 |
| Credenza | 1 |
| Storage cabinet short | 0 |
| Chair (desk) | 1 |
| Chair | 2 |
| Window treatment | 2 |
| Space heaters | 1 |
| | |
| **Club House:** | |
| Window coverings | 4 |
| Refrigerator | 1 |
| Coffee Maker | 1 |
| Microwave | 1 |
| Tables | 2 |
| Couch | 2 |
| Chairs | 13 |
| Vases (large) | 2 |
| Ficus tree | 2 |
| 19" box tv | 1 |

| ITEM | QTY. |
|---|---|
| **Outdoor Recreation Equipment:** | |
| Pool Deck Furniture: | 26 |
| Chair Lounge | 19 |
| Table with umbrella | 2 |
| Tennis Net | 1 |
| | |
| **Housekeeping:** | |
| Vacuum | 1 |
| Buckets w/ ringer | 1 |
| Mop | 2 |
| | |
| **Maintenance, Outdoor:** | |
| Golf Cart | 1 |
| Snow Blower | 2 |
| Wheel Barrow | 1 |
| Shovels | 4 |
| Rakes | 1 |
| Brooms | 3 |
| Garden Hoses | 2 |
| | |
| **Painting Equipment** | |
| Ladder, step | 1 |
| Ladder, other | 1 |
| Drywall knife | 1 |
| Caulk guns | 1 |
| Tables, folding | 1 |
| glaze/paint sprayer | 1 |
| | |
| **Maintenance, Tools:** | |
| Grinder | 1 |
| Vise | 1 |
| Drain, snake | 1 |
| Dolly | 1 |
| Air mover | 1 |
| | |
| **Maintenance, Cleaning:** | |
| Extension cords, outdoor | 3 |
| Brooms | 2 |
| | |
| **Safety Equipment:** | |
| Fire Cabinet | 1 |
| First Aid Kit | 1 |

**Maintenance Office:**

| | |
|---|---|
| Desk | 1 |
| Chair (desk) | 1 |
| File cabinet (2 drawer) | 0 |

**Communications:**

| | |
|---|---|
| Telephones | 3 |

**Fitness Center:**

| | |
|---|---|
| Stationary bike | 1 |
| Treadmill | 2 |
| Universal workout | 1 |
| Stationary weigh machine | 1 |
| 19" Box tv | 1 |

**Model Apartment:**

| | |
|---|---|
| Sofa | 1 |
| Chair | 1 |
| End tables | 1 |
| Lamps | 3 |
| Bed | 2 |
| Dresser | 2 |
| Lamps | 2 |
| Nightstand | 1 |
| Ficus tree | 1 |
| Chairs | 2 |
| Rug | 1 |

**Other:**

| | |
|---|---|
| Capacitor tester | 1 |
| Key machine | 1 |
| Saws all | 0 |
| Electronic Charging Scale | 1 |
| Air Compressor | 1 |
| Refirgerant recovery system | 1 |
| Vacume Pump | 1 |
| table saw | 1 |
| miter saw | 1 |
| chain saw | 1 |
| shop vac | 1 |
| water extractor | 1 |
| power sweep | 1 |
| toilet auger | 1 |
| sump pump | 1 |

**LAKESIDE POINTE AT NORA**

| ITEM | QTY. | ITEM | QTY. |
|---|---|---|---|
| **Leasing Office:** | | **Outdoor Recreation Equipment:** | |
| Desk (double pedestal) | 4 | Chair Lounge | 12 |
| Chair (desk) | 4 | Table with umbrella | 4 |
| File cabinet (4 drawer) | 3 | | |
| Tables | 0 | **Housekeeping:** | |
| Window Treatment | 2 | Vacuum | 1 |
| Telephones | 4 | Wet/dry vacuum | 1 |
| Shredder | 1 | Buckets w/ ringer | 1 |
| | | Mop | 1 |
| **Assistant's Office:** | | Extraction machine | 1 |
| Desk (double pedestal) | 1 | **Maintenance, Outdoor:** | |
| Desk hutch | 1 | Golf Cart | 3 |
| Chair (desk) | 1 | Snow Blower | 1 |
| Chair | 2 | Snow Blower | 1 |
| Adding machine | 1 | Shovels | 3 |
| Check scanner | 1 | Rakes | 1 |
| Desk | 1 | Garden Hoses | 1 |
| Desk Chair | 1 | Backpack sprayer | 5 |
| Chairs | 2 | Gas string trimmer | 5 |
| 4 drawer storage | 1 | Electric string trimmer | 2 |
| Trunk | 1 | Extension cords, outdoor | 2 |
| | | Chipper/Shredder | 1 |
| **Manager's Office:** | | **Painting Equipment** | |
| Desk bridge | 1 | Ladder, step | 1 |
| Desk Hutch | 1 | Ladder, other | 1 |
| Storage cabinet short | 1 | Tables, folding | 3 |
| Chair (desk) | 1 | | |
| Chair | 2 | **Maintenance, Tools:** | |
| Lamps | 1 | Vise | 1 |
| | | Drain, snake (closet auger) | 1 |
| **1st Floor Club House:** | | Dolly | 1 |
| Stove | 1 | Air mover | 3 |
| Refrigerator | 1 | | |
| Coffee Maker | 1 | **Maintenance, Cleaning:** | |
| Microwave | 1 | Extension cords, outdoor | 2 |
| Tables | 3 | | |
| Couch | 1 | **Safety Equipment:** | |
| Chairs | 19 | First Aid Kit | 1 |
| Vases (large) | 7 | **Other:** | |
| Ficus tree | 2 | Key machine | 1 |
| Rug (custom) | 1 | Electronic Charging Scale (HVAC) | 1 |
| Armoire | 1 | Torch Kit | 1 |
| Flat Screen | 1 | Air Compressor | 1 |

| | |
|---|---|
| Bar Stools | 6 |

**2nd Floor Club House:**

| | |
|---|---|
| Wall covering | 3 |
| Refrigerator | 1 |
| Stove | 1 |
| Tables | 6 |
| Couch | 1 |
| Box TV | 1 |
| Chairs | 20 |
| Bar Stools | 5 |
| Palm Tree | 1 |
| Curio Cabinet | 1 |
| Lamps | 1 |

**Stairway / Landing:**

| | |
|---|---|
| Wall hangings | 2 |

**Maintenance Office:**

| | |
|---|---|
| Desk | 1 |
| Chair (desk) | 1 |
| Chair | 1 |

**Fitness Center:**

| | |
|---|---|
| Stationary bike | 1 |
| Elliptical machine | 1 |
| Treadmill | 1 |
| Stationary weigh machine | 1 |
| Weight bench | 2 |
| 19" Box TV | 1 |

**Model Apartment: 8863B**

| | |
|---|---|
| Sofa | 1 |
| Chair | 1 |
| End tables | 2 |
| Lamps | 3 |
| Dining room table | 1 |
| Dining room chairs | 4 |
| Bed | 1 |
| Nightstand | 2 |
| Ficus tree | 2 |
| Rug | 1 |

**Model Apartment**

| | |
|---|---|
| Sofa | 1 |
| Chair | 1 |
| End tables | 2 |

| | |
|---|---|
| Refrigerant recovery system | 1 |
| Vacuum Pump | 1 |
| Ozone Generator | 1 |
| B Tank | 1 |
| Brazing kit w/tanks & Stand | 1 |

| | |
|---|---|
| Coffee table | 1 |
| Lamps | 4 |
| Dining room table | 1 |
| Dining room chairs | 4 |
| Bed | 1 |
| Dresser | 1 |
| Nightstand | 2 |
| Ficus tree | 2 |
| Desk | 1 |
| Futon | 1 |

**WOODS AT OAK CROSSING**

4 Front office desk

4 High back chairs

7 low back chairs

3 lamps

1 leasing table and 4 chairs

Braden copier/scan/fax

3 File cabinets

2 small office tables

1 credenza

1 bookshelf

1 sofa glass table

1 hutch

1 halogen lamp

6 front office pictures

2 ceiling fans

4 phones

7 trash cans

8 Clubhouse #1 pictures

3 candle holders

3 clocks

2 round glass table with 6 chairs

1 coach

1 loveseat

3 wing back chairs

2 glass top end table

3 calculators

1 coffee table

2 bar stools

Microwave - Clubhouse 1

Keurig maker

32" TV and DVD player

1 curio cabinet

1 Frigidaire refrigerator - Clubhouse 1

1 Frigidaire stove - Clubhouse 1

Water fountain

3 pictures clubhouse #2

3 6' tables

12 folding chairs

1 kids table with 2 stools

1 Microwave - Clubhouse

1 Whirlpool refrigerator - Clubhouse 2

Hardwick 4 burner stove

2 wall sconces

Dolly

Shop vac

Vacuum pump

Recovery machine

6' Ladder

Snake

Water extractor + Handle

20' Ladder

5' Ladder

Fish Scale

Key machine

Grinder

Leaf Blow

**WOODHAVEN PARK**

**OFFICE INVENTORY**

| ITEM | QTY. |
|------|------|
| **Leasing Office:** | |
| Desk (double pedestal) | 1 |
| Desk (single pedestal) | 1 |
| Chair (desk) | 1 |
| File cabinet (2 drawer) | 1 |
| Telephones | 1 |
| **Reception Area:** | |
| Chair | 8 |
| Table | 2 |
| Pictures | 3 |
| Ficus tree | 3 |
| **Assistant's Office:** | |
| Desk (double pedestal) | 1 |
| 3 Shelf bookcase | 1 |
| Chair (desk) | 1 |
| Chair | 2 |
| File cabinet (4 drawer) | 2 |
| Lamps | 1 |
| Wall covering | 2 |
| Window treatment | 2 |
| **Manager's Office:** | |
| Desk bridge | 1 |
| Credenza | 1 |
| Storage cabinet short | 1 |
| Chair (desk) | 1 |
| Chair | 2 |
| Wall covering | 1 |
| Floor covering | |
| Window treatment | 2 |
| **Club House:** | |
| Wall covering | 11 |
| Window coverings | 5 |
| Cookie oven | 1 |
| Refrigerator | 1 |
| Coffee Maker | 1 |
| Microwave | 1 |
| Tables | 10 |
| Couch | 1 |

**MAINTENANCE INVENTORY**

| ITEM | QTY. |
|------|------|
| **Outdoor Recreation Equipment:** | |
| Chair Lounge | 15 |
| **Housekeeping:** | |
| Vacuum | 1 |
| Wet/dry vacuum | 1 |
| Mop | 1 |
| **Maintenance, Outdoor:** | |
| Golf Cart | 3 |
| Snow Blower | 2 |
| Shovels | 3 |
| Brooms | 1 |
| Garden Hoses | 1 |
| **Painting Equipment** | |
| Ladder, step | 2 |
| Caulk guns | 1 |
| Tables, folding | 2 |
| **Maintenance, Tools:** | |
| Drain, snake | 1 |
| Dolly | 2 |
| Saw, hand | 1 |
| Sander/polisher | 1 |
| **Safety Equipment:** | |
| Fire Cabinet | 1 |
| **Other:** | |
| Key machine | 1 |
| Electronic Charging Scale | 1 |
| Torch Kit | 1 |
| Power washer | 1 |
| Refrigerant recovery system | |
| Vacuum Pump | 1 |
| Cart Charger | 1 |
| Chain Saw | 1 |
| Leaf Blower | 1 |
| Flat Saw | 1 |
| **Maintenance Office:** | |

| | | | | |
|---|---|---|---|---|
| Chairs | 27 | Desk | 2 |
| Vases (large) | 1 | Chair (desk) | 1 |
| Ficus tree | 3 | Chair | 2 |
| Rug (custom) | 1 | | |
| 32' Flat tv | 1 | **Fitness Center:** | |
| Radio | | Stationary bike | 1 |
| | | Treadmill | 1 |
| **Communications:** | | Stair climber | 1 |
| Office Phones | 4 | Stationary weigh machine | 1 |
| | | 19" Box tv | 1 |

## SCHEDULE 3.5(b)

[Tangible Personal Property Leased by FARH]

**Schedule 3.5(b) Tangible Personal Property Leased by FARH**

PROPERTY NAME:     Capital Place

| VENDOR NAME | EQUIPMENT LEASED | Expiration Date |
|---|---|---|
| Jetz | Laundry Machines | 10/21/2023 |
| Kings III | Emergency Pool Phone | 8/1/2015 |
| Sprint | On Call Telephone Service | 2/9/2016 |
| Ricoh | Copier | 11/14/2017 |

PROPERTY NAME:     Covington Square

| VENDOR NAME | SERVICE PROVIDED | Expiration Date |
|---|---|---|
| Braden | Copier | 3/14/2016 |
| Kings III | Emergency Pool Phone | 8/1/2015 |
| Sprint | On Call Telephone Service | 8/25/2015 (manager) and 12/18/2015 (supervisor) |
| Coinmach | Laundry Machines | MTM |

PROPERTY NAME:     Estates at Crystal Bay

| VENDOR NAME | SERVICE PROVIDED | Expiration Date |
|---|---|---|
| Cintas | Uniforms/Mats | 11/30/2015 |
| CIT | Copier | 10/22/2015 |
| Jetz | Laundry Machines | 12/31/2015 |
| Kings III | Emergency Pool Phone | 8/1/2015 |
| Sprint | On Call Telephone Service | 7/25/2015 |
| Pitney Bowes | Postage Machine Rental | 12/6/2015 |

PROPERTY NAME:     Fox Club

| VENDOR NAME | SERVICE PROVIDED | Expiration Date |
|---|---|---|
| Commercial Coin | Laundry Machines | 12/1/2015 |
| Kings III | Emergency Pool Phone | 8/1/2015 |
| Lamar | Billboards | 3/22/2016 |

PROPERTY NAME:     Lakeside Pointe at Nora

| VENDOR NAME | SERVICE PROVIDED | Expiration Date |
|---|---|---|
| Xerox | Copier Rental | 4/29/2017 |
| Kings III | Emergency Pool Phone | 8/1/2015 |
| Sprint | On Call Telephone Service | MTM |
| Jetz | Laundry Machines | 4/1/2021 |

PROPERTY NAME:     Woods at Oak Crossing

| VENDOR | SERVICE |
|---|---|

**Schedule 3.5(b) Tangible Personal Property Leased by FARH**

| NAME | PROVIDED | Expiration Date |
|---|---|---|
| Braden | Copier | 2/1/19 |
| Kings III | Emergency Pool Phone | 8/1/15 |
| Sprint | On Call Telephone Service | 3/13/16 |
| Jetz | Laundry Machines | 4/22/23 |

**PROPERTY NAME:**      Woodhaven Park

| VENDOR NAME | SERVICE PROVIDED | Expiration Date |
|---|---|---|
| Jetz | Laundry Machines | MTM |
| Sprint | On Call Telephone Service | MTM |
| Kings III | Emergency Pool Phone | 8/1/2015 |

revised: 09/2002

file name: Schedule 3.5(b) (Tangible Property Leased)

**SCHEDULE 3.6(a)**

[Real Properties ]

1.  Capital Place Apartments
    4100 Continental Court
    Indianapolis, IN

2.  Covington Square Apartments
    115 South High School Road
    Indianapolis, IN

3.  Lakeside Pointe at Nora Apartments
    900 North College Avenue
    Indianapolis, IN

4.  Estates at Crystal Bay Apartments
    7136 Crystal Bay Drive
    Indianapolis, IN

5.  Fox Club Apartments
    4401 South Keystone Avenue
    Indianapolis, IN

6.  Woodhaven Park Apartments
    6363 Commons Drive
    Indianapolis, IN

7.  Woods at Oak Crossing Apartments
    3120 Nobscot Drive
    Indianapolis, IN

## SCHEDULE 3.6 (b)

[Other Interests in Real Property]

None, other than as may be set forth in the following Tittle Commitments issued by First American Title Insurance Company:

1. Commitment No.: 665552
2. Commitment No.: 665546
3. Commitment No.: 665531
4. Commitment No.: 665569
5. Commitment No.: 665537
6. Commitment No.: 665576
7. Commitment No.: 665560

**<u>SCHEDULE 3.7.1</u>**

[List of Contracts]

GREYSTONE PROPERTY MANAGEMENT CORPORATION
# CONTRACT DATA LOG



PROPERTY NAME: Capital Place

| VENDOR NAME | SERVICE PROVIDED | COMMENCEMENT DATE | EXPIRATION DATE | SELF-RENEW YES | SELF-RENEW NO |
|---|---|---|---|---|---|
| ADT | Alarm for Office | 04/12/01 | 04/12/16 | X | |
| AT&T | Phone | | MTM | | |
| AT&T | Internet | | MTM | | |
| AT&T | Communication Income | 12/20/10 | 12/20/17 | | X |
| Natures Partner | Landscaping | 03/01/15 | 12/01/15 | | X |
| Lamar | Billboards | 03/01/14 | 02/21/16 | | X |
| Indy Protective Services | Security | 06/15/15 | MTM | | X |
| Consumer Source | Apartment Guide | 08/01/13 | MTM | | X |
| Micro Air, Inc | Pool and Spa testing | 04/24/15 | MTM | | X |
| For Rent | Advertising | 03/01/12 | 08/01/15 | | X |
| Sprint | Cell Phone Service | 02/19/14 | 02/19/16 | | X |
| Gold Seal | Extermination | 07/08/13 | MTM | X | |
| Jetz | Laundry Income | 06/21/13 | 10/21/23 | | X |
| National Exemption Service | Gas Billing Service | 10/01/13 | 10/01/15 | | X |
| Republic | Trash Removal | 06/13/11 | MTM | X | |
| Ricoh | Copier Lease | 11/14/13 | 11/14/17 | | X |
| GE Capital | Copier Maintenance Agreement | 12/19/13 | 12/18/18 | | |
| Kings III | Pool Phone Service | 08/14/14 | 08/01/15 | X | |

GREYSTONE PROPERTY MANAGEMENT CORPORATION
# CONTRACT DATA LOG

PROPERTY NAME: <u>Woods at Oak Crossing</u>



| VENDOR NAME | SERVICE PROVIDED | COMMENCEMENT DATE | EXPIRATION DATE | SELF-RENEW | |
|---|---|---|---|---|---|
| | | | | YES | NO |
| ADT | Office Alarm | 12/28/05 | MTM | X | |
| ADT | Maint Shop Alarm | 12/28/05 | MTM | X | |
| AT & T | Phone | | MTM | | X |
| AT & T | TV | | MTM | | X |
| AT & T | Internet | | MTM | | X |
| Braden | Maintenance Agreement | 02/01/14 | 02/01/19 | | X |
| Natures Partner | Landscaping | 03/01/15 | 12/01/15 | | X |
| Bright House | Cable Line Access | 08/09/12 | 08/09/22 | X | |
| Consumer Source | Apartment Guides | 11/01/13 | MTM | | X |
| Micro Air, Inc | Pool Testing | 04/24/15 | MTM | | X |
| Gold Seal | Extermination | 07/08/13 | MTM | X | |
| Jetz | Laundry Income | 10/22/12 | 04/22/23 | | X |
| Kings III | Pool Phone | 08/14/14 | 08/14/15 | X | |
| Rays | Trash Removal | 02/23/09 | 02/23/19 | X | |
| Sprint | Cell Phones | 03/15/13 | 03/15/16 | | X |

GREYSTONE PROPERTY MANAGEMENT CORPORATION
# CONTRACT DATA LOG

PROPERTY NAME: <u>Estates at Crystal Bay</u>



| VENDOR NAME | SERVICE PROVIDED | COMMENCEMENT DATE | EXPIRATION DATE | SELF-RENEW | |
|---|---|---|---|---|---|
| | | | | YES | NO |
| ADT | Security Monitoring | 08/22/06 | MTM | | X |
| Apartment Guide | Apartment Guides | 08/01/13 | MTM | | X |
| AT&T | Communication Income | 12/20/10 | 12/20/17 | | X |
| AT&T | Telephone Service (Local / LD) | 11/01/12 | MTM | | |
| AT&T | Alarm Phone | 11/01/12 | MTM | | |
| For Rent | Advertising | 07/12/12 | MTM | | |
| Brickman | Landscaping | 03/01/14 | 11/31/2015 | | X |
| Central Indiana Protection Agency | Security Monitoring | 02/01/11 | MTM | | X |
| Cintas | Uniforms/Mats | 11/30/10 | 11/30/15 | X | |
| CIT | Copier Rental/Service | 10/22/12 | 10/22/15 | | X |
| Micro Air, Inc | Weekly Pool Testing | 04/24/15 | MTM | | X |
| Gold Seal | Extermination | 07/08/13 | MTM | X | |
| Jetz | Laundry Machines | 12/19/05 | 12/31/15 | | X |
| Pitney Bowes | Postage Machine Rental | 12/06/10 | 12/06/15 | X | |
| Republic | Trash Removal | 10/01/12 | 10/01/15 | X | |
| Sprint | Nextel Service | 07/24/13 | 07/24/15 | | X |
| Brickman | Landscaping | 03/01/14 | 11/30/14 | | X |
| Kings III | Pool Phone Service | 08/14/14 | 08/01/15 | X | |

file name:  Schedule 3.7.1 List of Contracts

**GREYSTONE PROPERTY MANAGEMENT CORPORATION**
# CONTRACT DATA LOG



**PROPERTY NAME:** Fox Club

| VENDOR NAME | SERVICE PROVIDED | COMMENCEMENT DATE | EXPIRATION DATE | SELF-RENEW | |
|---|---|---|---|---|---|
| | | | | YES | NO |
| ADT | Security Monitoring | 08/22/09 | 08/22/15 | X | |
| AT&T | Telephone Service | | MTM | | X |
| AT&T | Communication Income | 12/20/10 | 12/20/17 | | X |
| Natures Partner | Landscaping | 03/01/15 | 12/01/15 | | X |
| Commercial Coin | Laundry Systems | 12/01/05 | 12/01/15 | X | |
| Canyon | Copier Supplies/Services | 12/23/08 | MTM | | X |
| Consumer Source | Apartment Guide | 08/01/13 | MTM | | X |
| Micro Air, Inc | Pool Testing | 04/24/15 | MTM | | X |
| For Rent | For Rent | 03/01/11 | MTM | | X |
| Gold Seal | Extermination | 07/08/13 | MTM | X | |
| Lamar | Billboards | 03/01/14 | 02/21/16 | | X |
| Republic | Trash Removal | 10/01/12 | 10/01/15 | X | |
| Kings III | Pool Phone Service | 08/14/14 | 08/14/15 | X | |
| Sprint | Cell Phone Service | 11/26/12 | MTM | | |

GREYSTONE PROPERTY MANAGEMENT CORPORATION
## CONTRACT DATA LOG



PROPERTY NAME: <u>Lakeside Point at Nora</u>

| VENDOR NAME | SERVICE PROVIDED | COMMENCEMENT DATE | EXPIRATION DATE | SELF-RENEW | |
|---|---|---|---|---|---|
| | | | | YES | NO |
| AT&T | Communication Income | 12/20/10 | 12/20/17 | | X |
| AT&T | Phone Service | 09/28/13 | MTM | | |
| AT&T | Internet & TV | 09/28/13 | MTM | | |
| Natures Partner | Landscaping | 03/24/15 | 12/01/15 | | X |
| Central Indiana Protection Agency | Security Services | MTM | MTM | | X |
| Consumer Source | Apartment Guide | 10/09/13 | MTM | | X |
| Copy Co/Xerox | Maintenance Agreement | 04/29/12 | 04/29/17 | | X |
| Micro Air, Inc | Weekly Pool Testing | 04/24/15 | MTM | | X |
| For Rent Magazine | Apartment Guides | 07/01/12 | MTM | | X |
| Gold Seal | Extermination | 07/08/13 | MTM | X | |
| Jetz | Laundry Machines | 10/09/08 | 04/01/21 | X | |
| Republic | Trash Removal | 10/01/12 | 10/01/15 | X | |
| Kings III | Pool Phone Service | 08/14/14 | 08/14/15 | X | |
| Sentinal Monitoring | Alarm System | 10/31/12 | 10/31/15 | X | |
| Sprint | Cell Phone | 04/20/12 | MTM | | X |

GREYSTONE PROPERTY MANAGEMENT CORPORATION
# CONTRACT DATA LOG

PROPERTY NAME: Woodhaven Park



| VENDOR NAME | SERVICE PROVIDED | COMMENCEMENT DATE | EXPIRATION DATE | SELF-RENEW YES | SELF-RENEW NO |
|---|---|---|---|---|---|
| AT&T | Office Phone | 09/28/13 | MTM | | X |
| AT&T | Sub Station Phone | 09/28/13 | MTM | | X |
| AT&T | Cable & Internet | 09/28/13 | MTM | | X |
| AT&T | Communication Income | 12/20/10 | 12/20/17 | | X |
| Natures Partner | Landscaping | 03/01/15 | 12/01/15 | | X |
| Central Indiana Protection Agency | Patrol Service | 01/01/12 | MTM | | X |
| Consumer Source | Apartment Guide | 07/07/13 | MTM | | X |
| Micro Air, Inc | Pool Testing | 04/24/15 | MTM | | X |
| Gold Seal | Extermination | 07/08/13 | MTM | X | |
| Impact | Copier Maintenance Service | None | MTM | | |
| Jetz/AAL | Laundry Service | 02/02/03 | MTM | | X |
| Kings III | Pool Phone | 08/14/14 | 08/14/15 | X | |
| Republic | Trash Removal | 10/01/12 | 10/01/15 | X | |
| Sprint | Cell Phone Service | 05/21/13 | MTM | | |

file name:  Schedule 3.7.1 List of Contracts

GREYSTONE PROPERTY MANAGEMENT CORPORATION
# CONTRACT DATA LOG

PROPERTY NAME: <u>Woods at Oak Crossing</u>



| VENDOR NAME | SERVICE PROVIDED | COMMENCEMENT DATE | EXPIRATION DATE | SELF-RENEW | |
|---|---|---|---|---|---|
| | | | | YES | NO |
| ADT | Office Alarm | 12/28/05 | MTM | X | |
| ADT | Maint Shop Alarm | 12/28/05 | MTM | X | |
| AT & T | Phone | | MTM | | X |
| AT & T | TV | | MTM | | X |
| AT & T | Internet | | MTM | | X |
| Braden | Maintenance Agreement | 02/01/14 | 02/01/19 | | X |
| Natures Partner | Landscaping | 03/01/15 | 12/01/15 | | X |
| Bright House | Cable Line Access | 08/09/12 | 08/09/22 | X | |
| Consumer Source | Apartment Guides | 11/01/13 | MTM | | X |
| Micro Air, Inc | Pool Testing | 04/24/15 | MTM | | X |
| Gold Seal | Extermination | 07/08/13 | MTM | X | |
| Jetz | Laundry Income | 10/22/12 | 04/22/23 | | X |
| Kings III | Pool Phone | 08/14/14 | 08/14/15 | X | |
| Rays | Trash Removal | 02/23/09 | 02/23/19 | X | |
| Sprint | Cell Phones | 03/15/13 | 03/15/16 | | X |

## SCHEDULE 3.9

[List of Insurance Policies/Coverages]

**Schedule 3.9**
**List of Insurance Polcieis/Coverages**

| Property | Type of Coverage | Policy Carrier | Policy No. |
|---|---|---|---|
| Fox Club | Property | RSUI | LHD388596 |
| | General Liability | Lexington | MRMG84-LEX15-284 |
| | Umbrella | Commerce and Industry Ins. Co. | MRMG84-CI15-10-284 |
| Lakeside Pointe | Property | Philadelphia | PHPK1165661 |
| | General Liability | Kinsdale | 0100019359-0 |
| | Umbrella | Commerce and Industry Ins. Co. | 63176708 |
| Capital Place | Property | Oklahoma Specialty | PRO440079-2 |
| | General Liability | Kinsdale | 0100028010-0 |
| | Umbrella | Torus | 89330I151ALI |
| Covington Square | Property | Oklahoma Specialty | PRO440079-2 |
| | General Liability | Scottsdale | PCPS211795 |
| | Umbrella | AURA | 48403134 |
| Woods at Oak Crossing | Property | RSUI | LHD391773 |
| | General Liability | James River | 00057119-2 |
| | Umbrella | AURA | 48403255 |
| Estates at Crystal Bay | Property | Oklahoma Specialty | PRO440079-2 |
| | General Liability | Rockhill | RCGLPG00920-00 |
| | Umbrella | Starr Indemnity | 1000010669 |
| Woodhaven Park | Property | Oklahoma Specialty | PRO440079-2 |
| | General Liability | Philadelphia | PPK1317999 |
| | Umbrella | Commerce and Industry Ins. Co. | USCM048403355 |

## <u>SCHEDULE 3.10.1</u>

[Licenses]

**NONE**

**<u>SCHEDULE 3.10.2</u>**

[Legal Proceedings]

Schedule 3.10.2
FARH - Legal Proceedings

| Property | Claim | Date | Claimant/Detail | Reserved |
|---|---|---|---|---|
| Fox Club | | 5/21/2014 | Fire caused by lightening strike. All items repaired; only issue open is settlement for lost rents. | |
| Woods at Oak Crossing | | | Fire of unknown origin - 3205 Merrick Lane. Partial repairs completed. Working to repair two units that were damaged. | $ 80,000.00 |
| Capital Place | 202729 | 1/31/2014 | DANIEL JAFFKE - Claimant was fatally shot on premises while delivering a pizza to a resident. File open with a $30k reserve. Case is in discovery. Liability is doubtful. | $ 30,000.00 |
| Covington Apartments | 2AHE3 | Unknown | Blutt - Alleges her son became ill as a result of mold in the apartment. Resident recently evicted. No suit has been filed; no medical proof received to date | |
| The Estates at Crystal Bay | 1292937/1344 | 12/19/2013 | TERRY SWANIGAN - Slip and fall on ice in parking lot. Claimant suffered a fractured knee cap. Awaiting documentation from claimant's attorney. | $ 15,000.00 |
| Fox Club | 2290265 | 7/29/2014 | Alexis Witham - Alleges a fall on the sidewalk. Attorney has not provided demand package. Liability doubtful. | $ 20,000.00 |
| Lakeside Pointe | 1882 | 6/5/2014 | IVAN VEGARA - Claimant drowned in lake. Police determined it was an accident. No claim pursued as of this date. | $ 10,000.00 |
| Woods at Oak Crossing | 2AED0 | 6/30/2012 | DEWAYNE WALLACE - Claimant alleges injury after falling from a balcony. Depositions taken, discovery continues. | $ 20,000.00 |
| Capital Place | N/A | 5/27/2015 | Jane Plumhoff Daughter fell in unit hallway. I am determining whether we had notice of the faulty lighting. Resident wants 2 days of lost wages at Taco Bell and compensation for her daughter's pain and suffering. | |
| Covington Square | 2AIB9 FW | 2/21/2015 | Deon Phillips - Resident claims he slipped on a cologne bottle left on the stairs. We had no notice of such, and photographed a clean stairwell. He has related a history of making false claims at casinos, and his former attorney is not representing him. | $ 12,500.00 |

**Schedule 3.10.2**
**FARH - Legal Proceedings**

| Property | Claim | Date | Claimant/Detail | Reserved |
|---|---|---|---|---|
| Covington Square | N/A | 8/1/2014 | Destiny Soto has asked for reimbursement of ambulance charges incurred when her son was taken to the hospital due to a seizure. I obtained the medical records relative to the visit. We have reviewed and determined that the diagnosis was seizure caused by a temperature associated with infection. I have advised we are not legally liable for the charges. He has a history of similar seizures and temperatures reached only a high of 82 degrees on that date. | |
| Woodhaven | 117959 | 1/16/15 | Latonya Walton claims to have fallen in the snow. We have photos of the shoveled walkway. Neither a demand nor theory of liability has been provided by counsel. | $ 3,000.00 |
| Woodhaven | 115407 | 9/5/14 | Yolanda Wells claims she fell into a storm drain on site. After she reported the claim, we did find the cover was cracked cleanly in half, suggestive of a sudden and unexpected metallurgic failure. | |

## SCHEDULE 3.12

[List of any Bonds/Security/LCs relating to utility/service accounts]

**SCHEDULE 3.12 - List of any Bonds/Security/LC's relating to utility/service accounts**

**Capital Place**

    Citizens Gas

| | | |
|---|---|---|
| 1352290 | 365781 | $900.00 |
| 1352290 | 365828 | $900.00 |
| 1352290 | 365783 | $900.00 |
| 1352290 | 365782 | $600.00 |
| 1352290 | 365814 | $900.00 |
| 1352290 | 365780 | $900.00 |
| 1352290 | 365815 | $600.00 |
| 1352290 | 365816 | $900.00 |
| 1352290 | 365818 | $900.00 |
| 1352290 | 365819 | $900.00 |
| 1352290 | 365820 | $900.00 |
| 1352290 | 365821 | $900.00 |
| 1352290 | 365822 | $900.00 |
| 1352290 | 365824 | $900.00 |
| 1352290 | 365825 | $900.00 |
| 1352290 | 365826 | $900.00 |
| 1352290 | 365827 | $900.00 |
| 1352290 | 365828 | $900.00 |
| 1352290 | 370747 | $600.00 |
| 1352290 | 370750 | $900.00 |
| 1352290 | 370751 | $900.00 |
| 1352290 | 370752 | $900.00 |
| 1352290 | 365830 | $900.00 |
| 1352290 | 365829 | $900.00 |
| 1352290 | 370753 | $900.00 |
| 1352290 | 370758 | $900.00 |
| 1352290 | 370759 | $900.00 |
| 1352290 | 365779 | $900.00 |
| 1352290 | 365788 | $900.00 |
| 1352290 | 439747 | $900.00 |
| 1352290 | 439744 | $900.00 |
| 1352290 | 370757 | $900.00 |
| 1352290 | 370756 | $900.00 |
| 1352290 | 370755 | $1,200.00 |
| 1352290 | 370754 | $900.00 |
| 1352290 | 365809 | $900.00 |
| 1352290 | 370748 | $900.00 |
| 1352290 | 365823 | $900.00 |
| 1352290 | 370749 | $900.00 |
| 1352290 | 365808 | $900.00 |
| 1352290 | 365792 | $900.00 |
| 1352290 | 365791 | $900.00 |
| 1352290 | 365790 | $900.00 |
| 1352290 | 365789 | $900.00 |
| 1352290 | 365787 | $900.00 |
| 1352290 | 365786 | $900.00 |
| 1352290 | 365785 | $600.00 |
| 1352290 | 365784 | $600.00 |
| 1352290 | 365817 | $1,200.00 |
| | | $43,200.00 |

| | | |
|---|---|---|
| IPL | 1187439 | 2,351.00 |
| | | $45,551.00 |

**Covington Square**

| | | |
|---|---|---|
| IPL 1553266 | $ 2,117.94 | |
| | $ 602.24 | interest as of 7/16 |
| IPL 1553307 | $ 1,000.00 | |
| | $ 215.37 | interest as of 7/16 |
| Citizens Gas 1173638-1023806 | $ 6,120.00 | |
| | $ 20.93 | interest as of 7/16 |
| | $10,076.48 | |

**Lakeside Pointe**

| | | |
|---|---|---|
| IPL 1348451 | $ 500.00 | |
| | $ 96.45 | Interest as of 7/16 |
| | $596.45 | |

**Estates at Crystal Bay**

| | | |
|---|---|---|
| Citizens Gas 859005-185072 | $30,315.00 | |
| | $ 4,217.99 | interest as of 7/16 |
| | $34,532.99 | |

| | |
|---|---|
| **Grand Total:** | **$90,756.92** |

## SCHEDULE 3.15

[Accounts Payable  Summary and Not in the Ordinary Course (None)]

## Aged Open Invoices by Property

Aged as of Jul 24, 2015 / Cutoff Date Dec 31, 9999        Cutoff Prd/Fiscal Year : 12/9999

| Total for All Properties | Property | Balance Due | 30 Days | 60 Days | 90 Days | 120 Days |
|---|---|---|---|---|---|---|
| | Lakeside Pointe Apartments | 30,782.49 | 24,306.13 | 2,974.85 | 1,996.51 | 1,505.00 |
| | Fox Club Apartments | 204,890.64 | 43,988.53 | (38,408.29) | 192,699.40 | 6,611.00 |
| | Estates at Crystal Bay | 14,074.22 | 14,050.22 | 0.00 | 0.00 | 24.00 |
| | Woodhaven Park Apartments | 45,350.24 | 45,350.24 | 0.00 | 0.00 | 0.00 |
| | Capital Place Apartments | 73,370.38 | 52,440.57 | 11,402.81 | 48.00 | 9,479.00 |
| | Woods at Oak Crossing Apartments | 36,660.40 | 18,547.93 | 9,415.83 | (1,538.73) | 10,235.37 |
| | Covington Square Apartments | 56,749.97 | 32,491.48 | 4,300.68 | 835.00 | 19,122.81 |
| | Grand Total | 461,878.34 | 231,175.10 | (10,314.12) | 194,040.18 | 46,977.18 |

Vendor - 1002   This report (AP9352) was run on 07/24/2015 11:17:35AM by controller.   * Balance Due includes unauthorized invoices. * Balance Due includes unapproved transactions.                   Page        1

**Schedule 3.15**
**Accounts Payable NOT in the ordinary Course**

| | |
|---|---|
| Fox Club | None |
| Lakeside Pointe | None |
| Capital Place | None |
| Covington Square | None |
| Woods at Oak Crossing | None |
| Estates at Crystal Bay | None |
| Woodhaven Park | None |

## SCHEDULE 3.16

[Rent Rolls (listing tenant Leases, claims/setoffs)]

**[See the Rent Roll Reports uploaded to the Sharesite on or about July 21, 2015]**

<u>SCHEDULE 3.17</u>

[Debt Escrows and Security Deposits]

### Debt Escrow Balances as of June 30, 2015

**Loan Servicer (Greystone/Midland)**

| Project - Bond/Loan | | Insurance | | Replacement Reserve | | Taxes | | MIP | | Repair |
|---|---|---|---|---|---|---|---|---|---|---|
| Capital Place, Covington Square, Woods at Oak Crossing (9379) | $ | 111,279.21 | $ | 34,821.32 | $ | (1,110.84) | $ | - | | |
| Fox Club, Lakeside (9250) | $ | 194,738.17 | $ | 41,013.09 | $ | (999.47) | $ | - | | |
| Woodhaven Park (030304122) | $ | 46,702.81 | $ | 298,507.68 | $ | 868.00 | $ | 16,731.69 | $ | 96,796.23 |
| Estates at Crystal Bay (12981) | $ | 117,122.84 | $ | 272,225.77 | $ | - | $ | 30,477.99 | | |
| Totals: | $ | 469,843.03 | $ | 646,567.86 | $ | (1,242.31) | $ | 47,209.68 | $ | 96,796.23 |

| | | |
|---|---|---|
| Total Servicer Escrows (FNMA/Bond Loans) | $ | 379,741.48 |
| Total Servicer Escrows (HUD Loans) | $ | 879,433.01 |
| TOTAL SERVICER ESCROWS: | $ | 1,259,174.49 |

**Bond Trustee (US Bank)**

| Project/Bond | | Credit Facility | | Interest Account | Fees Account | | Principal Reserve | | Loan Fund | | Redemption Fund |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Capital Place, Covington Square, Woods at Oak Crossing | $ | - | $ | - | $ 3,827.62 | $ | 1,646,860.27 | $ | 9.64 | | N/A |
| Fox Club, Lakeside | $ | - | $ | 279.57 | $ 11,511.63 | $ | 116,237.72 | $ | - | $ | - |
| Totals: | $ | - | $ | 279.57 | $ 15,339.25 | $ | 1,763,097.99 | $ | 9.64 | $ | - |

| | | |
|---|---|---|
| Total Bonds Escrows | $ | 1,778,726.45 |
| TOTAL BOND TRUSTEE ESCROWS: | $ | 1,778,726.45 |

| | | |
|---|---|---|
| TOTAL DEBT ESCROWS: | $ | 3,037,900.94 |

## **Security Deposit Escrow (Owner Funded)**

| Bond/Loan | | Secruity Deposit Escrow | Held |
|---|---|---|---|
| Capital Place | $ | 35,080.24 | PNC |
| Covington Square | $ | 15,481.11 | PNC |
| Woods at Oak Crossing | $ | 2,021.48 | PNC |
| Fox Club | $ | 25,250.22 | PNC |
| Lakeside | $ | 2,021.62 | PNC |
| Woodhaven Park | $ | 27,937.69 | JP Morgan Chase |
| Estates at Crystal Bay | $ | 114,099.34 | PNC |
| Total: | $ | **221,891.70** | |
| | | | |
| Total Security Deposits (FNMA/Bond Loans) | $ | 79,854.67 | |
| Total Security Deposits (FNMA/Bond Loans) | $ | 142,037.03 | |
| TOTAL | $ | **221,891.70** | |

## SCHEDULE 4.7

[Indemnity list of brokers from attorney letter, dated 6/1/15]

1.  PF HOLDINGS LLC

2.  STRATEGIC INVESTMENT ADVISORY

3.  DANIEL EPSTEIN

4.  YONAH KUFMAN

5.  ELI POLLACK

6.  AVRAHM ADLER

7.  ARON PUERITZ

8.  LEIB PUERITZ

9.  KASSIN SABBAGH REALTY LLC

## **SCHEDULE 5.4**

[FARH Entity Names]

1. FOUNDATION FOR AFFORDABLE RENTAL HOUSING, INC.

2. FARH-SOUTH AFFORDABLE HOUSING, INC.

3. FARH-WEST AFFORDABLE HOUSING, INC.

4. FARH-FOX LAKE AFFORDABLE HOUSING, INC.